## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CAPITOL LAKES, INC., | § | Case No. 16-10158 |
| | § | |
| Debtor. [1] | § | Hon. Robert D. Martin |

## DECLARATION OF TIM CONROY IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS OF CAPITOL LAKES, INC.

Tim Conroy, being duly sworn, deposes and states as follows:

1.      I am the Executive Director of Capitol Lakes, Inc., the above-captioned debtor and debtor in possession ("Capitol Lakes" or the "Debtor").

2.      I have personal knowledge of, and am familiar with, the business affairs, day-to-day operations, books and records, and financial condition of the Debtor, and I am authorized to submit this Declaration (the "Declaration") on behalf of the Debtor.

3.      On January 20, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Wisconsin.

4.      The Debtor remains in possession of its assets and continues to manage its business as a debtor in possession pursuant to Bankruptcy Code sections 1107 and 1108.

5.      No trustee, examiner or committee has been appointed in this case.

---

[1]  The debtor in this chapter 11 case, along with the last four (4) digits of its taxpayer identification number, is: Capitol Lakes, Inc. (2320).  The mailing address of the debtor, solely for purposes of notices and communications, is: 333 W. Main Street, Madison, Wisconsin 53703.

6.    The Debtor has filed or anticipates filing the following motions and application

(collectively, the "First Day Motions"):

    i.    Motion to Expedite and Limit Notice on First Day Motions (the "Motion to Expedite");

    ii.    Motion of Debtor Pursuant to 11 U.S.C. § 521 and Fed. R. Bankr. P. 1007(c) Requesting an Extension of Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs ("Schedules Extension Motion");

    iii.    Motion of Debtor, Pursuant to 11 U.S.C. §§ 105(a) and 363(b), for an Order Authorizing Payment of Pre-Petition (I) Wages, Salaries and Other Compensation of Employees, (II) Employee Medical and Similar Benefits, (III) Reimbursable Employee Expenses, and (IV) Other Miscellaneous Employee Expenses and Benefits (the "Wage Motion");

    iv.    Motion of Debtor for Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service, (II) Deeming the Utility Providers Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Requests for Additional Adequate Assurance (the "Utilities Motion");

    v.    Motion of Debtor for Entry of an Order (I) Authorizing the Debtor to (A) Maintain Existing Insurance Policies and Pay All Obligations Arising Therefrom, and (B) Renew, Revise, Extend, Supplement, Change, or Enter Into New Insurance Policies; and (II) Granting Certain Related Relief (the "Insurance Motion");

    vi.    Motion of Debtor for an Order Authorizing (I) Continued Use of Existing Cash Management System, (II) Maintenance of Existing Bank Accounts, (III) Continued Use of Existing Business Forms, and (IV) Interim Waiver of 11 U.S.C. § 345(b) Deposit and Investment Requirements (the "Cash Management Motion");

    vii.    Motion of Debtor for Interim and Final Orders (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection to Santander Bank N.A. and KBC Bank N.V. and (III) Scheduling a Final Hearing Thereon (the "Cash Collateral Motion");

    viii.    Motion of Debtor for an Order Authorizing the Debtor to Escrow Certain Entrance Fees and Refund Certain Entrance Fees (the "Escrow Motion"); and

    ix.    Debtor's Application for Appointment of Prime Clerk LLC as Claims, Noticing and Balloting Agent (the "Claims Agent Retention Application").

7.      The Debtor further anticipates filing a proposed Chapter 11 Plan of Reorganization (the "Plan") and associated Disclosure Statement in the next several days.

8.      I am submitting this Declaration in support of the Debtor's chapter 11 petition and First Day Motions.  Capitalized terms used but not defined in this Declaration shall have the meanings ascribed to such terms in the relevant First Day Motion.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my opinion based upon my experience and knowledge of the Debtor's operations and financial condition, and information provided to me by management, advisors, employees or other representatives of the Debtor.  If I was called as a witness, I would testify consistently with the facts set forth in this Declaration.

9.      This Declaration provides an overview of the Debtor and the circumstances leading to the commencement of this chapter 11 case.  Section I provides an overview of the Debtor's operations.  Section II recounts the events preceding the bankruptcy filing.  Section III affirms and incorporates facts that support the First Day Motions.

## PRELIMINARY STATEMENT

10.      Capitol Lakes, a Wisconsin nonstock nonprofit corporation, is a leader in the senior living industry in the State of Wisconsin with a long standing history of providing superior services to its senior residents.  In particular, Capitol Lakes operates a continuing care retirement community ("CCRC") that offers its senior residents a continuum of care throughout the aging process.  Upon entering the CCRC, residents are provided spacious apartment homes and a broad range of social and recreational activities.  When assistance with everyday activities or health care services are needed, the residents have access to assisted living and skilled nursing facilities located on the same campus.  Put simply, the residents of Capitol Lakes have entrusted

their health, safety and well-being to Capitol Lakes for the duration of their lives.

11.     For many seniors, joining a CCRC is an attractive option for them and their families because it minimizes the burdens and costs associated with the aging process.  These seniors will often sell their homes or liquidate significant assets in order to become part of a CCRC, like Capitol Lakes.

12.     CCRCs, however, are often operationally and financially complex.   More specifically, CCRCs can be challenging to operate because they require the maintenance of a broad range of services to seniors in varying stages of the aging process.  Additionally, CCRCs require a steady flow of new residents in order to maintain day-to-day operations and to remain current on financial obligations, including, most importantly, obligations to current and former residents.

13.      As will be described in greater detail below, Capitol Lakes relies on revenue generated by new residents to, among other things, maintain its day-to-day operations, service its debt obligations and comply with its resident refund obligations.  As has become common in the senior living industry, however, the lingering effects of the 2008 financial crisis and housing crash combined with the burden of unsustainable debt levels have threatened Capitol Lakes' ability to generate enough revenue to cover its expenses.  In fact, after reviewing the current and prospective financial and operational aspects of Capitol Lakes' business, including Capitol Lakes' historical performance, assets, current and long-term liabilities and the market for senior care services, management has determined that Capitol Lakes' overly burdensome, long-term debt obligations will jeopardize its financial and operational stability as well as the overall well-being of its residents.

14.     In order to be proactive and responsible, and in an effort to avoid a chapter 11

proceeding, management made several attempts over the last few months to reach a consensual resolution with Capitol Lakes' secured lenders that would bring relief to Capitol Lakes. These attempts, however, were unsuccessful. Consequently, Capitol Lakes was forced to seek chapter 11 protection in order to recapitalize, "re-size" and restructure its debt obligations so that it can ensure its continued operations and ability to honor its resident obligations.

## I.      OVERVIEW OF THE DEBTOR'S BUSINESS

### A.      <u>Description of the Continuing Care Retirement Community and Affiliations</u>

15.      Capitol Lakes owns and operates a CCRC that has been serving seniors in Madison, Wisconsin since 1975. The CCRC was first built by Methodist Retirement Services, Inc., which later became known as Meriter Retirement Services, Inc. ("<u>Meriter Retirement</u>"), a division of Meriter Health Services, Inc. ("<u>Meriter Health</u>").  In November 2007, Pacific Retirement Services, Inc., an Oregon nonprofit corporation ("<u>PRS</u>"), acquired Meriter Health's sole membership interest in Meriter Retirement pursuant to the terms of a Membership Purchase and Sale Agreement between PRS and Meriter Health (the "<u>Purchase Agreement</u>"). Soon thereafter, in May 2008, Meriter Retirement was renamed "Capitol Lakes, Inc."

16.      As a CCRC, Capitol Lakes offers its residents a continuum of care in a campus-style setting, providing living accommodations and related health care and support services to a target market of seniors aged sixty two (62) and older. The CCRC is comprised of the following facilities: (i) an urban high rise containing 105 independent living units (the "<u>Heights</u>"), (ii) an apartment building containing 52 additional independent living units (the "<u>Main Gate</u>"), (iii) an assisted living residential facility containing 43 assisted living units (the "<u>Terraces</u>"), of which 39 are single occupancy and 4 are available for double occupancy, (iv) a skilled nursing facility with 85 active skilled nursing beds licensed by the Wisconsin Department of Health and Family

Services and certified to participate in the Medicare and Medicaid programs (the "Health Center"), all located on a site of approximately 3.814 acres of land owned by Capitol Lakes located in the heart of downtown Madison, Wisconsin (the "Site," and collectively with the Heights, the Main Gate, the Terraces, the Health Center, related improvements and all other improvements, fixtures, equipment and other personal property now or hereafter located on the Site, the "Facilities"). Capitol Lakes also owns and uses Unit 1 of the Main Street Parking Condominium, including the air space encompassed thereby (the "Parking Condominium Unit").

17. At the Facilities, seniors are offered a variety of residency options, including one-, two-, and two bedroom-plus den styles that range in size from 500 square feet to 2,062 square feet. Living units can be customized with a resident's choice of carpet color, paint color and window treatments. Capitol Lakes also offers its residents a full roster of activities, wellness programs, fine dining and trips to downtown Madison and surrounding areas. Residents have access to a main dining room as well as food delivery services, a chapel, lounges, meeting rooms, a library, day excursions, housekeeping services, transportation services and various planned social and recreational activities. As a resident's health needs changes, Capitol Lakes also provides assistance with daily activities, such as bathing, dressing and medication reminders, rehabilitative care, long term nursing care and memory care.

18. The Facilities currently have a 95% occupancy rate, with 305 residents currently living in the Facilities. Among these residents, 25 participate in Capitol Lakes' assisted living program, 11 participate in Capitol Lakes' memory care program and 78 participate in Capitol Lakes' skilled nursing program. Many of the residents, particularly those that participate in the memory care and skilled nursing programs, depend on the physicians, nurses and aides at the various Facilities for their day-to-day care and overall well-being.

19.     Capitol Lakes receives revenue from several sources, which include: (i) entrance fees (each, an "Entrance Fee");[2] (ii) monthly fees; (iii) daily rates; (iv) fees for services; and (v) certain upgrade fees.  Average daily rates range from $183 to $326.  Monthly fees range from $1,314 to $6,504.  Entrance Fees range from $70,500 to $768,500.

20.     As of December 31, 2015, on a book value basis, Capitol Lakes has approximately $57.6 million in assets and $104.2 million in liabilities.  Capitol Lakes' main assets consist of: (i) approximately $6.7 million in cash and cash equivalents; (ii) approximately $2.0 million in accounts receivable; and (iii) approximately $42.2 million in property and equipment.  As described in greater detail below, Capitol Lakes' main liabilities are its long term municipal bond obligations to which U.S. Bank National Association serves a Master Trustee (the "Master Trustee"), letter of credit obligations to KBC Bank N.V. ("KBC") and Santander Bank N.A.[3] ("Santander," and together with KBC and U.S. Bank, the "Secured Lenders"), and interest swap obligations.  As of the Petition Date, approximately $56.2 million was owed to the Secured Lenders.

21.     Capitol Lakes has received a determination letter from the Internal Revenue Service setting forth its determination that Capitol Lakes is exempt from federal income taxation under section 501(a) of the Internal Revenue Code as an organization described in section 501(c)(3) of the Internal Revenue Code.

22.     In addition to operating a CCRC, Capitol Lakes is also a member of Senior Housing of Middleton, Inc. and Middleton Glen, Inc., two Wisconsin nonstock nonprofit

---

[2] As described in greater detail below, an Entrance Fee is a one-time payment due when a resident first moves into the CCRC.  Upon satisfaction of certain conditions, a portion of the Entrance Fee may be refunded to the resident or his/her estate.

[3] Santander Bank N.A. was formerly known as Sovereign Bank, N.A.

corporations (the "<u>Middleton Glen Owners</u>") that own and operate Middleton Glen, a CCRC located in Middleton, Wisconsin that is currently occupied by 124 senior residents ("<u>Middleton Glen</u>").  On December 1, 2009, the Middleton Glen Owners and PRS entered into a Management Services Agreement (the "<u>Middleton Glen Management Agreement</u>"), pursuant to which (i) PRS oversees and manages the general day-to-day operations of Middleton Glen; and (ii) Capitol Lakes provides Middleton Glen with a staff of thirteen (13) employees.  Middleton Glen reimburses Capitol Lakes for the cost of these employees.  As part of the affiliation between Capitol Lakes and Middleton Glen, the residents of Middleton Glen have priority access to the Health Center and the Terraces and can participate in wellness classes sponsored by Capitol Lakes.  Additionally, in the event of a dissolution, the articles of incorporation for each of the Middleton Glen Owners provide that the assets of the respective corporations, after payment of all outstanding liabilities, are to be turned over to Capitol Lakes.

23.     Capitol Lakes is also the sole member of Capitol Lakes Foundation, Inc., a Wisconsin nonstock nonprofit corporation (the "<u>Foundation</u>"), which holds all of Capitol Lakes' donor-restricted funds.  As of the Petition Date, the Foundation held approximately $1.2 million in donor-restricted funds.

**B.     Continuing Care Contracts**

24.     As is common practice in the CCRC industry, a resident interested in occupying an independent living unit in one of the Facilities must first enter into a continuing care contract (a "<u>Continuing Care Contract</u>") with Capitol Lakes.  The Continuing Care Contract sets forth the terms and conditions under which the resident will occupy a unit, including outlining the obligations for the payment of an Entrance Fee, the amount and timing of a refund of that Entrance Fee, the amount of monthly fees to be charged and other general matters.

25.    In general, a prospective resident must pay an Entrance Fee prior to occupying an independent living unit.  Typically, the resident pays a $10,000 fully refundable deposit at the time of signing the Continuing Care Contract and pays the remaining balance of the Entrance Fee once a unit is ready for a resident to occupy.  Entrance Fees range from $70,500 to $768,500, depending on the configuration of the unit selected by a resident.  The Continuing Care Contract also requires residents to pay monthly service fees to Capitol Lakes.  Capitol Lakes uses the revenue generated by the receipt of Entrance Fees and monthly service fees to fund its operations, service its debt obligations and make capital improvements.

26.    In consideration for payment of Entrance Fees, monthly service fees and other fees charged by Capitol Lakes, residents are furnished with a residence and are given access to a number of services, including dining, housekeeping and transportation services.  Additionally, residents have access to an unlimited number of temporary stays at the Health Center and given discounted daily rates at the Health Center when a permanent move is required.

27.    If, after more than ninety (90) days after occupying a unit, (i) a resident terminates the Continuing Care Contract; (ii) a resident dies; or (iii) Capitol Lakes terminates the Continuing Care Contract because of a resident's willful violation of the terms thereof (each a "Termination Event"), then such resident may be entitled to a refund of a portion of their Entrance Fee.

28.    The amount of a refund owed to a resident depends on the type of Continuing Care Contract signed by such resident.  Capitol Lakes currently offers residents the following two (2) types of Continuing Care Contracts:

      i.     90% Refundable Continuing Care Contract:  Upon the occurrence of a Termination Event, the resident is entitled to a refund of ninety percent (90%) of his or her Entrance Fee; and

ii.　　　Traditional Continuing Care Contract: Upon the occurrence of a Termination Event, the resident is entitled to a refund of his or her Entrance Fee less 1/36 of such Entrance Fee for each month the resident has lived at the Facilities.

29.　　Under both types of Continuing Care Contracts, a refund is only due after (i) a resident physically and permanently leaves a unit; and (ii) a new resident has executed a Continuing Care Contract and paid the then-applicable Entrance Fee for that prior resident's same unit.

30.　　Residents who require skilled nursing, rehabilitative or memory care services are typically required to enter into separate agreements with Capitol Lakes that outline the services to be rendered and fees to be charged in connection therewith.

### C.　　Management by PRS

31.　　PRS has been the sole member of Capitol Lakes since 2008.  PRS is a nonprofit corporation under Oregon law, a tax-exempt organization under section 501(c)(3) of the Internal Revenue Code of 1986 (the "Tax Code"), and a "supporting organization" and public charity under section 509(a)(3) of the Tax Code.  As a supporting organization, PRS provides support to various "supported organizations," which are also tax-exempt organizations under section 501(c)(3) of the Tax Code and public charities under section 509(1) or 509(a)(2) of the Tax Code.  Capitol Lakes is just one of thirty-five (35) supported organizations that receive support, management assistance and other services from PRS.

32.　　Pursuant to Article X of the Bylaws of Capitol Lakes, Capitol Lakes is required to contract with PRS, as its sole member, to provide management, accounting, marketing and other services to Capitol Lakes.  Accordingly, PRS and Capitol Lakes entered into that certain Affiliate Management and Support Services Agreement dated as of March 18, 2014 (the "PRS Management Agreement") pursuant to which PRS agreed to provide the following non-

exhaustive list of services to Capitol Lakes: (i) operate the CCRC in compliance with the annual

budget; (ii) provide accounting and information technology services; (iii) provide and maintain a

qualified Executive Director (the "Executive Director") and Health Care Administrator (the

"Health Care Administrator"), at Capitol Lakes' expense; (iv) recruit and hire personnel to

maintain and operate the CCRC; and (v) assist in the collection of revenues.

33.    In exchange for such services, the PRS Management Agreement provides that

Capitol Lakes is to pay PRS a base management fee equal to five percent (5%) of Capitol Lakes'

Net Cash Operating Revenue (the "Base Management Fee").   "Net Cash Revenue Operating

Revenue" is defined in the PRS Management Agreement as all receipts derived from the

operation of the CCRC, including, without limitation, all net Entrance Fees, monthly fees, daily

rates, investment income, rent, payments from third parties for resident fees or rent and interest

income.   In addition to the Base Management Fee, PRS is entitled to payment of: (i) an

information technology fee calculated based upon Capitol Lakes' rate of usage of PRS'

information technology (the "Information Technology Fees"); and (ii) an accounting service fee

calculated based upon Capitol Lakes' usage of PRS' accounting systems and services (the

"Accounting Service Fees").

34.    Except for the Executive Director and Health Care Administrator, all personnel

permanently employed in the operation of Capitol Lakes are employees of Capitol Lakes.   The

Executive Director and Health Care Administrator of Capitol Lakes are employed by Pacific

Retirement Services Management, Inc. ("PRSMI"), a wholly owned subsidiary of PRS, and

Capitol Lakes reimburses PRSMI for all compensation paid, including, but not limited to,

salaries, fringe benefits, retirement plan funding, payroll taxes, and unemployment and worker's

compensation insurance, to the Executive Director and Health Care Administrator.

35.     On the same day they executed the PRS Management Agreement, Capitol Lakes and PRS also entered into the First Amendment to Affiliate and Support Services Agreement, pursuant to which PRS agreed to (i) reduce the Base Management Fee by thirty percent (30%); (ii) defer fifty percent (50%) of the Base Management Fee; and (iii) defer all reimbursement of costs that become due and payable under the PRS Management Agreement, other than the Information Technology Fees and Accounting Fees (collectively, the "Deferred Fees") until the 2002 Letter of Credit, 2008A Letter of Credit, 2008B Letter of Credit and 2008C Letter of Credit (all as defined below) are terminated and while any Event of Default as defined in the KBC Reimbursement Agreement or the Santander Reimbursement Agreement (as defined below) has occurred and is continuing.  As of the Petition Date, the Deferred Fees total approximately $3,153,607.

36.     I am a licensed Nursing Home Administrator in Wisconsin and Oregon, and I am currently the Executive Director of Capitol Lakes.  I joined Capitol Lakes in 2009 as the Health Care Administrator and advanced to the position of Executive Director to oversee the entire operations of Capitol Lakes.  Kristi Vater is currently the Health Care Administrator at Capitol Lakes.

### D.     Regulatory Agencies

37.     The CCRC industry nationwide is heavily regulated by various state and federal agencies.  Each state has a different regulatory scheme governing CCRCs, particularly with respect to disclosure of financial statements, solvency of the facility, maintenance of a certain amount of reserves and the refunding of fees and deposits.

38.     As a CCRC operating in the State of Wisconsin, Capitol Lakes is regulated by the Wisconsin Office of the Commissioner of Insurance ("COI"), the Wisconsin Department of

Health Services, the Wisconsin Department of Financial Institutions and the United States Department of Health and Human Services' Centers for Medicare & Medicaid Services.

39.    In particular, Capitol Lakes must comply with the provisions of Chapter 647 of the Wisconsin Statutes which proscribe, among other things, (i) the powers and duties of the COI with respect to CCRCs; (ii) the duties of CCRC operators; and (iii) provisions to be included in Continuing Care Contracts.

### E.    The Debtor's Prepetition Capital Structure

40.    As of the Petition Date, Capitol Lakes owes a total of approximately $56.2 million consisting of municipal bond debt, letter of credit obligations and interest swap obligations (collectively, the "Debt Obligations").  Each month, Capitol Lakes makes a total payment of approximately $412,000 on account of its Debt Obligations.  Capitol Lakes has made each and every debt service obligation payment up to and including the January 2016 payment. The major components of Capitol Lakes' prepetition debt structure and debt service obligations are described in detail below.

### i.    Municipal Bond Debt

41.    Before PRS purchased Meriter Health's sole membership interest in Meriter Retirement pursuant to the Purchase Agreement in November 2007, Meriter Retirement had financed a portion of the costs of the Facilities with the proceeds of the following bond issuances: (i) $3,000,000 original principal amount Community Development Authority of the City of Madison, Wisconsin, Redevelopment Revenue Bonds, Series 1995 (Meriter Retirement Services, Inc. Project) (the "1995 Bonds"); (ii) $2,000,000 original principal amount Wisconsin Health and Educational Facilities Authority Revenue Bonds, Series 1999 (Meriter Retirement Services, Inc. Project) (the "1999 Bonds"); and (iii) $8,000,000 original principal amount Wisconsin Health and Educational Facilities Authority WHA Capital Access Designated Pool

Program Variable Rate Demand Revenue Bonds, Series 2002A (Meriter Retirement Services, Inc.) (the "2002 Bonds").

42.     The 2002 Bonds are issued and outstanding under a Loan and Trust Agreement dated as of April 1, 2002 (as amended and supplemented from time to time, the "2002 Loan and Trust Agreement") among the Wisconsin Health and Educational Facilities Authority (the "Issuer"), Meriter Retirement and U.S. Bank National Association, as Trustee (the "2002 Trustee"), pursuant to which Meriter Retirement is obligated to, among other things, make loan payments corresponding to the required payments of principal and interest on the 2002 Bonds. Meriter Retirement's obligations to make such loan payments is evidenced and secured by its Promissory Note, Series 2002-A in the original principal amount of $8,000,000 (the "2002 Bond Master Note").  As described in greater detail below, in March of 2008, KBC issued the 2002 Letter of Credit (defined below) in connection with the 2002 Bonds.

43.     In November 2007, pursuant to the Purchase Agreement, Meriter Health agreed to sell (i) its sole membership interest in Meriter Retirement, together with certain related assets, to PRS, and (ii) the Parking Condominium Unit and certain related assets to Meriter Retirement.

44.     In order to finance (i) the acquisition by PRS of Meriter Health's sole membership interest in Meriter Retirement and certain related assets pursuant to the Purchase Agreement, (ii) the acquisition by Meriter Retirement of the Parking Condominium Unit and certain other assets relating to Meriter Retirement and the Facilities pursuant to the Purchase Agreement, (iii) certain renovations to the Heights, the Terraces and the Health Center, (iv) refunding of the 1995 Bonds and the 1999 Bonds, (v) the purchase of the Parking Condominium Unit, and (vi) the funding of capitalized financing charges, a debt service reserve fund and

closing costs in conjunction with the foregoing, Meriter Retirement obtained financing from the Issuer as described below (the "Bond Financing"):

i.        Meriter Retirement entered into a Bond Trust Indenture dated as of March 1, 2008 (as the same may be amended or supplemented from time to time, the "2008A Indenture") with U.S. Bank National Association, as Trustee (the "2008A Trustee"), pursuant to which the Issuer issued its Variable Rate Demand Revenue Bonds, Series 2008A (Meriter Retirement Services, Inc.) in the original aggregate principal amount of $15,210,000 (the "2008A Bonds") and loaned the proceeds thereof to Meriter Retirement pursuant to a Loan Agreement dated as of March 1, 2008 (as the same may be amended and supplemented from time to time, the "2008A Loan Agreement"), under which Meriter Retirement agreed to make loan payments corresponding to the required payments of principal and interest on the 2008A Bonds.   In order to evidence and secure the 2008A Loan Agreement, Meriter Retirement executed and delivered to the Issuer, and the Issuer assigned to the 2008A Trustee, a Promissory Note, Series 2008-A in the principal amount of $15,210,000 (the "2008A Master Bond Note").

ii.        Meriter Retirement entered into a Bond Trust Indenture dated as of March 1, 2008 (as the same may be amended or supplemented from time to time, the "2008B Indenture") with U.S. Bank National Association, as Trustee (the "2008B Trustee"), pursuant to which the Issuer issued its Variable Rate Demand Revenue Bonds, Series 2008B (Meriter Retirement Services, Inc.) in the original aggregate principal amount of $29,380,000 (the "2008B Bonds") and loaned the proceeds thereof to Meriter Retirement pursuant to a Loan Agreement dated as of March 1, 2008 (as the same may be amended and supplemented from time to time, the "2008B Loan Agreement"), under which Meriter Retirement agreed to make loan payments corresponding to the required payments of principal and interest on the 2008B Bonds.   In order

to evidence and secure the 2008B Loan Agreement, Meriter Retirement executed and delivered

to the Issuer, and the Issuer assigned to the 2008B Trustee, a Promissory Note, Series 2008-B in

the principal amount of $29,380,000 (the "2008B Master Bond Note.")

        iii.        Meriter Retirement entered into a Bond Trust Indenture dated as of March

1, 2008 (as the same may be amended or supplemented from time to time, the "2008C

Indenture") with U.S. Bank National Association, as Trustee (the "2008C Trustee"), pursuant to

which the Issuer issued its Taxable Variable Rate Demand Revenue Bonds, Series 2008C

(Meriter Retirement Services, Inc.) in the original aggregate principal amount of $6,985,000 (the

"2008C Bonds") and loaned the proceeds thereof to Meriter Retirement pursuant to a Loan

Agreement dated as of March 1, 2008 (as the same may be amended and supplemented from

time to time, the "2008C Loan Agreement"), under which Meriter Retirement agreed to make

loan payments corresponding to the required payments of principal and interest on the 2008C

Bonds.   In order to evidence and secure the 2008C Loan Agreement, Meriter Retirement

executed and delivered to the Issuer, and the Issuer assigned to the 2008C Trustee, a Promissory

Note, Series 2008-C in the principal amount of $6,985,000 (the "2008C Master Bond Note").

        45.        Simultaneously with the issuance of the 2008A Bonds, 2008B Bonds and

2008C Bonds (collectively the "2008 Bonds"), Meriter Retirement defeased the 1995 Bonds

resulting in a discharge of the promissory note related thereto and redeemed the 1999 Bonds

resulting in the discharge of the note related thereto.

        46.        In connection with the foregoing, Meriter Retirement is also party to (i) the

Amended and Restated Master Trust Indenture dated as of March 1, 2008 with U.S. Bank

National Association, as Master Trustee (as the same may be amended and supplemented from

time to time, the "Master Indenture"), (ii) the Mortgage, Assignment of Leases and Security

Agreement dated of March 1, 2008 ("<u>Mortgage</u>") and (iii) the Investment Security Agreement. In order to secure its payment and performance under the Bond Financing and letters of credit described below, Meriter Retirement pledged a security interest in certain assets, including, but not limited to: (i) any and all Gross Revenues (as defined in the Master Indenture); (ii) any and all general deposit accounts; (iii) the Facilities; (iv) all revenues, rent, issues, profits and other benefits derived from the Facilities; (v) and Securities, Investment Property, Financial Assets and other property from time to time contained in or credited to the Securities Account (as such terms are defined in the Investment Security Agreement).

**ii.**    <u>**Letters of Credit**</u>

47.    In order to provide credit and liquidity support for the 2008A Bonds, Meriter Retirement and KBC entered into a Reimbursement, Credit and Security Agreement dated as of March 1, 2008 (as the same may be amended from time to time, the "<u>KBC Reimbursement Agreement</u>"), pursuant to which KBC issued its Irrevocable Letter of Credit (including any amendments thereto, the "<u>2008A Letter of Credit</u>") to the 2008A Trustee for the benefit of Meriter Retirement that authorized the 2008A Trustee to make one or more draws on KBC up to an aggregate of $15,480,030, of which $15,210,000 is in respect of principal and $270,030 is in respect of interest on the 2008A Bonds.    As of the Petition Date, the 2008A Trustee has not drawn on the 2008A Letter of Credit.

48.    In order to provide credit and liquidity support for the 2008B Bonds, Meriter Retirement and Santander entered into a Reimbursement, Credit and Security Agreement dated as of March 1, 2008 (as the same may be amended from time to time, the "<u>Santander Reimbursement Agreement</u>"), pursuant to which Santander issued its Irrevocable Letter of Credit (including any amendments thereto, the "<u>2008B Letter of Credit</u>") to the 2008B Trustee for the benefit of Meriter Retirement that authorized the 2008B Trustee to make one or more draws on

Santander up to an aggregate of $29,901,596, of which $29,380,000 is in respect of principal and $521,596 is in respect of interest on the 2008B Bonds.  As of the Petition Date, the 2008B Trustee has not drawn on the 2008B Letter of Credit.

49.     In order to provide credit and liquidity support for the 2008C Bonds, KBC issued its Irrevocable Letter of Credit (including any amendments thereto, the "2008C Letter of Credit") to the 2008C Trustee for the benefit of Meriter Retirement that authorized the 2008C Trustee to make one or more draws on KBC up to an aggregate of $7,140,010, of which $6,985,000 is in respect of principal and $155,010 is in respect of interest on the 2008C Bonds. As of the Petition Date, the 2008C Trustee has not drawn on the 2008C Letter of Credit.

50.     Finally, in connection with the 2002 Bonds, KBC issued a substitute credit facility to the 2002 Trustee (the "2002 Letter of Credit") for the benefit of Meriter Retirement that authorized the 2002 Trustee to make one or more draws on KBC up to an aggregate of $7,277,126, of which $7,185,000 was in respect of principal and $92,126 in respect of interest on the 2002 Bond.  The 2002 Letter of Credit replaced a prior credit facility held by the 2002 Trustee under the 2002 Loan and Trust Agreement.

51.     In order to secure its obligations under the KBC Reimbursement Agreement, Meriter Retirement issued to KBC a Promissory Note, Series 2008-D in the stated principal amount of $29,897,166 (the "KBC Reimbursement Note").  Additionally, in order to secure its obligations under the Santander Reimbursement Agreement, Meriter Retirement issued to Santander a Promissory Note, Series 2008-E in the stated principal amount of $29,901,596 (the "Santander Reimbursement Note").

52.     The 2002 Master Bond Note, the 2008A Master Bond Note, the 2008B Master Bond Note, the 2008C Master Bond Note, the KBC Master Reimbursement Note, the Santander

Reimbursement Master Note and all other promissory notes issued under the Master Indenture are secured equally and ratably under the Master Indenture and Mortgage.

53.     Pursuant to that certain Intercreditor Agreement between KBC and Santander dated March 1, 2008 (the "Intercreditor Agreement"), the Secured Lenders appointed KBC as administrative agent to perform a number of tasks, including but not limited to, administering the Secured Lenders' rights under the KBC Reimbursement Agreement and Santander Reimbursement Agreement.  The Intercreditor Agreement further requires that each of the Secured Lenders not assert or seek to exercise any remedy or other right of legal redress against Meriter Retirement unless the other Secured Lender consents to such action.

### iii.     Interest Swap Agreements

54.     In addition to the foregoing, Capitol Lakes is also obligated under two (2) International Swaps and Derivatives Association, Inc. ("ISDA") Master Agreements with KBC, one with a $6,985,000 notional amount (the "$6.9 Million Swap Agreement") and the other with a $47,284,375 notional amount (the "$47 Million Swap Agreement" and, together with $6.9 Million Swap Agreement, the "Swap Agreements").   Pursuant to the $6.9 Million Swap Agreement, Capitol Lakes is required to make a 4.365% fixed interest rate payment on the third business day of each month to KBC in exchange for a floating rate interest payment from KBC for a term of twelve (12) years commencing on April 1, 2008 and ending on March 1, 2020. Additionally, pursuant to the $47 Million Swap Agreement, Capitol Lakes is required to make a 3.005% fixed interest rate payment on the third business day of each month to KBC in exchange for a floating rate interest payment from KBC for a term of twelve (12) years commencing on April 1, 2008 and ending on March 1, 2020.

55.    The purpose of the Swap Agreements was to hedge the variability of the interest rates on the 2008 Bonds and 2002 Bonds.  The consequences of filing for chapter 11 protection include termination of the Swap Agreements.  If the Swap Agreements have a negative value at the time of a termination event, Capitol Lakes is obligated to make a termination payment to KBC in the amount of that negative value.  This payment would be substantial and would adversely affect the financial condition of Capitol Lakes.

## II.    EVENTS LEADING TO BANKRUPTCY

56.    As detailed above, Capitol Lakes is saddled with a significant amount of debt. Additionally, over the last several years, Capitol Lakes has faced a number of covenant violations under its various debt agreements. While Capitol Lakes has yet to face a payment default, it strongly believes, after a careful assessment of its current and prospective  operational needs, that it will not have sufficient liquidity to operate the CCRC, service its debt obligations and satisfy its refund obligations and may, consequently, default on its debt obligations.

57.    Capitol Lakes is particularly concerned about its ability to honor approximately $3.0 million in resident refund obligations to a select group of residents currently residing in Capitol Lakes' skilled nursing facility (the "SNF Residents").   When they first started living at Capitol Lakes, the SNF Residents paid substantial Entrance Fees and resided in independent living units.  Over time, the health of the SNF Residents deteriorated and they moved out of their independent living units and into the Health Center where they currently reside.  Pursuant to the terms of the SNF Residents' Continuing Care Contracts, Capitol Lakes was permitted to relet the SNF Residents' independent living units to new residents.  In connection with the reletting of these units, Capitol Lakes received an Entrance Fee from each of the new residents.  As with all other Entrance Fees, Capitol Lakes used the funds to pay for its day-to-day operations and debt service obligations.   At the time of reletting the units, Capitol Lakes did not have a refund

obligation to the SNF Residents because they were living at the Health Center. However, based upon actuarial assumptions, Capitol Lakes believes that it will need to satisfy its refund obligations to the SNF Residents this year.

58.    Typically, a refund obligation does not stress Capitol Lakes' cash flow. Capitol Lakes normally receives a new Entrance Fee before it is required to make a refund. With respect to the SNF Residents, however, Capitol Lakes will not have recently received a new Entrance Fee from which it can make a refund. Instead, Capitol Lakes received an Entrance Fee when the SNF Resident moved into the Health Center and used it toward operational expenses in prior years. Consequently, Capitol Lakes will need to refund the SNF Residents from the limited operational funds that are also needed to satisfy its debt obligations.

59.    In order to mitigate the financial stress caused by the SNF Residents and to free up funds for other things, such as capital improvements, Capitol Lakes needs to restructure its debt obligations.

60.    As discussed above, Capitol Lakes engaged in extensive negotiations with its Secured Lenders in an effort to restructure its unsustainable debt load with the best interests of its residents in mind. Towards that end, Capitol Lakes retained Cain Brothers & Company, LLC ("Cain Brothers") to provide restructuring and other investment advisory services and DLA Piper LLP (US) to provide legal advice in connection with a potential restructuring. Capitol Lakes' efforts, however, have been unsuccessful and it has been left with no other choice but to seek chapter 11 protection.

## III.    FACTS IN SUPPORT OF FIRST DAY MOTIONS

61.    Contemporaneously with the filing of its chapter 11 petition, Capitol Lakes has filed the First Day Motions. Capitol Lakes requests that each of the First Day Motions described below

be granted, as they constitute a critical element in ensuring Capitol Lakes' successful reorganization in this chapter 11 case.

62.     Additionally, Capitol Lakes intends to file the Plan in the next several days in an effort to expedite this chapter 11 proceeding for the benefit of Capitol Lakes' residents.  The Plan provides for the reduction of Capitol Lakes' outstanding debt obligations to its Secured Lenders to the total value of their collateral and further provides for payment of these restructured debt obligations over a period of thirty (30) years, subject to market terms and a market rate of interest, pursuant to Bankruptcy Code section 1129(b)(2).  In connection with its proposed Plan, Capitol Lakes also seeks to have this Court schedule a valuation hearing to determine the value of the Secured Lenders' collateral.

## A.    **Motion to Expedite**

63.     By the Motion to Expedite, Capitol Lakes requests that this Court enter an order expediting the hearing on all of the First Day Motions and allowing Capitol Lakes to limit notice on the First Day Motions.

64.     As described in greater detail below, the relief requested in the First Day Motions must be granted in the very short term for Capitol Lakes to continue to operate its business and manage its assets post-petition.  Capitol Lakes, therefore, requests that the Court address the First Day Motions at a hearing to be held as soon as possible.

65.     Capitol Lakes also requests that it be allowed to limit notice to the following parties: (a) the Office of the United States Trustee for the Western District of Wisconsin; (b) the Office of the Attorney General of the State of Wisconsin; (c) the Wisconsin Office of the Commissioner of Insurance; (d) each of the Debtor's twenty (20) largest unsecured creditors; (e) U.S. Bank, N.A. as trustee; (f) counsel to Santander Bank, N.A.; (g) counsel to KBC Bank N.V.;

(h) all other parties identified in the notice section of each of the First Day Motions (namely, the Utility Providers and the Insurance Providers); (i) the Department of Housing and Urban Development; and (j) the Internal Revenue Service and state taxing authorities.

66.    Capitol Lakes submits that attempting to locate and give notice to all of its creditors would be unreasonably difficult and expensive.   Therefore, I believe the relief sought in the Motion to Expedite should be granted.

**B.    Schedules Extension Motion**

67.    By the Schedules Extension Motion, Capitol Lakes requests that the Court enter an order extending the time by which Capitol Lakes must file its Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases and Statement of Financial Affairs (the "Schedules and SOFA") through and including February 10, 2016.

68.    Given the substantial burdens already imposed on Capitol Lakes' management by the commencement of this chapter 11 case, the prepetition negotiations with the Secured Lenders and preparation of the proposed Plan, Capitol Lakes' management requires additional time to complete the Schedules and SOFA as required under the Bankruptcy Code.  I do not believe that the fourteen (14) day automatic extension will provide Capitol Lakes with sufficient time to permit completion of the Schedules and SOFAs.

69.    In light of the fact that Capitol Lakes has already commenced preparation of its Schedules and SOFAs, I believe that the additional extension through February 10, 2016 will provide sufficient time to prepare and file the Schedules and SOFAs.

**C.    Wage Motion**

70.    By the Wage Motion, Capitol Lakes is requesting entry of an order: (a) authorizing Capitol Lakes to pay certain pre-petition (i) wages, salaries and other compensation, (ii) employee medical and similar benefits, (iii) reimbursable employee expenses; and (iv) other

miscellaneous employee expenses and benefits.

71.    Capitol Lakes provides the following wages and benefits to its employees:

    i)    Wages, salaries, bonuses and other compensation;

    ii)    Employee benefits, including, but not limited to:

        a.  Medical, dental and vision insurance;

        b.  401(k) plan; and

        c.  Life and long-term disability insurance;

    iii)    Workers' compensation insurance and related obligations;

    iv)    Paid vacation and sick time; and

    v)    Miscellaneous employee- related obligations.

72.    Capitol Lakes has approximately 292 employees in the aggregate - 64 employees are paid full-time hourly, 195 employees are paid part-time hourly and 33 are full-time salaried employees (collectively, the "Employees").  The approximate monthly cost for wages, salaries, and benefits for Capitol Lakes is $790,000.  Capitol Lakes estimates that in total, approximately $250,000 in unpaid salary, wages and other compensation is due to its Employees (including the Executive Director and Health Care Administrator) as of the Petition Date.

73.    I believe that any delay in paying prepetition employee obligations will adversely impact Capitol Lakes' relationship with its Employees and will irreparably impair the Employees' morale, dedication, confidence and cooperation in the chapter 11 process.  At this early stage in the case, Capitol Lakes simply cannot risk the substantial damage to its business that would inevitably result from a decline in the Employees' morale and cooperation attributable to Capitol Lakes' failure to pay wages, salary, benefits and other similar items.  Furthermore, Capitol Lakes relies on the Employees to provide necessary services to its residents.  Loss of Employees would endanger the health, safety and welfare of Capitol Lakes' residents.

74.    In addition, I believe that all unpaid, pre-petition compensation is entitled to priority treatment in accordance with Bankruptcy Code sections 507(a)(4) in light of the fact that none of Capitol Lakes' employees are owed more than $12,475.

75.    For these reasons, and for the reasons and legal arguments set forth in the Wage Motion, I believe the relief sought in the Wage Motion should be granted.

**D.      Utilities Motion**

76.    By the Utilities Motion, Capitol Lakes is requesting interim and final orders to (i) prohibit utility providers from altering, refusing, or discontinuing service to Capitol Lakes; (ii) deeming the utility providers adequately assured of future performance; and (iii) establishing procedures for determining requests to Capitol Lakes for additional adequate assurance.

77.    In the ordinary course of business, Capitol Lakes obtains gas, water, sewer, electric, telephone and other similar utility services from approximately nine (9) utility providers (the "Utility Providers").  A list of the Utility Providers is attached to the Utilities Motion as Exhibit A. On average, Capitol Lakes spends approximately $78,300 each month for utility services.

78.    At all relevant times, Capitol Lakes has attempted to remain current with regard to its utility bills.  Furthermore, to the best of my knowledge, Capitol Lakes is current on all amounts owing to the Utility Providers, other than payment interruptions that may be caused by the commencement of this chapter 11 case.

79.    I believe that uninterrupted utility services are essential to the ongoing operations of Capitol Lakes, and therefore, to the successful resolution of this case.  Any interruption of utility services, even for a brief period of time, would put the health, safety and welfare of the residents at risk.  It is, therefore, critical that utility services continue uninterrupted during this chapter 11 case.

80.    Capitol Lakes proposes to provide "assurance of payment" to the Utility Providers within twenty (20) days after the Petition Date by placing a cash deposit equal to one-half of one

month's worth of payments to Utility Providers ($39,150) into a newly created, segregated account (the "Utility Deposit Account") to be held for the exclusive purpose of paying the Utility Providers. Capitol Lakes submits that the establishment of the Utility Deposit Account, in conjunction with Capitol Lakes' ability to pay for future utility services in the ordinary course of business, constitutes adequate assurance of payment to the Utility Providers.

81.     Capitol Lakes is also concurrently seeking access to Cash Collateral (as defined below), which means that it will have the liquidity sufficient to keep current on its utility obligations.

82.     Further, Capitol Lakes proposes to protect the Utility Providers by establishing the procedures provided in the Utilities Motion, whereby any Utility Provider can request additional adequate assurance in the event that it believes there are facts and circumstances with respect to its providing postpetition services to Capitol Lakes that would merit greater protection.

83.     Therefore, I believe that the Utility Providers have adequate assurance of future performance, and the relief sought in the Utility Motion should be granted.

**E.     Insurance Motion**

84.     By the Insurance Motion, Capitol Lakes seeks authorization to (a) maintain existing insurance policies and pay all obligations arising therefrom, including reimbursements to PRS (collectively, the "Insurance Obligations") and (b) renew, revise, extend, supplement, change, or enter into new insurance policies as needed in its business judgment. Capitol Lakes further requests that financial institutions be directed to receive, process, honor and pay all checks presented for payment and electronic payment requests related to the Insurance Obligations, whether such checks were presented or electronic requests submitted prior to or after the Petition Date.

85.     In particular, Capitol Lakes maintains several insurance policies and surety contracts that are administered by several insurance carriers and collectively provide coverage for, among other things (a) director and officer liability, (b) automobile liability, (c) property, and (d) general and professional liability (collectively, the "Insurance Policies").

86.     In order to protect and safeguard Capitol Lakes' ongoing operations and ensure compliance with the United States Trustee Guidelines, it is critical that Capitol Lakes be allowed to pay its Insurance Obligations on an ongoing and uninterrupted basis and renew, revise, extend, supplement, or change its existing Insurance Policies and enter into new insurance policies as needed in Capitol Lakes' business judgment.  Capitol Lakes' failure to pay amounts related to the Insurance Obligations as and when they come due could result in attempts by Capitol Lakes' insurance companies to terminate or decline to renew the Insurance Policies, or decline to enter into new insurance policies with Capitol Lakes in the future.  If any of the Insurance Policies are terminated, Capitol Lakes could be exposed to substantial liability, to the detriment of all interested parties.  Therefore, I believe that the relief requested in the Insurance Motion is in the best interest of Capitol Lakes, its estate, creditors and other parties in interest.

## F.     Cash Management Motion

87.     By the Cash Management Motion, Capitol Lakes seeks entry of an order granting the following relief:

(a)     Authorizing Capitol Lakes to continue to use the Cash Management System (defined below), subject to any modification or other relief granted by order of this Court relating thereto, including the following:

   i)     the continued use of the existing Bank Accounts (defined below) with the same names and account numbers as such Bank Accounts existed immediately prior to the Petition Date (with the option of streamlining their Cash Management System by closing or consolidating Bank Accounts);

    ii)      the ability of Capitol Lakes to deposit funds into and withdraw funds from any of the Bank Accounts (subject to available funds or, in the case of zero balance accounts, subject to the availability of funds in the applicable linked funding accounts) by all usual means, including but not limited to checks, wire transfers, electronic funds transfers and other debits;

    iii)     the ability of Capitol Lakes to otherwise treat the Bank Accounts, along with any accounts opened postpetition, for all purposes as debtor in possession accounts;

    iv)     the waiver of any requirements to establish separate accounts for cash collateral and/or tax payments;

    v)      authorizing and directing the Banks (as defined below) to maintain, service and administer the Bank Accounts, without interruption and in the ordinary course of business, in accordance with applicable non-bankruptcy law and the account agreements and/or other service documentation between the applicable Bank and Capitol Lakes relating to such accounts; and

    vi)     authorizing the Banks to charge and collect, and authorizing but not directing Capitol Lakes to pay, the prepetition and postpetition service charges and other fees and expenses to which the Banks are entitled under the terms of their account agreements and/or other service documentation with Capitol Lakes;

(b)    Authorizing Capitol Lakes to continue to use its existing business forms without alteration or change, provided however, that, once Capitol Lakes has depleted its existing stock of checks, Capitol Lakes shall order new checks with the "debtor in possession" designation; and

(c)    An interim waiver of the deposit and investment requirements of section 345(b) of the Bankruptcy Code to the extent they apply to Capitol Lakes' Bank Accounts.

88.    I believe that by using the existing Bank Accounts and investment practices, Capitol Lakes will avoid unnecessary expense and delay, which will disrupt the ordinary financial affairs and business operations of Capitol Lakes, delay the administration of Capitol Lakes' estate and increase the costs to the estate.

89.    Prior to the Petition Date and in the ordinary course of business, Capitol Lakes maintained its own cash management system through which funds were collected into an operating account and disbursed to various other accounts to pay operating expenses, with excess

funds being deposited into a savings account or invested (the "<u>Cash Management System</u>").   A chart depicting the Cash Management System is attached to the Cash Management Motion as <u>Exhibit A</u>.

90.      The Cash Management System employs a series of financial accounts, including a centralized operating account which receives cash from various sources.  The cash maintained in the operating account is used to fund Capitol Lakes' day-to-day operations, including payroll, payments to vendors and other accounts payable.

91.      As of the Petition Date, Capitol Lakes' Cash Management System utilized a total of 36 bank and investment accounts (collectively, the "<u>Bank Accounts</u>") with U.S. Bank National Association and UBS Financial Services Inc. (together, the "<u>Banks</u>").

92.      The Cash Management Motion sets forth for each of the Bank Accounts the name of the institution at which the account is maintained, the account number (last four digits only) and a description of the purpose of the account.  Capitol Lakes manages its cash receipts, transfers and disbursements through one or more of the Bank Accounts.  In doing so, Capitol Lakes routinely deposits, withdraws and otherwise transfers funds to, from and between the Bank Accounts by various methods including check, wire transfer, automated clearing house transfer and electronic funds transfer.  On a daily basis, Capitol Lakes processes large numbers of transactions through the Cash Management System.  Capitol Lakes maintains current and accurate records of all transactions processed through the Cash Management System.

93.      Capitol Lakes' Cash Management System is similar to those commonly employed by corporate enterprises of comparable size and complexity.  Among other benefits, the Cash Management System permits Capitol Lakes to accurately monitor cash availability at all times.  The Cash Management System also permits Capitol Lakes to centrally manage and

track the collection and transfer of funds which reduces administrative burdens and expenses and maximizes interest income.

94.     In addition to the Cash Management System and Bank Accounts, Capitol Lakes uses in the ordinary course of its business numerous business forms (including but not limited to checks, deposit slips, letterhead, contracts, purchase orders and invoices).  Capitol Lakes has a supply of these forms on hand.  It would be expensive, wasteful and disruptive to Capitol Lakes' business to destroy all of these forms and order new ones.

95.     Contemporaneously with the filing of the Cash Management Motion, Capitol Lakes has filed other motions seeking authority to pay certain prepetition obligations, including obligations to employees and other entities.   With respect to certain of these prepetition obligations, Capitol Lakes already has issued, in the ordinary course of business, checks and other debits that have yet to clear the banking system.   In other instances, Capitol Lakes will issue checks or other debits postpetition on account of the prepetition obligations once the Court has entered an appropriate order permitting Capitol Lakes to do so.  Capitol Lakes intends to inform the Banks which prepetition checks and other debits should be honored or dishonored pursuant to orders of the Court authorizing such payments.

96.     I believe that the relief requested in the Cash Management Motion will help to ensure Capitol Lakes' orderly entry into and administration in chapter 11 and avoid many of the possible disruptions and distractions that could divert Capitol Lakes' attention from more pressing matters during the initial days of this chapter 11 case.

97.     Given the size and complexity of Capitol Lakes' business operations, any disruption of its accounting and cash management procedures would be enormously burdensome and disruptive, and could adversely impact Capitol Lakes' efforts to reorganize.  At this critical

juncture, Capitol Lakes must be able to conduct "business as usual" to the extent possible. To this end, it is essential that Capitol Lakes be permitted to continue to use its existing Cash Management System and Bank Accounts.

98.    Historically, all excess funds of Capitol Lakes have been maintained in interest-bearing domestic accounts insured by the United States (through the FDIC) or invested in accordance with an Investment Policy Statement.  Although Capitol Lakes' investment practices may not strictly comply in all respects with the guidelines identified in section 345 of the Bankruptcy Code, Capitol Lakes' investments are nevertheless safe, prudent and designed to yield maximum reasonable return on the funds invested, taking into account the safety of such deposits and investments.  Accordingly, Capitol Lakes requests authority to maintain its existing investment practices and an interim waiver of the requirements of section 345 of the Bankruptcy Code.

99.    Capitol Lakes has a complex cash management system that provides it with the ability to transfer funds rapidly to ensure its safety and to maximize its investment value. Capitol Lakes and its estate will receive significant benefits from the continued investment of excess funds.  In light of these factors, I believe that Capitol Lakes should be permitted to maintain its investment practices.

### G.    Cash Collateral Motion

100.    By the Cash Collateral Motion, Capitol Lakes seeks entry of interim and final orders (i) authorizing Capitol Lakes to use the cash collateral of its Secured Lenders, (ii) approving the form of adequate protection, and (iii) scheduling a final hearing.

101.    In the ordinary course of business, Capitol Lakes requires cash on hand and cash flow from its operations to pay operating expenses and other routine payables.  In addition, Capitol Lakes requires cash on hand to fund this chapter 11 case and to successfully reorganize.

The cash and cash proceeds of Capitol Lakes is encumbered by security interests in favor of the Secured Lenders, and, as such, constitutes "cash collateral" of such Secured Lenders (as such term is defined in Bankruptcy Code section 363(a), "Cash Collateral").

102.    Capitol Lakes has an emergency need for the immediate use of Cash Collateral to, among other things, maintain ongoing day-to-day operations and fund its working capital needs. Without access to such Cash Collateral, Capitol Lakes may be forced to cease operations. Such an abrupt cessation of its business would have devastating effects on the health and safety of the residents of Capitol Lakes and would cause the residents to suffer immediate and irreparable harm. The residents of Capitol Lakes are elderly and have, in many cases, invested a large portion of their total assets to live in a CCRC and may rely on the Health Center for life-sustaining medical treatment. Simply put, if Capitol Lakes were to cease operations, the well-being of the residents would be jeopardized.

103.    Capitol Lakes has submitted with the Cash Collateral Motion a proposed interim order granting the relief requested (the "Interim Cash Collateral Order"). Attached to the Interim Cash Collateral Order is a detailed operating budget (the "Budget").

104.    I believe that the relief requested in the Cash Collateral Motion is in the best interests of Capitol Lakes, its estate and its creditors, and absent such relief, Capitol Lakes will experience immediate and irreparable harm and its reorganization efforts will be jeopardized.

**H.      Escrow Motion**

105.    By the Escrow Motion, Capitol Lakes seeks authority to escrow all Entrance Fees collected postpetition in order to provide assurance to new residents that Capitol Lakes' chapter 11 case will not affect prospective residents' rights to a refund. Capitol Lakes proposes to escrow the Entrance Fees pending confirmation of the Plan or as otherwise directed by this

Court.

106.    A prospective resident's willingness to pay an Entrance Fee is necessarily dependent upon such resident's conviction that Capitol Lakes' bankruptcy case will not negatively affect the refundability of his or her Entrance Fee.  Any negative publicity suggesting that a community is in bankruptcy will necessarily deter prospective residents from entering into new Continuing Care Contracts, which are the precursors to Capitol Lakes' receipt of future Entrance Fees.

107.    The relief requested with respect to the Entrance Fees should be granted because the Entrance Fees paid pursuant to the Continuing Care Contracts are critical to Capitol Lakes' operations.  The Entrance Fees account for a significant portion of Capitol Lakes' annual operating budget and collection of such amounts is critical to Capitol Lakes' ability to reorganize.  Finally, providing the relief requested in the Escrow Motion maintains the status quo pending a resolution of this case.

108.    Pursuant to section 552 of the Bankruptcy Code, the post-petition Entrance Fees are not subject to the security interests of the Secured Lenders.

109.    During the pendency of this case, Capitol Lakes seeks to refund Entrance Fees to residents in the ordinary course of business as provided under the Continuing Care Contracts as new Entrance Fees are collected into the escrow.  Additionally, upon confirmation of the Plan, the Entrance Fees will be transferred to the reorganized Debtor or such other party as directed by this Court.

110.    I believe it will have a negative effect on Capitol Lakes' operations if it cannot guarantee potential residents that their Entrance Fees will be escrowed during the pendency of this case.  Accordingly, Capitol Lakes seeks authorization to escrow all Entrance Fees received

postpetition and protect the residents' interest with respect thereto.

     **I.**       **Claims Agent Retention Application**

     111.     Pursuant to the Claims Agent Retention Application, Capitol Lakes seeks authorization to retain Prime Clerk LLC ("Prime Clerk") as its claims, noticing and balloting agent ("Agent") with respect to this chapter 11 case.

     112.     Upon information and belief, Prime Clerk is an experienced Agent and is frequently used by debtors in large chapter 11 cases, and I believe the professionals at Prime Clerk are well-qualified to provide such services, expertise, consultation and assistance to Capitol Lakes and serve as Agent in this chapter 11 case.  Capitol Lakes believes that Prime Clerk is capable of handling the requisite noticing responsibilities, thereby relieving the Clerk or, in the alternative, Capitol Lakes of such burden.  The employment of Prime Clerk will provide efficient management of the claims and noticing processes in this case, thereby allowing Capitol Lakes' management and advisors to focus on Capitol Lakes' reorganization efforts.

     113.     I believe such experience and knowledge will be valuable to Capitol Lakes during this case.  Accordingly, Capitol Lakes wishes to retain Prime Clerk to provide assistance during this case.

## <u>CONCLUSION</u>

For all the foregoing reasons, I respectfully request that the Court grant the relief requested in the First Day Motions. I reserve the right to supplement and/or amend this Declaration with testimony and/or exhibits.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  January 21, 2016

/s/ *Tim Conroy*

By: Tim Conroy

Title: Executive Director