**THIS PROPOSED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION FOR USE IN CONNECTION WITH THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OF REORGANIZATION DESCRIBED HEREIN.   ACCORDINGLY, THE FILING AND DISSEMINATION OF THIS PROPOSED DISCLOSURE STATEMENT ARE NOT INTENDED AND SHOULD NOT IN ANY WAY BE CONSTRUED AS A SOLICITATION OF VOTES ON THE PLAN, NOR SHOULD THE INFORMATION CONTAINED HEREIN BE RELIED UPON FOR ANY PURPOSE BEFORE A CONDITIONAL DETERMINATION BY THE BANKRUPTCY COURT THAT THE PROPOSED DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION.**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

| | | |
|---|---|---|
| In re: | § | **Case No. 16-10158** |
| | § | |
| **CAPITOL LAKES, INC.** | § | **Chapter 11** |
| | § | |
| | § | **Hon. Robert D. Martin** |
| **Debtor.** | § | |

**DISCLOSURE STATEMENT FOR DEBTOR'S THIRD AMENDED PLAN OF
REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

Thomas R. Califano                          Rebecca R. DeMarb
thomas.califano@dlapiper.com                rdemarb@sweetdemarb.com
DLA PIPER LLP (US)                          Sweet DeMarb LLC
1251 Avenue of the Americas                 One North Pinckney Street, Suite 300
New York, New York 10020-1104               Madison, WI 53703
Telephone:  (212) 335-4500                  Telephone:  (608) 310-5500
Facsimile:  (212) 335-4501                  Facsimile:   (608) 310-5525

*Counsel for the Debtor and
Debtor in Possession*

Dated:  April 17, 2016

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ....................................................................................................4

II.     BACKGROUND INFORMATION .....................................................................10

III.    EVENTS LEADING TO BANKRUPTCY ..........................................................20

IV.     EVENTS EXPECTED TO OCCUR DURING DEBTOR'S CHAPTER 11 CASE .......22

        A.      Anticipated Events During the Chapter 11 Case. ................................22

        B.      Motion For Authority To Pay Prepetition Employee Wages and
                Associated Benefits ............................................................................22

        C.      Motion To Continue Using Existing Cash Management Systems ......22

        D.      Motion to Escrow and/or Refund Certain Entrance Fees...................23

        E.      Motion To Approve the Use of Cash Collateral ................................23

        F.      Applications For Retention of the Debtor's Professionals .................24

        G.      506(a) Valuation Hearing ..................................................................24

        H.      Timetable for Chapter 11 Case. .........................................................25

V.      PLAN OF REORGANIZATION ........................................................................25

        A.      Classification and Treatment of Claims Under the Plan ....................25

        B.      Treatment of Administrative Claims, Tax Claims and Trustee Fees ...................25

        C.      Treatment of Classified Claims .........................................................26

        D.      Bank Secured Claim ..........................................................................30

        E.      Acceptance Requirements. .................................................................31

        F.      Means for Implementation of the Plan ..............................................32

        G.      Treatment of Executory Contracts and Unexpired Leases. ...............35

        H.      Provisions Governing Distributions. ..................................................38

        I.      Procedures for Resolving Contingent, Unliquidated and Disputed Claims. ........40

        J.      Conditions Precedent to Confirmation of the Plan and the Effective Date ..........41

        K.      Modification, Revocation or Withdrawal of the Plan. .......................42

        L.      Retention of Jurisdiction. ...................................................................43

        M.      Miscellaneous Provisions. .................................................................45

VI.     RISK FACTORS IN CONNECTION WITH THE PLAN ...............................47

VII.    FINANCIAL PROJECTIONS ............................................................................53

VIII.   STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN OF
        REORGANIZATION ..........................................................................................54

EAST\122979759.7

# TABLE OF CONTENTS
(continued)

**Page**

| | A. | Elements of Confirmation ................................................................54 |
| | B. | Best Interests of Creditors ..............................................................54 |
| | C. | Feasibility of the Plan.....................................................................55 |
| | D. | Confirmation of the Plan if One or More Classes Do Not Accept .....................56 |
| | E. | Hearing on Confirmation of the Plan ..............................................57 |
| IX. | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ...............57 |
| X. | EFFECTS OF PLAN CONFIRMATION.......................................................58 |
| | A. | Compromise and Settlement of Claims, Interests and Controversies.................58 |
| | B. | Releases by the Debtor.....................................................................58 |
| | C. | Releases by Holders of Claims ........................................................59 |
| | D. | Exculpation......................................................................................59 |
| | E. | Discharge of Claims and Termination of Interests ...........................60 |
| | F. | Injunction.........................................................................................60 |
| | G. | Term of Injunctions or Stays ..........................................................61 |
| | H. | Protection Against Discriminatory Treatment..................................62 |
| | I. | Release of Liens ..............................................................................62 |
| XI. | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ...................................................................................................62 |
| | A. | Liquidation Under Chapter 7...........................................................62 |
| | B. | Alternative Plan of Reorganization..................................................63 |
| XII. | CONCLUSION AND RECOMMENDATIONS................................................64 |

EAST\122979759.7

## EXHIBITS

| | |
|---|---|
| Exhibit 1 | Debtor's Third Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated April 17, 2016 |
| Exhibit 2 | CVs of Timothy Conroy and Kristi Vater |
| Exhibit 3 | Liquidation Analysis |
| Exhibit 4 | Financial Projections |
| Exhibit 5 | Residency Agreements with Resident Modifications |
| Exhibit 6 | New Management Agreement |

**IF YOU ARE ENTITLED TO VOTE TO APPROVE THE PLAN, YOU ARE RECEIVING A BALLOT WITH YOUR COPY OF THIS DISCLOSURE STATEMENT. THE DEBTOR URGES YOU TO VOTE TO ACCEPT THE PLAN.**

**EACH HOLDER OF A CLAIM AGAINST THE DEBTOR ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING.  NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO THIS DISCLOSURE STATEMENT AND BANKRUPTCY CODE SECTION 1125.  NO HOLDER OF A CLAIM SHOULD RELY ON ANY INFORMATION RELATING TO THE DEBTOR, ITS PROPERTY OR THE PLAN OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT AND THE ATTACHED EXHIBITS.**

**THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE COURT TO BE USED IN CONNECTION WITH THE PLAN.  NO SOLICITATIONS FOR OR AGAINST THE PLAN MAY BE MADE EXCEPT THROUGH THIS DISCLOSURE STATEMENT.**

**THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN.  ALTHOUGH THE DEBTOR BELIEVES AND HAS MADE EVERY EFFORT TO ENSURE THAT THIS SUMMARY PROVIDES ADEQUATE INFORMATION WITH RESPECT TO THE PLAN, IT DOES NOT PURPORT TO BE COMPLETE AND IS QUALIFIED TO THE EXTENT IT DOES NOT SET FORTH THE ENTIRE TEXT OF THE PLAN.  IF THERE IS ANY INCONSISTENCY BETWEEN THE PLAN AND THE SUMMARY OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN SHALL CONTROL. ACCORDINGLY, EACH HOLDER OF A CLAIM SHOULD REVIEW THE PLAN IN ITS ENTIRETY.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND BANKRUPTCY RULE 3016 AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER APPLICABLE NON-BANKRUPTCY LAW.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.  THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE REORGANIZATION OF THE DEBTOR AS TO HOLDERS OF CLAIMS AGAINST THE DEBTOR.**

**IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF**

CLAIMS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER BUT RATHER AS THE DEBTOR'S STATEMENT OF THE STATUS OF THE RESPECTIVE MATTER.

ALL OF THE PROJECTED RECOVERIES TO CREDITORS ARE BASED UPON THE ANALYSES PERFORMED BY THE DEBTOR AND ITS PROFESSIONALS. ALTHOUGH THE DEBTOR HAS MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN AND IN THE EXHIBITS ATTACHED HERETO, THE DEBTOR CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE INFORMATION.

THE DEBTOR RECOMMENDS THAT CREDITORS SUPPORT AND VOTE TO ACCEPT THE PLAN. IT IS THE OPINION OF THE DEBTOR THAT THE TREATMENT OF CREDITORS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES FOR THE REORGANIZATION OR LIQUIDATION OF THE DEBTOR. ACCORDINGLY, THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS.

## I.     INTRODUCTION

### A.     General.

The following introduction is qualified by the Third Amended Plan of Reorganization of Capitol Lakes, Inc. ("Capitol Lakes") as debtor and debtor-in-possession (the "Debtor"), dated April 17, 2016 (the "Plan"),[1] which is attached hereto as **Exhibit 1**, and the more detailed information and financial statements contained elsewhere in this document. The Debtor believes that confirmation and implementation of the Plan is in the best interest of creditors and that the Plan provides the best available alternative to creditors.

This disclosure statement ("Disclosure Statement") and the other documents described herein are being furnished by the Debtor to holders of Claims in the Debtor's Chapter 11 Case pending before the United States Bankruptcy Court for the Western District of Wisconsin (the "Court").

Under the Bankruptcy Code, only holders of Claims that are "impaired" are entitled to vote to accept or reject the Plan. The Bankruptcy Code further provides that a Class that is left unimpaired under the Plan is deemed to have accepted the Plan and a Class that receives no distribution under the Plan is deemed to have rejected the Plan. To become effective, the Plan must be accepted by certain Classes of Claims and confirmed by the Court.

### B.     Classification and Treatment of Claims Under the Plan.

Certain Classes of Claims are impaired under the Plan and, accordingly, are entitled to vote on the Plan. The Debtor is seeking votes to accept the Plan from holders of Claims in these Classes. For a description of the Classes of Claims and their treatment under the Plan, see Section 3 of the Plan – Classification and Treatment of Claims.

Estimated Claim amounts for certain Classes are based upon a preliminary analysis by the Debtor and its Professionals of Claims filed in the Debtor's Chapter 11 Case. There can be no assurance that these estimates are correct. The following treatments are possible only if the Plan is approved and the Debtor's estimate of the Claims is determined to be valid by the Court. The timing of distributions under the Plan, if any, is subject to conditions and determinations described in later sections of this Disclosure Statement.

Each Class of Claims, except Administrative Claims, Priority Tax Claims and Trustee Fees, are placed in the following Classes and will receive the following treatment under the Plan:

---

[1]     All capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

*Summary of Classification*
*and Treatment of Claims Under the Plan*

| Class Description | Estimated Amount of Allowed Claims | Impaired | Treatment |
|---|---|---|---|
| Class 1 - Other Priority Claims | $0 | No | Each Allowed Claim in this Class shall be in a separate subclass.  Unless otherwise agreed by the holder of any Claim in this Class, each Allowed Claim under Bankruptcy Code section 507(a), which has not been satisfied as of the Effective Date, in full and final satisfaction and discharge of and in exchange for each Allowed Other Priority Claim, will receive (i) deferred Cash payments of a value, as of the Effective Date, equal to the holder's Allowed Other Priority Claim or (ii) payment in Cash in full on the later of:  (a) the third (3rd) Business Day after the Effective Date or as soon as reasonably practicable thereafter as determined by the Disbursing Agent; and (b) the date on which there is a Final Order allowing such Claim.  The Debtor estimates that the Allowed Class 1 Claims will be $0 on the Effective Date. |
| Class 2 – Bank Secured Claims | $36,000,000 | Yes | This Class consists of all Bank Secured Claims held by the Banks.  Upon the terms and subject to the conditions set forth in the Plan, on the Effective Date, in full and final satisfaction and discharge of and in exchange for each Allowed Bank Secured Claim, the Banks shall receive the New Senior Debt, which shall be documented in substantially the same form and substance as the Reimbursement Agreements, with the following modifications: (a) an aggregate principal amount equal to the Valuation Determination Amount set at the 506(a) Valuation Hearing; (b) interest shall accrue and be paid at a fixed rate for the first ten (10) years, and adjusted thereafter, which such interest rate shall be set by the Court; (c) the maturity date for all notes shall be thirty-five (35) years following the Confirmation Date, provided, however, that all such notes may be prepaid at any time without penalty; (d) principal payments will be made on a thirty-five (35) year amortization schedule with interest only payable for the first five (5) years of the term; and (e) the Reorganized Debtor's obligations under the New Senior Debt shall be secured by first priority, senior secured liens in substantially all assets held by the Reorganized Debtor; provided, however, that the Health Center Funding, if and when obtained, shall prime the New Senior Debt and be secured by liens senior to the New Senior Debt.  Notwithstanding the foregoing, in the event that the Banks, on or before May 2, 2016, make the 1111(b) Election, the Class 2 Claim would be comprised of the "Allowed Bank 1111(b) Claim", and in full and final satisfaction and discharge of and in exchange for each Allowed Bank 1111(b) Claim, the Banks shall |

| Class Description | Estimated Amount of Allowed Claims | Impaired | Treatment |
|---|---|---|---|
| | | | receive the 1111(b) Amended and Restated Note, as further described in Article V.D herein. |
| Class 3 – Other Secured Claims | $0 | No | Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction and discharge of and in exchange for each Allowed Other Secured Claim, on the later of the Effective Date and the date such Other Secured Claim becomes Allowed, or as soon as practicable thereafter, each Allowed Other Secured Claim shall have its Other Secured Claim reinstated and otherwise leave unaltered the legal, equitable and contractual rights to which the holder of such Claim is entitled in accordance with section 1124 of the Bankruptcy Code. |
| Class 4 – Bank Deficiency Claims | $21,600,000 | Yes | The Banks will have a Class 4 Bank Deficiency Claim unless, on or before May 2, 2016, the Banks elect, pursuant to § 1111(b)(1)(A)(i) of the Bankruptcy Code and in accordance with the obligations contained in the Intercreditor Agreement, to have their Allowed Claim receive the treatment set forth in § 1111(b)(2) of the Bankruptcy Code.  In the event that the Banks have a Class 4 Bank Deficiency Claim, then, on the Effective Date, such holders of a Class 4 Bank Deficiency Claim shall receive, on the Effective Date and in full and final satisfaction of all Bank Deficiency Claims, a pro rata share of the PRS Plan Payment. |
| Class 5 – Resident Claims | $46,000,000 | Yes | Except to the extent that a holder of an Allowed Resident Claim agrees to a less favorable treatment, in full and final satisfaction and discharge of and in exchange for each Allowed Resident Claim, each holder of a Resident Claim shall have its Residency Agreement, as modified solely by the Resident Modifications described below, assumed by the Reorganized Debtor. |
| Class 6 – Manager Claims | $3,153,607 | Yes | Holders of Manager Claims will receive no property or Distribution under the Plan on account of such Manager Claims. |
| Class 7 – General Unsecured Claims | $439,992 | Yes | Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction and discharge of and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive deferred Cash payments of a value, as of the Effective Date, equal to the holder's General Unsecured Claim, payable in two equal installments, without interest, with the first payment to be made on or as soon as practicable after the Effective Date, and the second payment to be made within three (3) months thereafter. |

| Class Description | Estimated Amount of Allowed Claims | Impaired | Treatment |
|---|---|---|---|
| Class 8 – Subordinated 510(b) Claims | $0 | Yes | Each Holder of a Subordinated 510(b) Claim will not receive any property or Distribution under the Plan on account of such Subordinated 510(b) Claim. |

### C.    Plan Overview.

The following is a brief overview of the Plan and it is qualified by reference to the Plan itself.  For a more detailed description of the terms and provisions of the Plan, see Article V - Plan of Reorganization.

The Plan provides for the payment and/or full satisfaction of all Allowed Administrative Claims, Allowed Priority Tax Claims, Trustee Fees, Allowed Other Priority Claims, Allowed Other Secured Claims, and Allowed General Unsecured Claims.  The Plan also provides for payment of the Banks' Secured Claims over time, a payment on account of the Banks' unsecured Deficiency Claims, and honoring of the Debtor's obligations to its residents, both of a financial nature and with respect to continuing care.  The Plan also provides that the holders of Allowed Bank Secured Claims, in full and final satisfaction and discharge of and in exchange for such Allowed Claims, will receive New Senior Debt, which shall be documented in substantially the same form and substance as the Reimbursement Agreements, with the modifications described herein.

The potential recoveries are only estimates and the actual recovery will either increase or decrease depending upon the occurrence or non-occurrence of numerous factors, including, but not limited to, the risk factors discussed in Article VI of this Disclosure Statement.

### D.    Summary of Confirmation Requirements.

Under the Bankruptcy Code, only classes of claims that are "impaired" are entitled to vote to accept or reject the Plan.  The Bankruptcy Code requires, as a condition to confirmation of a consensual plan of reorganization, that each impaired class of claims accepts the Plan.  A class of creditors is deemed to accept a plan if the holders of at least two-thirds in dollar amount, and more than one-half in number, of those creditors that actually cast ballots, vote to accept such plan.

Liabilities incurred in the ordinary course of business by the Debtor since the Petition Date that are described in the Plan as Allowed Administrative Claims will be paid on the later of: (1) the third Business Day after the Effective Date; (2) the date on which such Person becomes the holder of an Allowed Administrative Claim; or (3) the date or dates on which that Claim is payable by its terms, consistent with past practice and in accordance with past terms. Holders of Administrative Claims will not be entitled to vote on the Plan.

Any Claims arising from the rejection of executory contracts and unexpired leases are treated under the Bankruptcy Code as if they arose before the filing of the Chapter 11 petition.

Any Claim in an impaired Class that is subject to a pending objection or is scheduled as unliquidated, disputed or contingent is not entitled to vote unless the holder of such Claim has obtained an order of the Court temporarily allowing the Claim for the purpose of voting on the Plan.

### E.    Voting Instructions and Deadline.

The Debtor has prepared this Disclosure Statement as required by Bankruptcy Code section 1125 and Bankruptcy Rule 3016(c). It is being distributed to holders of Claims against the Debtor to assist such holders in evaluating the feasibility of the Plan, the manner in which their Claims are treated and in determining that the Plan satisfies the requirements for confirmation set forth in Bankruptcy Code section 1129. A copy of the Plan is attached hereto as **Exhibit 1**. The purpose of this Disclosure Statement is to assist those entitled to vote on the Plan to make an informed judgment in voting to accept or reject the Plan.

This Disclosure Statement is subject to the Court's approval, as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor typical of each of the Classes whose votes are being solicited to make an informed judgment with respect to the Plan.

**THE COURT'S CONDITIONAL APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION WITH RESPECT TO THE MERITS OF THE PLAN. ALL CREDITORS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE TO ACCEPT OR REJECT THE PLAN.**

This Disclosure Statement describes the background of the Debtor and the significant events leading up to and following the filing of the Chapter 11 Case on the Petition Date. It summarizes the major events that have taken place during the Debtor's Chapter 11 Case and describes the Plan, which divides creditor Claims into Classes and provides for the treatment of Allowed Claims.

1.    <u>General Information</u>. Under the Bankruptcy Code, certain Classes of creditors are deemed to accept or reject the Plan and the vote of these Classes will not be solicited.

2.    <u>Unimpaired Classes Are Deemed to Accept the Plan and Do Not Vote</u>. If a Creditor holds a Claim included within a Class that is not impaired under the Plan, under Bankruptcy Code section 1126(f), the Creditor is deemed to have accepted the Plan with respect to such Claim and its vote of such Claim will not be solicited. Classes 1 and 3 are unimpaired under the Plan.

3.    <u>Certain Classes Are Deemed to Reject the Plan and Do Not Vote</u>. Under Bankruptcy Code section 1126(g), Classes 6 and 8, will receive no distributions on account of such claims. Thus, Classes 6 and 8 are deemed to have rejected the Plan and

the vote of holders of such Claims in these Classes will not be solicited.

4.    <u>Claims Which Are Not Allowed</u>.  The Bankruptcy Code provides that only the holders of Allowed Claims are entitled to vote on the Plan.  A Claim to which an objection has been filed is not an Allowed Claim unless and until the Court rules on the objection and allows the Claim.  If the Court has not ruled on the objection or status of such a Claim, but the holder of a Claim wishes to vote, the holder of the Claim may petition the Court to estimate its claim for voting purposes under Bankruptcy Rule 3018(a).  Consequently, although holders of such Claims may receive ballots, their votes will not be counted unless the Court, prior to the Voting Deadline, rules on the objection and allows the Claim or, on proper request under Bankruptcy Rule 3018(a) prior to the hearing on Confirmation, temporarily allows the Claim in an amount that the Court deems proper for the purpose of voting on the Plan.

5.    <u>Voting and Record Date</u>.  If a Creditor holds a Claim classified in a voting Class of Claims under the Plan, the Creditor's acceptance or rejection of the Plan is important and must be in writing and filed on time.  The record date for determining which creditors may vote on the Plan is April 6, 2016.  The Voting Deadline is June 1, 2016 at 5:00 p.m. (prevailing Central Time).

a.    <u>How to Vote</u>.  IN ORDER FOR A VOTE TO BE COUNTED, THE BALLOT MUST BE PROPERLY COMPLETED IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND RETURNED (I) TO THE RESPECTIVE NOMINEES IN SUFFICIENT TIME TO ENABLE THE RESPECTIVE NOMINEES TO COMPLETE THE MASTER BALLOT AND DELIVER IT TO THE VOTING AGENT BY THE VOTING DEADLINE OR (II) TO THE VOTING AGENT BY THE VOTING DEADLINE, AS EACH IS APPLICABLE.

b.    <u>Ballots</u>.  Creditors must use only the ballot or ballots sent to them with this Disclosure Statement.  If a Creditor has Claims in more than one Class, it should receive multiple ballots.  IF A CREDITOR RECEIVES MORE THAN ONE BALLOT THE CREDITOR SHOULD ASSUME THAT EACH BALLOT IS FOR A SEPARATE CLAIM AND SHOULD COMPLETE AND RETURN ALL OF THEM.

**IF A CREDITOR IS A MEMBER OF A VOTING CLASS AND DID NOT RECEIVE A BALLOT FOR SUCH CLASS, OR IF SUCH BALLOT IS DAMAGED OR LOST, OR IF A CREDITOR HAS ANY QUESTIONS CONCERNING VOTING PROCEDURES, PLEASE CONTACT PRIME CLERK, LLC (THE "<u>VOTING AGENT</u>") AT (844) 794-3478 OR capitollakesballots@primeclerk.com.**

F.    **The Confirmation Hearing.**

The Debtor has requested that the Court schedule a hearing to consider confirmation of the Plan on June 22, 2016 at 9:00 a.m. **(prevailing Central Time)**, before the Honorable Robert D. Martin, at the United States Bankruptcy Court, Robert W. Kastenmeier U.S. Courthouse, 120 N. Henry Street, Room 340, Madison, Wisconsin 53703.  The date of the

Confirmation Hearing may be continued at such later time(s) as the Court may announce during the Confirmation Hearing or any continued hearing without further notice.

If the Plan is confirmed by the Court, it will be binding on all Claim holders regardless of whether an individual Claim holder has supported or opposed the Plan.

### G. Definitions.

1.    <u>Defined Terms</u>.    As used in this Disclosure Statement, terms defined in the Plan annexed hereto and not otherwise specifically defined herein will have the meanings attributed to them in the Plan.

2.    <u>Interpretation of Terms</u>.    Each definition in this Disclosure Statement and in the Plan includes both the singular and the plural, and references in this Disclosure Statement include the masculine and feminine where appropriate.  Headings are for convenience or reference and shall not affect the meaning or interpretation of this Disclosure Statement.

## II.    BACKGROUND INFORMATION

### A.    Overview.

Capitol Lakes, a Wisconsin nonstock nonprofit corporation, is a leader in the senior living industry in the State of Wisconsin with a long standing history of providing superior services to its senior residents.  In particular, Capitol Lakes operates a continuing care retirement community ("<u>CCRC</u>") that offers its senior residents a continuum of care throughout the aging process.  Upon entering the CCRC, residents are provided spacious apartment homes and a broad range of social and recreational activities.  When assistance with everyday activities or health care services are needed, the residents have access to assisted living and skilled nursing facilities located on the same campus.  Put simply, the residents of Capitol Lakes have entrusted their health, safety and well-being to Capitol Lakes for the duration of their lives.

For many seniors, joining a CCRC is an attractive option for them and their families because it minimizes the burdens and costs associated with the aging process.  These seniors will often sell their homes or liquidate significant assets in order to become part of a CCRC, like Capitol Lakes.  Upon entry into a CCRC like Capitol Lakes, a new resident pays a significant "entrance fee" which is refundable under certain circumstances as discussed herein.

CCRCs, however, are often operationally and financially complex.  More specifically, CCRCs can be challenging to operate because they require the maintenance of a broad range of services to seniors in varying stages of the aging process.  Additionally, CCRCs require a steady flow of new residents in order to maintain day-to-day operations and to remain current on financial obligations, including, most importantly, obligations to current and former residents.

As will be described in greater detail below, Capitol Lakes relies on revenue generated by new residents to, among other things, maintain its day-to-day operations, service its debt obligations and comply with its resident refund obligations.  As has become common in the

senior living industry, however, the lingering effects of the 2008 financial crisis and housing crash combined with the burden of unsustainable debt levels have threatened Capitol Lakes' ability to generate enough revenue to cover its expenses.  In fact, after reviewing the current and prospective financial and operational aspects of Capitol Lakes' business, including Capitol Lakes' historical performance, assets, current and long-term liabilities and the market for senior care services, management has determined that Capitol Lakes' overly burdensome, long-term debt obligations will jeopardize its financial and operational stability, its ability to meet its financial and continuing care obligations to its residents and ultimately, the overall well-being of its residents.

In order to be proactive and responsible, and in an effort to avoid a chapter 11 proceeding, management made several attempts over the past several months to reach a consensual resolution with Capitol Lakes' secured lenders that would bring relief to Capitol Lakes.  These attempts, however, were unsuccessful.  Consequently, Capitol Lakes was forced to seek chapter 11 protection in order to recapitalize, "right-size" its debt load and restructure its debt obligations so that it can ensure its continued operations and ability to honor its resident obligations.

**B.      Description of the CCRC and Affiliations.**

Capitol Lakes owns and operates a CCRC that has been serving seniors in Madison, Wisconsin since 1975.  The CCRC was first built by Methodist Retirement Services, Inc., which later became known as Meriter Retirement Services, Inc. ("Meriter Retirement"), a division of Meriter Health Services, Inc. ("Meriter Health").   In November 2007, Pacific Retirement Services, Inc., an Oregon nonprofit corporation ("PRS"), affiliated with Meriter Retirement pursuant to the terms of a Membership Purchase and Sale Agreement between PRS and Meriter Health (the "Purchase Agreement").   Soon thereafter, in May 2008, Meriter Retirement was renamed "Capitol Lakes, Inc."

As a CCRC, Capitol Lakes offers its residents a continuum of care in a campus-style setting, providing living accommodations and related health care and support services to a target market of seniors aged sixty two (62) and older.  The CCRC is comprised of the following facilities: (i) an urban high rise containing 105 independent living units (the "Heights"), (ii) an apartment building containing 52 additional independent living units (the "Main Gate"), (iii) an assisted living residential facility containing 43 assisted living units (the "Terraces"), of which 39 are single occupancy and 4 are available for double occupancy, (iv) a skilled nursing facility with 85 active skilled nursing beds licensed by the Wisconsin Department of Health and Family Services and certified to participate in the Medicare and Medicaid programs (the "Health Center"), all located on a site of approximately 3.814 acres of land owned by Capitol Lakes located in the heart of downtown Madison, Wisconsin (collectively with the Heights, the Main Gate, the Terraces, the Health Center, related improvements and all other improvements, fixtures, equipment and other personal property now or hereafter located on the site, the "Facility").  Capitol Lakes also owns and uses Unit 1 of the Main Street Parking Condominium, including the air space encompassed thereby (the "Parking Condominium Unit").

At the Facility, seniors are offered a variety of residency options, including one-, two-, and two bedroom-plus den styles that range in size from 500 square feet to 2,062 square feet.  Living units can be customized with a resident's choice of carpet color, paint color and

window treatments.  Capitol Lakes also offers its residents a full roster of activities, wellness programs, fine dining and trips to downtown Madison and surrounding areas.  Residents have access to a main dining room as well as food delivery services, a chapel, lounges, meeting rooms, a library, day excursions, housekeeping services, transportation services and various planned social and recreational activities.  As a resident's health needs changes, Capitol Lakes also provides assistance with daily activities, such as bathing, dressing and medication reminders, rehabilitative care, long term nursing care and memory care.

As of the Petition Date, the Facility had a 95% occupancy rate, with 305 residents living in the Facility.  Among these residents, 25 participated in Capitol Lakes' assisted living program, 11 participated in Capitol Lakes' memory care program and 78 participated in Capitol Lakes' skilled nursing program.  Many of the residents, particularly those that participate in the memory care and skilled nursing programs, depend on the physicians, nurses and aides at the Facility for their day-to-day care and overall well-being.

Capitol Lakes receives revenue from several sources, which include: (i) entrance fees (each, an "Entrance Fee"); (ii) monthly fees; (iii) daily rates; (iv) fees for services; and (v) certain upgrade fees.  Average daily rates range from $183 to $326.  Monthly fees range from $1,314 to $6,504.  Entrance Fees range from $70,500 to $768,500.

As of December 31, 2015, on a book value basis, Capitol Lakes had approximately $57.6 million in assets and $104.2 million in liabilities.[2]  Capitol Lakes' main assets consist of: (i) approximately $6.7 million in cash and cash equivalents; (ii) approximately $2.0 million in accounts receivable; and (iii) approximately $42.2 million in property and equipment.  As described in greater detail below, Capitol Lakes' main liabilities are its long term municipal bond obligations to which U.S. Bank National Association serves a Master Trustee (the "Master Trustee"), letter of credit obligations to KBC Bank, N.V. ("KBC") and Santander Bank, N.A.  ("Santander," and together with KBC and U.S. Bank, the "Banks"), and interest swap obligations.  As of the Petition Date, approximately $57.6 million was owed to the Banks.

Capitol Lakes has received a determination letter from the Internal Revenue Service setting forth its determination that Capitol Lakes is exempt from federal income taxation under section 501(a) of the Internal Revenue Code as an organization described in section 501(c)(3) of the Internal Revenue Code.

In addition to operating a CCRC, Capitol Lakes is also the sole member of Senior Housing of Middleton, Inc. and Middleton Glen, Inc., two Wisconsin nonstock nonprofit corporations (the "Middleton Glen Owners") that own and operate Middleton Glen, a CCRC located in Middleton, Wisconsin that is currently occupied by 124 senior residents ("Middleton Glen").  On December 1, 2009, the Middleton Glen Owners and PRS entered into a Management Services Agreement (the "Middleton Glen Management Agreement"), pursuant to which (i) PRS oversees and manages the general day-to-day operations of Middleton Glen; and (ii) Capitol Lakes provides Middleton Glen with a staff of thirteen (13) employees.  Middleton Glen

---

2    The Debtor believes that book value is not reflective of the actual value of such assets.

reimburses Capitol Lakes for the cost of these employees. As part of the affiliation between Capitol Lakes and Middleton Glen, the residents of Middleton Glen have priority access to the Health Center and the Terraces and can participate in wellness classes sponsored by Capitol Lakes. Additionally, in the event of a dissolution, the articles of incorporation for each of the Middleton Glen Owners provide that the assets of the respective corporations, after payment of all outstanding liabilities, are to be turned over to Capitol Lakes.

Capitol Lakes is also the sole member of Capitol Lakes Foundation, Inc., a Wisconsin nonstock nonprofit corporation (the "Foundation"), which holds all of Capitol Lakes' donor-restricted funds. As of the Petition Date, the Foundation held approximately $1.2 million in donor-restricted funds. These funds are not part of the Debtor's bankruptcy estate.

C.    **Management of the CCRC.**

PRS has been the sole member of Capitol Lakes since 2008. PRS is a nonprofit corporation under Oregon law, a tax-exempt organization under section 501(c)(3) of the Internal Revenue Code of 1986 (the "Tax Code"), and a "supporting organization" and public charity under section 509(a)(3) of the Tax Code. As a supporting organization, PRS provides support to various "supported organizations," which are also tax-exempt organizations under section 501(c)(3) of the Tax Code and public charities under section 509(1) or 509(a)(2) of the Tax Code. Capitol Lakes is just one of 35 supported organizations that receive support, management assistance and other services from PRS.

Pursuant to Article X of the Bylaws of Capitol Lakes, Capitol Lakes is required to contract with PRS, as its sole member, to provide management, accounting, marketing and other services to Capitol Lakes. Accordingly, PRS and Capitol Lakes entered into that certain Affiliate Management and Support Services Agreement dated as of March 18, 2014 (the "PRS Management Agreement" or "Current Management Agreement") pursuant to which PRS agreed to provide the following non-exhaustive list of services to Capitol Lakes: (i) operate the CCRC in compliance with the annual budget; (ii) provide accounting and information technology services; (iii) provide and maintain a qualified Executive Director (the "Executive Director") and Health Care Administrator (the "Health Care Administrator"), at Capitol Lakes' expense; (iv) recruit and hire personnel to maintain and operate the CCRC; and (v) assist in the collection of revenues.

In exchange for such services, the PRS Management Agreement provides that Capitol Lakes is to pay PRS a base management fee equal to five percent (5%) of Capitol Lakes' Net Cash Operating Revenue (the "Base Management Fee"). "Net Cash Operating Revenue" is defined in the PRS Management Agreement as all receipts derived from the operation of the CCRC, including, without limitation, all net Entrance Fees, monthly fees, daily rates, investment income, rent, payments from third parties for resident fees or rent and interest income. In addition to the Base Management Fee, PRS is entitled to payment of: (i) an information technology fee calculated based upon Capitol Lakes' rate of usage of PRS' information technology (the "Information Technology Fees"); and (ii) an accounting service fee calculated based upon Capitol Lakes' usage of PRS' accounting systems and services (the "Accounting Service Fees").

Except for the Executive Director and Health Care Administrator, all personnel permanently employed in the operation of Capitol Lakes are employees of Capitol Lakes. The Executive Director and Health Care Administrator of Capitol Lakes are employed by Pacific Retirement Services Management, Inc. ("PRSMI"), a wholly owned subsidiary of PRS, and Capitol Lakes reimburses PRSMI for all compensation paid, including, but not limited to, salaries, fringe benefits, retirement plan funding, payroll taxes, and unemployment and worker's compensation insurance, to the Executive Director and Health Care Administrator.

Following entry into the PRS Management Agreement, Capitol Lakes and PRS also entered into the First Amendment to Affiliate and Support Services Agreement, pursuant to which PRS agreed to (i) reduce the Base Management Fee by thirty percent (30%); (ii) defer fifty percent (50%) of the Base Management Fee; and (iii) defer all reimbursement of costs that become due and payable under the PRS Management Agreement, other than the Information Technology Fees and Accounting Fees (collectively, the "Deferred Fees") until the 2002 Letter of Credit and the Series 2008 Letters of Credit are terminated and while any Event of Default as defined in the Reimbursement Agreements has occurred and is continuing. As of the Petition Date, the Deferred Fees totaled approximately $3,150,000; however the actual amount of fees deferred, discounted or otherwise not received by PRS under the PRS Management Agreement total nearly $5 million.

Tim Conroy, a licensed Nursing Home Administrator in Wisconsin and Oregon, is currently the Executive Director of Capitol Lakes. Mr. Conroy joined Capitol Lakes in 2009 as the Health Care Administrator and advanced to the position of Executive Director to oversee the entire operations of Capitol Lakes. Kristi Vater is currently the Health Care Administrator at Capitol Lakes.

The success of Capitol Lakes and overall satisfaction of its residents is a testament to Mr. Conroy's and Ms. Vater's leadership skills and PRS' superior management services. It is intended that Mr. Conroy and Ms. Vater will continue in their roles with the Reorganized Debtor, and CVs for both Mr. Conroy and Ms. Vater are attached hereto as Exhibit 2.

**D.  Debtor's Prepetition Capital Structure**

1.  Municipal Bond Debt

Before PRS purchased Meriter Health's sole membership interest in Meriter Retirement pursuant to the Purchase Agreement in November 2007, Meriter Retirement had financed a portion of the costs of the Facilities with the proceeds of the following bond issuances: (i) $3,000,000 original principal amount Community Development Authority of the City of Madison, Wisconsin, Redevelopment Revenue Bonds, Series 1995 (Meriter Retirement Services, Inc. Project) (the "1995 Bonds"); (ii) $2,000,000 original principal amount Wisconsin Health and Educational Facilities Authority Revenue Bonds, Series 1999 (Meriter Retirement Services, Inc. Project) (the "1999 Bonds"); and (iii) $8,000,000 original principal amount Wisconsin Health and Educational Facilities Authority WHA Capital Access Designated Pool Program Variable Rate Demand Revenue Bonds, Series 2002A (Meriter Retirement Services, Inc.) (the "2002 Bonds").

The 2002 Bonds are issued and outstanding under a Loan and Trust Agreement dated as of April 1, 2002 (as amended and supplemented from time to time, the "2002 Loan and Trust Agreement") among the Wisconsin Health and Educational Facilities Authority (the "Issuer"), Meriter Retirement and U.S. Bank National Association, as Trustee (the "2002 Trustee"), pursuant to which Meriter Retirement is obligated to, among other things, make loan payments corresponding to the required payments of principal and interest on the 2002 Bonds. Meriter Retirement's obligations to make such loan payments is evidenced and secured by its Promissory Note, Series 2002-A in the original principal amount of $8,000,000 (the "2002 Bond Master Note"). As described in greater detail below, in March of 2008, KBC issued the 2002 Letter of Credit (defined below) in connection with the 2002 Bonds.

In November 2007, pursuant to the Purchase Agreement, Meriter Health agreed to sell (i) its sole membership interest in Meriter Retirement, together with certain related assets, to PRS, and (ii) the Parking Condominium Unit and certain related assets to Meriter Retirement.

In order to finance (i) the acquisition by PRS of Meriter Health's sole membership interest in Meriter Retirement and certain related assets pursuant to the Purchase Agreement, (ii) the acquisition by Meriter Retirement of the Parking Condominium Unit and certain other assets relating to Meriter Retirement and the Facilities pursuant to the Purchase Agreement, (iii) certain renovations to the Heights, the Terraces and the Health Center, (iv) refunding of the 1995 Bonds and the 1999 Bonds, (v) the purchase of the Parking Condominium Unit, and (vi) the funding of capitalized financing charges, a debt service reserve fund and closing costs in conjunction with the foregoing, Meriter Retirement obtained financing from the Issuer as described below (the "Bond Financing"):

Meriter Retirement entered into a Bond Trust Indenture dated as of March 1, 2008 (as the same may be amended or supplemented from time to time, the "2008A Indenture") with U.S. Bank National Association, as Trustee (the "2008A Trustee"), pursuant to which the Issuer issued its Variable Rate Demand Revenue Bonds, Series 2008A (Meriter Retirement Services, Inc.) in the original aggregate principal amount of $15,210,000 (the "2008A Bonds") and loaned the proceeds thereof to Meriter Retirement pursuant to a Loan Agreement dated as of March 1, 2008 (as the same may be amended and supplemented from time to time, the "2008A Loan Agreement"), under which Meriter Retirement agreed to make loan payments corresponding to the required payments of principal and interest on the 2008A Bonds. In order to evidence and secure the 2008A Loan Agreement, Meriter Retirement executed and delivered to the Issuer, and the Issuer assigned to the 2008A Trustee, a Promissory Note, Series 2008-A in the principal amount of $15,210,000 (the "2008A Master Bond Note").

Meriter Retirement entered into a Bond Trust Indenture dated as of March 1, 2008 (as the same may be amended or supplemented from time to time, the "2008B Indenture") with U.S. Bank National Association, as Trustee (the "2008B Trustee"), pursuant to which the Issuer issued its Variable Rate Demand Revenue Bonds, Series 2008B (Meriter Retirement Services, Inc.) in the original aggregate principal amount of $29,380,000 (the "2008B Bonds") and loaned the proceeds thereof to Meriter Retirement pursuant to a Loan Agreement dated as of March 1, 2008 (as the same may be amended and supplemented from time to time, the "2008B Loan Agreement"), under which Meriter Retirement agreed to make loan payments corresponding to the required payments of principal and interest on the 2008B Bonds. In order to evidence and secure the 2008B Loan Agreement, Meriter Retirement executed and delivered to the Issuer, and

the Issuer assigned to the 2008B Trustee, a Promissory Note, Series 2008-B in the principal amount of $29,380,000 (the "<u>2008B Master Bond Note</u>").

Meriter Retirement entered into a Bond Trust Indenture dated as of March 1, 2008 (as the same may be amended or supplemented from time to time, the "<u>2008C Indenture</u>") with U.S. Bank National Association, as Trustee (the "<u>2008C Trustee</u>"), pursuant to which the Issuer issued its Taxable Variable Rate Demand Revenue Bonds, Series 2008C (Meriter Retirement Services, Inc.) in the original aggregate principal amount of $6,985,000 (the "<u>2008C Bonds</u>") and loaned the proceeds thereof to Meriter Retirement pursuant to a Loan Agreement dated as of March 1, 2008 (as the same may be amended and supplemented from time to time, the "<u>2008C Loan Agreement</u>"), under which Meriter Retirement agreed to make loan payments corresponding to the required payments of principal and interest on the 2008C Bonds. In order to evidence and secure the 2008C Loan Agreement, Meriter Retirement executed and delivered to the Issuer, and the Issuer assigned to the 2008C Trustee, a Promissory Note, Series 2008-C in the principal amount of $6,985,000 (the "<u>2008C Master Bond Note</u>").

Simultaneously with the issuance of the 2008A Bonds, 2008B Bonds and 2008C Bonds (collectively the "<u>2008 Bonds</u>"), Meriter Retirement defeased the 1995 Bonds resulting in a discharge of the promissory note related thereto and redeemed the 1999 Bonds resulting in the discharge of the note related thereto.

In connection with the foregoing, Meriter Retirement is also party to (i) the Amended and Restated Master Trust Indenture dated as of March 1, 2008 with U.S. Bank National Association, as Master Trustee (as the same may be amended and supplemented from time to time, the "<u>Master Indenture</u>"), (ii) the Mortgage, Assignment of Leases and Security Agreement dated of March 1, 2008 ("<u>Mortgage</u>") and (iii) the Investment Security Agreement. In order to secure its payment and performance under the Bond Financing and letters of credit described below, Meriter Retirement pledged a security interest in certain assets, including, but not limited to: (i) any and all Gross Revenues (as defined in the Master Indenture); (ii) any and all general deposit accounts; (iii) the Facilities; (iv) all revenues, rent, issues, profits and other benefits derived from the Facilities; (v) and Securities, Investment Property, Financial Assets and other property from time to time contained in or credited to the Securities Account (as such terms are defined in the Investment Security Agreement).

2.      <u>Letters of Credit</u>

In order to provide credit and liquidity support for the 2008A Bonds, Meriter Retirement and KBC entered into a Reimbursement, Credit and Security Agreement dated as of March 1, 2008 (as the same may be amended from time to time, the "<u>KBC Reimbursement Agreement</u>"), pursuant to which KBC issued its Irrevocable Letter of Credit (including any amendments thereto, the "<u>2008A Letter of Credit</u>") to the 2008A Trustee for the benefit of Meriter Retirement that authorized the 2008A Trustee to make one or more draws on KBC up to an aggregate of $15,480,030, of which $15,210,000 is in respect of principal and $270,030 is in respect of interest on the 2008A Bonds.

In order to provide credit and liquidity support for the 2008B Bonds, Meriter Retirement and Santander entered into a Reimbursement, Credit and Security Agreement dated as of March 1, 2008 (as the same may be amended from time to time, the "<u>Santander</u>

Reimbursement Agreement"), pursuant to which Santander issued its Irrevocable Letter of Credit (including any amendments thereto, the "2008B Letter of Credit") to the 2008B Trustee for the benefit of Meriter Retirement that authorized the 2008B Trustee to make one or more draws on Santander up to an aggregate of $29,901,596, of which $29,380,000 is in respect of principal and $521,596 is in respect of interest on the 2008B Bonds.

In order to provide credit and liquidity support for the 2008C Bonds, KBC issued its Irrevocable Letter of Credit (including any amendments thereto, the "2008C Letter of Credit") to the 2008C Trustee for the benefit of Meriter Retirement that authorized the 2008C Trustee to make one or more draws on KBC up to an aggregate of $7,140,010, of which $6,985,000 is in respect of principal and $155,010 is in respect of interest on the 2008C Bonds.

Finally, in connection with the 2002 Bonds, KBC issued a substitute credit facility to the 2002 Trustee (the "2002 Letter of Credit") for the benefit of Meriter Retirement that authorized the 2002 Trustee to make one or more draws on KBC up to an aggregate of $7,277,126, of which $7,185,000 was in respect of principal and $92,126 in respect of interest on the 2002 Bond. The 2002 Letter of Credit replaced a prior credit facility held by the 2002 Trustee under the 2002 Loan and Trust Agreement.

In order to secure its obligations under the KBC Reimbursement Agreement, Meriter Retirement issued to KBC a Promissory Note, Series 2008-D in the stated principal amount of $29,897,166 (the "KBC Reimbursement Note"). Additionally, in order to secure its obligations under the Santander Reimbursement Agreement, Meriter Retirement issued to Santander a Promissory Note, Series 2008-E in the stated principal amount of $29,901,596 (the "Santander Reimbursement Note").

The 2002 Master Bond Note, the 2008A Master Bond Note, the 2008B Master Bond Note, the 2008C Master Bond Note, the KBC Master Reimbursement Note, the Santander Reimbursement Master Note and all other promissory notes issued under the Master Indenture are secured equally and ratably under the Master Indenture and Mortgage.

Pursuant to that certain Intercreditor Agreement between KBC and Santander dated March 1, 2008 (the "Intercreditor Agreement"), the Banks appointed KBC as administrative agent to perform a number of tasks, including but not limited to, administering the Banks' rights under the KBC Reimbursement Agreement and Santander Reimbursement Agreement. The Intercreditor Agreement further requires that each of the Banks not assert or seek to exercise any remedy or other right of legal redress against Meriter Retirement unless the other Secured Lender consents to such action.

3.      Interest Swap Agreements

In addition to the foregoing, Capitol Lakes is also obligated under two (2) International Swaps and Derivatives Association, Inc. ("ISDA") Master Agreements with KBC, one with a $6,985,000 notional amount (the "$6.9 Million Swap Agreement") and the other with a $47,284,375 notional amount (the "$47 Million Swap Agreement" and, together with $6.9 Million Swap Agreement, the "Swap Agreements"). Pursuant to the $6.9 Million Swap Agreement, Capitol Lakes is required to make a 4.365% fixed interest rate payment on the third business day of each month to KBC in exchange for a floating rate interest payment from KBC

for a term of twelve (12) years commencing on April 1, 2008 and ending on March 1, 2020. Additionally, pursuant to the $47 Million Swap Agreement, Capitol Lakes is required to make a 3.005% fixed interest rate payment on the third business day of each month to KBC in exchange for a floating rate interest payment from KBC for a term of twelve (12) years commencing on April 1, 2008 and ending on March 1, 2020.

The purpose of the Swap Agreements was to hedge the variability of the interest rates on the 2008 Bonds and 2002 Bonds. The consequences of filing for chapter 11 protection include termination of the Swap Agreements. To date, Capitol Lakes has paid a total of approximately $12.8 million in "mark to market" payments under the Swap Agreements.

E.    **Residents of the CCRC.**

1.    Residence and Care Agreements.

As is common practice in the CCRC industry, a resident interested in occupying an independent living unit in one of the Facilities must first enter into a continuing care contract (a "Continuing Care Contract") with Capitol Lakes. The Continuing Care Contract sets forth the terms and conditions under which the resident will occupy a unit, including outlining the obligations for the payment of an Entrance Fee, the amount and timing of a refund of that Entrance Fee, the amount of monthly fees to be charged and other general matters.

In general, a prospective resident must pay an Entrance Fee prior to occupying an independent living unit. Typically, the resident pays a $10,000 fully refundable deposit at the time of signing the Continuing Care Contract and pays the remaining balance of the Entrance Fee once a unit is ready for that resident to occupy it. Entrance Fees range from $70,500 to $768,500, depending on the configuration of the unit selected by a resident. The Continuing Care Contract also requires residents to pay monthly service fees to Capitol Lakes. Capitol Lakes uses the revenue generated by the receipt of Entrance Fees and monthly service fees to fund its operations, service its debt obligations and make capital improvements.

In consideration for payment of Entrance Fees, monthly service fees and other fees charged by Capitol Lakes, residents are furnished with a residence and are given access to a number of services, including dining, housekeeping and transportation services. Additionally, residents have access to an unlimited number of temporary stays at the Health Center and given discounted daily rates at the Health Center when a permanent move is required.

If, after more than ninety (90) days after occupying a unit, (i) a resident terminates the Continuing Care Contract; (ii) a resident dies; or (iii) Capitol Lakes terminates the Continuing Care Contract because of a resident's willful violation of the terms thereof (each a "Termination Event"), then such resident may be entitled to a refund of a portion of their Entrance Fee.

The amount of a refund owed to a resident depends on the type of Continuing Care Contract signed by such resident. Capitol Lakes currently offers residents the following two (2) types of Continuing Care Contracts:

i.      90% Refundable Continuing Care Contract:  Upon the occurrence of a Termination Event, the resident is entitled to a refund of ninety percent (90%) of his or her Entrance Fee; and

ii.      Traditional Continuing Care Contract: Upon the occurrence of a Termination Event, the resident is entitled to a refund of his or her Entrance Fee less 1/36 of such Entrance Fee for each month the resident has lived at the Facility.

Under both types of Continuing Care Contracts, a refund is only due after (i) a resident physically and permanently leaves a unit; and (ii) a new resident has executed a Continuing Care Contract and paid the then-applicable Entrance Fee for that prior resident's same unit.

Residents who require skilled nursing, rehabilitative or memory care services are typically required to enter into separate agreements with Capitol Lakes that outline the services to be rendered and fees to be charged in connection therewith.

2.      State and Federal Regulations.

The CCRC industry nationwide is regulated by various state and federal agencies. Each state has a different regulatory scheme governing CCRCs, particularly with respect to disclosure of financial statements, solvency of the facility, maintenance of a certain amount of reserves and the refunding of fees and deposits.

As a CCRC operating in the State of Wisconsin, Capitol Lakes is regulated by the Wisconsin Office of the Commissioner of Insurance ("COI"), the Wisconsin Department of Health Services, the Wisconsin Department of Financial Institutions and the United States Department of Health and Human Services' Centers for Medicare & Medicaid Services.

In particular, Capitol Lakes must comply with the provisions of Chapter 647 of the Wisconsin Statutes which proscribe, among other things, (i) the powers and duties of the COI with respect to CCRCs; (ii) the duties of CCRC operators; and (iii) provisions to be included in Continuing Care Contracts.

F.      **Legal Proceedings.**

Certain claims, suits and complaints which arise in the ordinary course of the Debtor's business have been filed or are pending against it.  The Debtor believes, based upon the currently available information, that all the results of such proceedings, individually, or in the aggregate, would not have a material adverse effect on its consolidated financial condition or results of operations.

G.      **Environmental Matters.**

The Debtor's operations are subject to a number of federal, state and local environmental laws and regulations including those governing air emissions, wastewater discharges, the use, generation, storage, management and disposal of, or exposure to hazardous or toxic substances and wastes, the investigation and remediation of contaminated soil, air, and groundwater and occupational health and safety.  While these laws and regulations could impose

capital and operating costs on the Debtor's business and there are significant penalties for violations, these costs currently are not material.

## III.    EVENTS LEADING TO BANKRUPTCY

*NOTE: The following summary contains the Debtor's account of pre-petition workout negotiations between the Debtor and the Banks. This summary does not necessarily reflect the opinions or expressions of the Banks, and the Banks may disagree with some or all of the description provided in this section.*

As noted above, in April of 2008, Capitol Lakes entered into the various transactions that led to the current capital structure of Capitol Lakes. At that time, Capitol Lakes provided the Banks with financial projections to support the debt levels provided under the various loan documents. Unfortunately, as a result of the financial and housing crisis beginning shortly after these transactions, those financial projections proved to be unattainable. In fact, only two months after the April 2008 transactions, Capitol Lakes first violated the operating ratio covenant under its loan documents. Since that time, there have been in excess of 50 instances of covenant violations, amendments and covenant resets.

Beginning almost immediately following the first covenant default and continuing for more than seven years until the filing of this Chapter 11 Case, Capitol Lakes has worked hard to remedy its financial situation and position Capitol Lakes as the premier retirement community in Madison, Wisconsin. In many respects, Capitol Lakes has been successful in these efforts. During that time, PRS has invested upwards of $4 million into Capitol Lakes, while Capitol Lakes has funded over $16.5 million into its Facility. These investments have yielded operational improvements and increased occupancy; however, the overleveraged capital structure and debt load remained as the final impediment to a full economic recovery and sustainable cash flows.

Unfortunately, although Capitol Lakes has consistently communicated these problematic issues to the Banks and engaged in good faith refinancing negotiations, the Banks have been unwilling to appropriately resolve Capitol Lakes' long-term financial stress and either lower the cost of debt or otherwise attract a replacement lender to provide for a refinancing and exit for the Banks. Indeed, during this time, the Banks benefitted from these discussions through the imposition of excessive fees, including an additional $3.3 million in increased letter of credit fees, $372,000 in fees relating to loan amendments, and nearly $150,000 in legal fees payable to the Banks' counsel in connection therewith. Notwithstanding these increased fees, Capitol Lakes continued to make all regular debt service payments up to and including January 2016.

The Banks were aware that the value of their collateral was well below Capitol Lakes' debt load, as the Banks' appraisal in 2014 revealed an estimated value of $45 million. As a result, it became clear that the current capital structure of Capitol Lakes was unsustainable, and failure to address these issues in a timely manner would place the residents' care and services in jeopardy, and threaten the ability of Capitol Lakes to continue to refund entrance fees due to resident families. These grave concerns further endangered Capitol Lakes' ability to continue its charitable mission and make necessary capital improvements required to provide care for its residents. To that end, in March of 2015, spurred on by concerns about the future viability of Capitol Lakes, the Banks and Capitol Lakes begun negotiations regarding a restructuring and

right-sizing of the unsustainable capital structure. Although these discussions continued through December of 2015, Capitol Lakes was unable to obtain the necessary relief.

While Capitol Lakes has yet to face a payment default, it strongly believes, after a careful assessment of its current and prospective operational needs, that it will not have sufficient liquidity to operate the CCRC, service its debt obligations and satisfy its refund obligations and may, consequently, default on its debt obligations. This Chapter 11 Case was only filed as last resort when the continuing negotiations among Capitol Lakes and the Banks proved fruitless, and was filed at a time when Capitol Lakes appropriately believed it was still in a stable enough condition that it would not endanger the welfare of its residents.

Capitol Lakes is particularly concerned about its ability to honor approximately $1,953,159 in resident refund obligations to a select group of nine (9) residents currently residing in Capitol Lakes' skilled nursing facility and assisted living units (the "SNF/AL Residents"). Although the Debtor anticipates that these obligations will become due in a manner consistent with past pattern and practice relating to refund obligations, there is no guarantee of such result. When they first started living at Capitol Lakes, the SNF/AL Residents paid substantial Entrance Fees and resided in independent living units. Over time, the health of the SNF/AL Residents deteriorated and they moved out of their independent living units and into the Health Center where they currently reside. Pursuant to the terms of the SNF/AL Residents' Continuing Care Contracts, Capitol Lakes was permitted to relet the SNF/AL Residents' independent living units to new residents. In connection with the reletting of these units, Capitol Lakes received an Entrance Fee from each of the new residents. As with all other Entrance Fees, Capitol Lakes used the funds to pay for its day-to-day operations and reduce its debt obligations. At the time of reletting the units, Capitol Lakes did not have a refund obligation to the SNF/AL Residents because they were living at the Health Center. However, these refunds will be due within 14 days of the resident's passing or moving out of the Facility. Based upon actuarial assumptions, Capitol Lakes believes that such refund obligations will become due over a number of years, but there is a risk that these refund obligations could be due to the SNF/AL Residents this year.

Typically, a refund obligation does not stress Capitol Lakes' cash flow. Capitol Lakes normally receives a new Entrance Fee before it is required to make a refund. For example, as of March 31, 2016, Capitol Lakes had a future, contingent obligation to pay refunds totaling approximately $1.9 million to residents who have permanently left the Facility but whose units have not yet been resold. These refunds will become due upon receipt of new Entrance Fees and in the ordinary course of business. With respect to the SNF/AL Residents, however, Capitol Lakes will not have recently received a new Entrance Fee from which it can make a refund. Instead, Capitol Lakes received an Entrance Fee when the SNF/AL Resident moved into the Health Center and used it toward operational expenses and debt payments in prior years as it was required to do under the loan documents. Consequently, Capitol Lakes will need to refund the SNF/AL Residents from the limited operational funds that are also needed to satisfy its debt obligations.

In order to mitigate the financial stress caused by the SNF/AL Residents and to free up funds for other things, such as capital improvements, Capitol Lakes needs to restructure its debt obligations. Capital improvements, including an upgrade of Capitol Lakes' Health Center are necessary to enable the Debtor to meet its future care obligations to its residents. These renovations to the Health Center are expected to include a new main entrance for

welcoming the residents, as well as a modernized and expanded therapy area. In addition to this work, Capitol Lakes would create more private rooms in the Health Center and expand resident common space, as well as providing updated furniture, a dining area and other ancillary remodeling. Although these renovations are expected to cost the Debtor approximately $1,600,000 and reduce the number of available beds within the Health Center, the Debtor believes that such renovations are necessary and appropriate to bring the Facility in line with the modern and updated facilities that are expected by the Debtor's current and prospective residents and those offered by competitors, thereby providing the Debtor with a continued ability to retain and attract residents in the current competitive environment. Moreover, such renovations are intended to allow the Debtor compete for an enhanced Medicare payor ratio, which may improve the Debtor's overall liquidity.

As discussed above, Capitol Lakes engaged in extensive negotiations with its Banks in an effort to restructure its unsustainable debt load with the best interests of its residents in mind. Towards that end, Capitol Lakes retained DLA Piper LLP (US) ("DLA Piper") to provide legal advice in connection with a potential restructuring, and Alvarez & Marsal Healthcare Services, LLC ("A&M") to provide restructuring and financial advisory support.

Capitol Lakes' efforts, however, have been unsuccessful and it has been left with no other choice but to seek chapter 11 protection.

## IV.    EVENTS EXPECTED TO OCCUR DURING DEBTOR'S CHAPTER 11 CASE

### A.    Anticipated Events During the Chapter 11 Case.

The Debtor does not expect the Chapter 11 Case to be protracted. To expedite its emergence from chapter 11, the Debtor, on the Petition Date, filed motions seeking the relief detailed below, among other relief, from the Court.

### B.    Motion For Authority To Pay Prepetition Employee Wages and Associated Benefits.

Capitol Lakes' employees are an integral part of its business, and their continued dedication is crucial to its success. Capitol Lakes believes that it has a valuable asset in its work force and that any delay in paying prepetition compensation or benefits to their employees would destroy its relationships with employees and irreparably harm employee morale at a time when the continued dedication, confidence and cooperation of their employees is most critical. Capitol Lakes is grateful to its employees for their help, without which a restructuring would not be possible. Accordingly, Capitol Lakes sought authority to pay compensation and benefits in the Chapter 11 Case which were accrued but unpaid as of the Petition Date and to continue its employee programs during the pendency of the Chapter 11 Case, which such motion was granted by the Court on January 27, 2016.

### C.    Motion To Continue Using Existing Cash Management Systems.

Capitol Lakes sought authority to continue using its existing cash management system, bank accounts and business forms and to follow their internal investment and deposit guidelines, which such motion was granted by the Court on January 27, 2016. Continued use of

existing cash management systems helped facilitate the Debtor's smooth and orderly transition into the Chapter 11 Case, minimize the disruption of its businesses while in chapter 11, and expedite its emergence from chapter 11.  As a result of set-up time and expenses, requiring the Debtor to adopt and implement a new cash management system would have increased the costs of the Chapter 11 Case.  For the same reasons, requiring the Debtor to close its existing bank accounts and establish new accounts or requiring the Debtor to create new business forms would have only frustrated efforts to reorganize expeditiously.

### D.    Motion to Escrow and/or Refund Certain Entrance Fees.

Capitol Lakes sought authority to escrow all Entrance Fees collected postpetition in order to provide assurance to new residents that Capitol Lakes' Chapter 11 Case would not affect rights to a refund.  In doing so, Capitol Lakes proposed to escrow the Entrance Fees pending confirmation of the Plan or as otherwise directed by the Court.  This relief has been granted in a number of similar chapter 11 cases nationwide and has had a demonstrable positive effect on a CCRC's continuing marketing efforts.  The Court granted this motion on January 27, 2016.

A prospective resident's willingness to pay an Entrance Fee is necessarily dependent upon such resident's conviction that Capitol Lakes' bankruptcy case will not negatively affect the refundability of his or her Entrance Fee.  Concerns about the resolution of this Chapter 11 Case may deter prospective residents from entering into new Continuing Care Contracts, and paying related Entrance Fees.

During the pendency of this Chapter 11 Case, in accordance with the Court's order granting the motion, Capitol Lakes will refund Entrance Fees to residents in the ordinary course of business as provided under the Continuing Care Contracts as new Entrance Fees are collected into the escrow.  Additionally, upon confirmation of the Plan, the Entrance Fees will be transferred to the Reorganized Debtor.

### E.    Motion To Approve the Use of Cash Collateral.

In the ordinary course of business, Capitol Lakes requires cash on hand and cash flow from its operations to pay operating expenses and other routine payables.  In addition, Capitol Lakes requires cash on hand to fund this Chapter 11 Case and to successfully reorganize.  The cash and cash proceeds of Capitol Lakes is encumbered by security interests in favor of the Banks, and, as such, constitutes "cash collateral" of the Banks.

As of the Petition Date, Capitol Lakes had an emergency need for the immediate use of Cash Collateral to, among other things, maintain ongoing day-to-day operations and fund its working capital needs.  Without access to such Cash Collateral, Capitol Lakes may have been forced to cease operations.  Such an abrupt cessation of its business would have had devastating effects on the residents of Capitol Lakes and would have caused the residents to suffer immediate and irreparable harm.  The residents of Capitol Lakes are elderly and have, in many cases, invested a large portion of their total assets to live in a CCRC.  Most, if not all, of the residents' meals are eaten at Capitol Lakes and their day-to-day activities rely on the CCRC.  Simply put, if Capitol Lakes were to have ceased operations, the well-being of the residents would have been jeopardized.

On January 27, 2016, the Court entered an interim order approving the Debtor's use of cash collateral in accordance with a 13-week cash flow budget. On March 9, 2016, the Court entered an agreed final order approving the Debtor's use of cash collateral.

### F.    Applications For Retention of the Debtor's Professionals.

The Debtor has already, or otherwise intends to seek retention of certain professionals to represent and assist it in connection with the Chapter 11 Case. These professionals were intimately involved with the negotiation and development of the restructuring transactions and the Plan. These professionals include, among others, DLA Piper as counsel for the Debtor and A&M as financial advisor and valuation expert.

### G.    506(a) Valuation Hearing

On February 10, 2016, the Court entered a scheduling order (the "Valuation Scheduling Order") to set a valuation hearing to determine the value of the Bank Secured Claim and establish related procedures and deadlines. Section 506(a)(1) of the Bankruptcy Code provides that the "allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . ." 11 U.S.C. § 506(a)(1). Section 506(a)(1) further provides that the value of the secured claim "shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." *Id.* Rule 3012 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that "[t]he court may determine the value of a claim secured by a lien on property in which the estate has an interest on motion of any party in interest and after hearing on notice to the holder of the secured claim . . . as the court may direct." Fed. R. Bankr. P. 3012. Because the Plan provides for payment of the Bank Secured Claim over time, and payment on account of the Bank Deficiency Claim, it is necessary to determine the Allowed amounts of both the Secured Claim and the Deficiency Claim at the hearing on approval of the Disclosure Statement, unless the Banks make the 1111(b) Election on or prior to May 2, 2016 to have their Allowed Claim receive the treatment set forth in section 1111(b)(2) of the Bankruptcy Code, as more fully described herein in Article V.D of this Disclosure Statement.

In accordance with the Valuation Scheduling Order, on March 14, 2016, both the Debtor's and the Banks' valuation experts submitted their expert valuation report. The Debtor's expert valuation report provided a valuation of $32,000,000 whereas the Banks' expert valuation reports provided a valuation ranging from $47,300,000 to $50,250,000.[3] The valuation hearing was held on April 6, 2016. At that hearing, the Court ruled that the valuation was $36,000,000

---

3    The *Real Estate Appraisal* prepared by Ed Smith of HealthTrust, LLC concluded that the market value of the Debtor as a going concern was $47,300,000 on an "as-is" basis and $49,600,000 on a "prospective stabilized" basis. The *Report Regarding Capitol Lakes, Inc. Enterprise Valuation Analysis* prepared by David B. Fields of RBC Capital Markets, LLC concluded that the enterprise valuation of the Debtor was $50,250,000.

(the "Valuation Determination Amount").  Accordingly, the projected recoveries provided in this Disclosure Statement are based on the Valuation Determination Amount.

**H.      Timetable for Chapter 11 Case.**

Assuming that the Court approves this Disclosure Statement and confirms the Plan on the schedule requested by the Debtor, the Debtor would seek to emerge from chapter 11 within six (6) months of the Petition Date.  There can be no assurance, however, that the Chapter 11 Case will proceed as expeditiously as anticipated.

**V.      PLAN OF REORGANIZATION**

**THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, TREATMENT AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT 1.**

**A.      Classification and Treatment of Claims Under the Plan.**

The Claims against the Debtor are divided into Classes according to their seniority and other criteria.  The Classes of Claims in the Debtor and the funds and other property to be distributed under the Plan are described more fully below.

**THE DEBTOR BELIEVES THAT THE PLAN AFFORDS CREDITORS THE POTENTIAL FOR THE GREATEST REALIZATION OF THE VALUE OF THE DEBTOR'S ASSETS.**

**B.      Treatment of Administrative Claims, Tax Claims and Trustee Fees.**

Certain Claims need not be classified under a plan pursuant to the Bankruptcy Code, including Administrative Claims and Priority Tax Claims.

1.      Administrative Claims

The Plan defines Administrative Claims as any Claim for payment of costs and expenses of administration pursuant to sections 503(b), 507(a)(2) or 507(b) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estate and operating the businesses of the Debtor; (b) compensation for Accrued Professional Compensation; (c) all fees and charges assessed against the Estate pursuant to chapter 123 of title 28 of the United States Code; and (d) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Case pursuant to sections 503(b)(3), (4) and (5) of the Bankruptcy Code.

In accordance with Bankruptcy Code section 1123(a)(1), Administrative Claims have not been classified and are treated as described herein.  Except as otherwise provided in the Plan, by written agreement of the holder of an Allowed Administrative Claim to accept different treatment than provided under the Plan, or by order of the Bankruptcy Court, a Person holding an Allowed Administrative Claim will receive Cash equal to the unpaid portion of such Allowed Administrative Claim which has come due for payment under any applicable order or law, as

soon as practicable after the later of:  (a) the third Business Day after the Effective Date; (b) the date on which such Person becomes the holder of such an Allowed Administrative Claim; or (c) the date or dates when that Claim is payable by its terms, consistent with past practice and in accordance with past terms.  Allowed Administrative Claims shall only be made in accordance with any Final Order of the Bankruptcy Court.

2.        Professional Compensation.

Professionals or other Persons asserting a Claim for Accrued Professional Compensation for services rendered before the Effective Date must file and serve on the Debtor, the Reorganized Debtor and such other Persons who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Court an application for final allowance of such Claim for Accrued Professional Compensation no later than 60 days after the Effective Date. Objections to any Claim for Accrued Professional Compensation must be filed and served on the Reorganized Debtor, the Office of the U.S. Trustee and the requesting party no later than 90 days after the Effective Date.

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor may employ and pay any professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to any party or action, order or approval of the Bankruptcy Court.

3.        Priority Tax Claims.

The Plan defines Priority Tax Claims as any Claim of a governmental unit of a kind entitled to priority under Bankruptcy Code section 507(a)(8).  Unless otherwise agreed by the holder of an Allowed Priority Tax Claim, any Person holding an Allowed Priority Tax Claim will receive, as determined by the Reorganized Debtor in its sole discretion and in full satisfaction of such Claim:  (a) payment in Cash in full on the later of the Effective Date or the date such Claim becomes an Allowed Claim; or (b) Cash over a period not exceeding five (5) years after the Petition Date, with interest at a rate equal to four percent (4%) per year, payable monthly, in periodic payments, having the value of such Claim as of the Effective Date.

4.        Trustee Fees.

Trustee Fees include all fees and charges assessed against the Debtor's Estate under section 1930 of title 28 of the United States Code.  All Trustee Fees will be paid in full by the Reorganized Debtor as they become due and owing.

**C.        Treatment of Classified Claims.**

The Plan provides for certain Claims by Class, as provided in Bankruptcy Code sections 1122 and 1123(a)(1).  The Classes established by the Plan and the treatment of each Class are set forth below.  The Plan provides for certain general treatment provisions that, in addition to other generally applicable provisions (including distribution provisions described herein), apply to the treatment of all Claims under the Plan.

The Plan will not provide any distributions on account of a Claim to the extent that such Claim has been disallowed, released, withdrawn, waived or otherwise satisfied or paid as of the Effective Date, including, without limitation, payments by third parties. Except as specifically provided in the Plan, the Plan will not provide any distributions on account of a Claim, the payment of which has been assumed by a third party.

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Bank Secured Claims | Impaired | Entitled to Vote |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Bank Deficiency Claims | Impaired | Entitled to Vote |
| 5 | Resident Claims | Impaired | Entitled to Vote |
| 6 | Manager Claims | Impaired | Deemed to Reject |
| 7 | General Unsecured Claims | Impaired | Entitled to Vote |
| 8 | Subordinated 510(b) Claims | Impaired | Deemed to Reject |

1.      Class 1 — Other Priority Claims.

This Class consists of all Allowed Other Priority Claims that are specified as having priority in Bankruptcy Code section 507(a), if any such Claims still exist as of the Effective Date. Each Allowed Claim in this Class shall be in a separate subclass. Unless otherwise agreed by the holder of any Claim in this Class, each Allowed Claim under Bankruptcy Code section 507(a), which has not been satisfied as of the Effective Date, in full and final satisfaction and discharge of and in exchange for each Allowed Other Priority Claim, will receive (a) deferred Cash payments of a value, as of the Effective Date, equal to the holder's Allowed Other Priority Claim or (b) payment in Cash in full on the later of: (i) the third (3rd) Business Day after the Effective Date or as soon as reasonably practicable thereafter as determined by the Disbursing Agent; and (ii) the date on which there is a Final Order allowing such Claim. The Debtor estimates that the Allowed Class 1 Claims will be $0 on the Effective Date.

Class 1 is unimpaired by the Plan. Each holder of an Other Priority Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

2.      Class 2 — Bank Secured Claims.

This Class consists of all Bank Secured Claims held by the Banks. Upon the terms and subject to the conditions set forth in the Plan, on the Effective Date, in full and final satisfaction and discharge of and in exchange for each Allowed Bank Secured Claim, the Banks shall receive the New Senior Debt, which shall be documented in substantially the same form and substance as the Reimbursement Agreements, with the following modifications: (i) an aggregate principal amount equal to the Valuation Determination Amount set at the 506(a) Valuation Hearing; (ii) interest shall accrue and be paid at a fixed rate for the first ten (10) years, and adjusted thereafter, which such interest rate shall be set by the Court; (iii) the maturity date for all notes shall be thirty-five (35) years following the Confirmation Date, provided, however, that all such notes may be prepaid at any time without penalty; (iv) principal payments will be

made on a thirty-five (35) year amortization schedule with interest only payable for the first five (5) years of the term; and (v) the Reorganized Debtor's obligations under the New Senior Debt shall be secured by first priority, senior secured liens in substantially all assets held by the Reorganized Debtor; provided, however, that the Health Center Funding, if and when obtained, shall prime the New Senior Debt and be secured by liens senior to the New Senior Debt. Notwithstanding the foregoing, in the event that both of the Banks, on or before May 2, 2016, make the 1111(b) Election, the Class 2 Claim would be comprised of the "Allowed Bank 1111(b) Claim", and in full and final satisfaction and discharge of and in exchange for each Allowed Bank 1111(b) Claim, the Banks shall receive the 1111(b) Amended and Restated Note, as further described in Article V.D herein.

Class 2 is impaired by the Plan. Each holder of a Bank Secured Claim is entitled to vote to accept or reject the Plan.

3. Class 3 — Other Secured Claims.

This Class consists of all Secured Claims other than Bank Secured Claims. Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction and discharge of and in exchange for each Allowed Other Secured Claim, on the later of the Effective Date and the date such Other Secured Claim becomes Allowed, or as soon as practicable thereafter, each Allowed Other Secured Claim shall have its Other Secured Claim reinstated and otherwise leave unaltered the legal, equitable and contractual rights to which the holder of such Claim is entitled in accordance with section 1124 of the Bankruptcy Code.

Class 3 is unimpaired by the Plan. Each holder of an Other Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

4. Class 4 — Bank Deficiency Claims.

This Class consists of all Bank Deficiency Claims. The Banks will have a Class 4 Bank Deficiency Claim unless, on or before May 2, 2016, both of the Banks elect, pursuant to § 1111(b)(1)(A)(i) of the Bankruptcy Code and in accordance with the obligations contained in the Intercreditor Agreement, to have their Allowed Claim receive the treatment set forth in § 1111(b)(2) of the Bankruptcy Code. In the event that the Banks have a Class 4 Bank Deficiency Claim, then, on the Effective Date, such holders of a Class 4 Bank Deficiency Claim shall receive, on the Effective Date and in full and final satisfaction of all Bank Deficiency Claims, a *pro rata* share of the PRS Plan Payment.

Class 4 is impaired by the Plan. Each holder of a Bank Deficiency Claim is entitled to vote to accept or reject the Plan.

5. Class 5 — Resident Claims.

This Class consists of all Resident Claims. Except to the extent that a holder of an Allowed Resident Claim agrees to a less favorable treatment, in full and final satisfaction and discharge of and in exchange for each Allowed Resident Claim, each holder of a Resident Claim

shall have its Residency Agreement, as modified solely by the Resident Modifications described below, assumed by the Reorganized Debtor.  The Resident Modifications shall consist solely of the following change to the existing Residency Agreement:  *Any entrance deposits refundable to residents pursuant to the Residency Agreements shall be due and payable to residents or their estates, without interest, in the order they are owed, within fourteen (14) days following receipt of sufficient replacement entrance fees to fully fund the refund obligation from the next re-sale(s) and occupancy of any residence(s) within the same contract type*.  Copies of the proposed Residency Agreements  incorporating the Resident Modifications are annexed hereto as Exhibit 5.  Class 5 is impaired by the Plan.  Each holder of a Resident Claim is entitled to vote to accept or reject the Plan.

6.  Class 6 — Manager Claims.

This Class consists of all Manager Claims.  Holders of Manager Claims will receive no property or Distribution under the Plan on account of such Manager Claims.

Class 6 is impaired by the Plan.  Each holder of a Manager Claim is conclusively presumed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

7.  Class 7 — General Unsecured Claims.

This Class consists of all General Unsecured Claims.  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction and discharge of and in exchange for each Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive deferred Cash payments of a value, as of the Effective Date, equal to the holder's General Unsecured Claims, payable in two equal installments, without interest, with the first payment to be made on or as soon as practicable after the Effective Date, and the second payment to be made within three (3) months thereafter.

Class 7 is impaired by the Plan.  Each holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

8.  Class 8 — Subordinated 510(b) Claims.

Each holder of a Subordinated 510(b) Claim will not receive any property or Distribution under the Plan on account of such Subordinated 510(b) Claim.

Class 8 is impaired by the Plan.  Each holder of a Subordinated 510(b) Claim is conclusively presumed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

### D.     Bank Secured Claim

Class 2 consists of the Secured Claim portion of the Bank Secured Claim, which is the outstanding payment obligation of the Debtor to the Banks under the Reimbursement Agreements and Swap Agreements as of the Petition Date as determined by entry of a Final Order of the Bankruptcy Court.   The Bank Secured Claim shall not include any default or contract interest, prepayment penalties, late charges, amounts due under any penalty provisions, or attorneys' fees or costs that accrued or arose after the Petition Date.

The Holders of the Allowed Bank Secured Claim shall have until May 2, 2016 to make the election, pursuant to section 1111(b) of the Bankruptcy Code (the "1111(b) Election"), which is the election provided to undersecured creditors pursuant to section 1111(b) of the Bankruptcy Code and Bankruptcy Rule 3014.

*If the Section 1111(b) Election is Not Made*.  In such event, Class 2 is comprised of the Allowed Bank Secured Claim.  Upon the terms and subject to the conditions set forth in the Plan, on the Effective Date, in full and final satisfaction and discharge of and in exchange for each Allowed Bank Secured Claim, the Banks shall receive the New Senior Debt.  In addition, in such event, Class 4 shall be comprised of the Allowed Bank Deficiency Claims.  In the event that the Banks have a Class 4 Bank Deficiency Claim, then, on the Effective Date, such holders of a Class 4 Bank Deficiency Claim shall receive, on the Effective Date and in full and final satisfaction of all Bank Deficiency Claims, a *pro rata* share of the PRS Plan Payment.

*If the Section 1111(b) Election is Made*.  In such event, the Class 2 Claim would be comprised of the "Allowed Bank 1111(b) Claim," which would provide the Banks with the PRS Plan Payment and deferred cash payments equal to the net present value of the Valuation Determination Amount.  In such event, no Class 4 Bank Deficiency Claims would exist.  Upon such 1111(b) Election, the Allowed Bank 1111(b) Claim will be evidenced by an 1111(b) Amended and Restated Note (the "1111(b) Amended and Restated Note"), which will be effective on the Effective Date and incorporate the terms of the existing notes, as modified as follows:

(1)  Principal Balance. The stated principal balance of the 1111(b) Amended and Restated Note shall be the Allowed Bank 1111(b) Claim.

(2)  Lien. From and after the Confirmation Date, the Holder of the Allowed Bank 1111(b) Claim shall retain its Lien in the Debtor's property consistent with the applicable prepetition loan documents and the 1111(b) Amended and Restated Note until the 1111(b) Amended and Restated Note is repaid in full.

(3)  Post Effective Date Interest.  No interest shall accrue on the 1111(b) Amended and Restated Note, except to the extent necessary to satisfy section 1111(b) of the Code.

(4) <u>Monthly Payments</u>.  Beginning on the fourteenth (14th) Business Day following the first (1st) day of the month following the Effective Date and on the fourteenth (14th) Business Day of each subsequent month thereafter through the three hundred and sixtieth month (360th) month after the Effective Date, Reorganized Debtor shall distribute to the Banks payments based upon a 40-year amortization schedule which shall equal, on an aggregated basis, the present value of the secured portion of the Allowed Bank Claim.

(5) <u>Maturity Date</u>.  The unpaid balance of the 1111(b) Amended and Restated Note, being the principal balance less the gross amount of all payments on the 1111(b) Amended and Restated Note, unless sooner paid, shall be due and payable on the first Business Day of the three hundred sixty first (361st) month after the Effective Date, or such later date as agreed to in writing by Reorganized Debtor and the Banks.

(6) <u>Full Repayment</u>.  As a result of the Section 1111(b) Election, the Allowed Bank 1111(b) Claim shall be deemed satisfied in full when the gross amount of all post-Effective Date Distributions made to the Banks on account of the Allowed Bank 1111(b) Claim equals the Allowed Bank 1111(b) Claim.

(7) <u>Prepayment</u>.  There shall be no penalty for prepayment for all or part of the 1111(b) Amended and Restated Note prior to the applicable maturity date under such note.

(8) <u>Financial Covenants</u>.  On and after the Effective Date, all financial covenants set forth in the prepetition loan documents shall be of no force and effect.

(9) <u>Prohibition on Improperly Asserting Fees and Costs</u>.  After the Effective Date, the Banks may not seek reimbursement or add to the amount of the Allowed Bank 1111(b) Claim any appraisal fees, title costs, charges, attorney's fees, or other amounts unless there has been a post-Effective Date default by the Reorganized Debtor with respect to the payments required under the Plan. Any and all costs, fees, or other charges arising or relating to events occurring prior to the Effective Date shall be waived and forever released unless expressly included as part of the Allowed Bank 1111(b) Claim as determined by Final Order of the Bankruptcy Court.

**E.      Acceptance Requirements.**

1.      <u>Acceptance or Rejection of the Plan.</u>

Classes 2, 4, 5 and 7 are Impaired under the Plan and are entitled to vote to accept or reject the Plan.  A class of creditors is deemed to accept a plan if the holders of at least two-thirds in dollar amount, and more than one-half in number, of those creditors that actually cast ballots, vote to accept such plan.  Classes 1 and 3 are unimpaired under the Plan and are, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Classes 6 and 8 are not entitled to receive or retain any property under the

Plan and are, therefore, conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

2.  <u>Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.</u>

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims. The Debtor shall seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to rejecting Classes of Claims. The Debtor reserves the right to modify the Plan to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

**F.  Means for Implementation of the Plan.**

1.  <u>Sources of Consideration.</u>

Except as otherwise provided in the Plan, all Cash consideration necessary for the Reorganized Debtor to make payments or distributions pursuant hereto shall be obtained from the Cash on hand of the Reorganized Debtor, including Cash derived from business operations.

2.  <u>New Senior Debt.</u>

On the Effective Date, the Reorganized Debtor shall enter into the New Senior Debt. The Confirmation Order shall be deemed approval of the New Senior Debt (including the transactions contemplated thereby, any amendments thereto and all actions to be taken, undertakings to be made and obligations to be incurred by the Reorganized Debtor in connection therewith, whether before or after the Effective Date) which shall be documented in substantially the same form and substance as the Reimbursement Agreements, subject to such modifications as described herein. A loan agreement, security document(s), intercreditor agreement and any other documents necessary or appropriate to reflect the New Senior Debt shall be filed as a Plan Supplement.

3.  <u>New Management Agreement.</u>

To the extent not entered into prior thereto, on the Effective Date, the Reorganized Debtor and the Manager will enter into the New Management Agreement, which shall be documented in substantially the same form as the Current Management Agreement with the sole material modification being the reinstatement of the full Base Management Fee not to exceed five percent (5%) of the Net Cash Operating Revenue (as defined in the Current Management Agreement) for the Reorganized Debtor; <u>provided</u>, <u>however</u>, that the Manager agrees, in the event the Plan is confirmed, to defer payment by the Reorganized Debtor of the post-Effective Date management fees under the New Management Agreement, in whole or in part, unless and until the Reorganized Debtor's days cash on hand exceeds 120 days for at least 60 consecutive days (after including the effect of payment of any management fees) or upon such other terms and conditions as may be agreed upon by the Manager in consideration with the reasonable and customary liquidity requirements in the CCRC industry. Once such stability is achieved, the Reorganized Debtor will resume full payment of Manager's five percent (5%) management fee and begin paying down deferred post-Effective Date management fees only to

the extent the Reorganized Debtor has sufficient cash to do so while maintaining 120 days cash on hand after giving effect to such payment.  Manager and Reorganized Debtor shall document such New Management Agreement in any reasonable manner necessary to contemplate the foregoing.  A copy of the New Management Agreement is annexed hereto as Exhibit 6.

4.      Vesting of Assets in the Reorganized Debtor.

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated therein, on the Effective Date, or as soon as practicable thereafter, all property of the Debtor's Estate including, without limitation, all Causes of Action (except those released pursuant to the Releases by the Debtor) shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances (except for Liens securing the New Senior Debt).  On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor may operate its business, and may use, acquire or dispose of property and compromise or settle any Claims or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

5.      Corporate Action.

Except as otherwise provided herein or in the Corporate Governance Documents or elsewhere in the Plan Supplement, the Reorganized Debtor shall continue to exist after the Effective Date as a separate nonstock nonprofit corporate entity with all the powers of a nonstock nonprofit corporation, pursuant to the applicable law in the jurisdiction in which the Reorganized Debtor is incorporated or formed.

6.      Reorganized Debtor's Governance.

The existing members of the Debtor's Board of Directors shall continue to be members of the Board of Directors of the Reorganized Debtor.

7.      Officers of Reorganized Debtor.

The existing officers of the Debtor shall continue to be officers of the Reorganized Debtor.  Such officers shall serve in accordance with applicable non-bankruptcy law.

8.      Employee Benefits.

Except as otherwise provided herein, on and after the Effective Date, the Reorganized Debtor may: (1) honor, in the ordinary course of business, any contracts, agreements, policies, programs and plans for, among other things, compensation, health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance and accidental death and dismemberment insurance for the directors, officers and employees of any of the Debtor who served in such capacity at any time and (2) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising before the Petition Date; provided, however, that the Debtor's or the Reorganized Debtor's performance under any employment agreement will not entitle any person to any benefit or alleged

entitlement under any policy, program or plan that has expired or been terminated before the Effective Date, or restore, reinstate or revive any such benefit or alleged entitlement under any such policy, program or plan. Nothing herein shall limit, diminish or otherwise alter the Reorganized Debtor's or the Debtor's defenses, claims, Causes of Action or other rights with respect to any such contracts, agreements, policies, programs and plans.

9.      Restructuring Transactions.

On the Effective Date or as soon as reasonably practicable thereafter, the Debtor and the Reorganized Debtor may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Persons may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Persons agree; (3) the filing of appropriate certificates or articles of incorporation or amendments thereof, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; and (4) all other actions that the applicable Persons determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

10.     Corporate Action.

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including all actions contemplated by the Plan (whether to occur before, on or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtor or the Reorganized Debtor, and any corporate action required by the Debtor or the Reorganized Debtor in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the directors or officers of the Debtor or the Reorganized Debtor.

On or (as applicable) before the Effective Date, the appropriate officers of the Debtor or the Reorganized Debtor, as applicable, shall be authorized and directed to issue, execute and deliver the agreements, documents, securities, certificates of incorporation, operating agreements and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Debtor or the Reorganized Debtor, as the case may be, and any and all other agreements, documents, securities and instruments relating to the foregoing.

11.     Section 1146 Exemption from Certain Taxes and Fees.

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property in contemplation of, in connection with, or pursuant to the Plan, shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing

and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, lien or other security interest; (2) the making or assignment of any lease or sublease; (3) any restructuring transaction authorized by of the Plan; or (4) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (c) deeds; or (d) assignments executed in connection with any transaction occurring under the Plan.

12.    <u>Preservation of Causes of Action of the Debtor.</u>

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to the Releases by the Debtor and exculpation provisions provided in the Plan), the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and the Reorganized Debtor's rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtor may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtor. No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtor or the Reorganized Debtor, as applicable, will not pursue any and all available Causes of Action against them. Except with respect to Causes of Action as to which the Debtor or the Reorganized Debtor has released any Person or Person on or before the Effective Date (including pursuant to the Releases by the Debtor or otherwise), the Debtor or the Reorganized Debtor, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan. Unless any Causes of Action against a Person are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtor expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after or as a consequence of the Confirmation or consummation of the Plan.

## G.    Treatment of Executory Contracts and Unexpired Leases.

1.    <u>Assumption and Rejection of Executory Contracts and Unexpired Leases.</u>

Except as otherwise provided in the Plan, or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, each of the Executory Contracts and Unexpired Leases of the Debtor shall be deemed assumed as of the Effective Date, unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected previously by the Debtor; (2) expired or terminated pursuant to its own terms before the Effective Date; (3) is the subject of a motion to reject filed on or before the Effective Date; or (4) is identified as an Executory Contract or Unexpired Lease to be rejected pursuant to the Plan Supplement before the Effective Date.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, all assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as such terms may have been modified by such order. Notwithstanding anything to the contrary in the Plan, the Debtor or the Reorganized Debtor, as applicable, reserve the right to alter, amend, modify or supplement the list of Executory Contracts and Unexpired Leases identified in the Plan Supplement at any time before the Effective Date. After the Effective Date, the Reorganized Debtor shall have the right to terminate, amend or modify any intercompany contracts, leases or other agreements without approval of the Bankruptcy Court.

2.    Claims Based on Rejection of Executory Contracts or Unexpired Leases.

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; provided, that any such Rejection Claims arising from the rejection of an Unexpired Lease shall be subject to the cap on rejection damages imposed by Bankruptcy Code section 502(b)(6). Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion and shall not be enforceable against the Debtor or the Reorganized Debtor, the Estate or its property without the need for any objection by the Reorganized Debtor or further notice to, or action, order or approval of the Bankruptcy Court. All Allowed Claims arising from the rejection of the Debtor's Executory Contracts or Unexpired Leases shall be classified as Class 7 General Unsecured Claims against the Debtor and shall be treated in accordance with the Plan.

3.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed under the Plan is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by Cure. If there is a dispute regarding (i) the nature or amount of any Cure, (ii) the ability of the Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (iii) any other matter pertaining to assumption, Cure shall occur following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of the assumption.

4.    <u>Insurance Policies.</u>

Notwithstanding anything herein to the contrary, as of the Effective Date, the Debtor shall assume (and assign to the Reorganized Debtor if necessary to continue the Insurance Policies in full force) all of the Insurance Policies pursuant to section 365(a) of the Bankruptcy Code.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtor's foregoing assumption and assignment of each of the Insurance Policies.

5.    <u>Modifications, Amendments, Supplements, Restatements or Other Agreements.</u>

Unless otherwise provided, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during other Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority or amount of any Claims that may arise in connection therewith, unless such Executory Contract or Unexpired Lease has been previously assumed by the Debtor.

6.    <u>Reservation of Rights.</u>

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtor has or have, as the case may be, any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtor or the Reorganized Debtor, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

7.    <u>Contracts and Leases Entered Into After the Petition Date.</u>

Notwithstanding any other provision in the Plan, contracts and leases entered into after the Petition Date by the Debtor, including any Executory Contracts and Unexpired Leases assumed by the Debtor, will be performed by the Debtor or the Reorganized Debtor liable thereunder in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

### H.      Provisions Governing Distributions.

#### 1.      Timing and Calculation of Amounts to Be Distributed.

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, on the next Distribution Date or as soon as reasonably practicable thereafter), each holder of an Allowed Claim against the Debtor shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided herein.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in the Plan.  Except as otherwise provided herein, holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

#### 2.      Disbursing Agent.

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Reorganized Debtor as Disbursing Agent or such other Person designated by the Reorganized Debtor as a Disbursing Agent on the Effective Date.

#### 3.      Rights and Powers of Disbursing Agent.

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

#### 4.      Payments and Distributions on Disputed Claims.

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

#### 5.      Special Rules for Distributions to Holders of Disputed Claims.

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Debtor or the Reorganized Debtor, on the one hand, and the holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

6.      Delivery of Distributions in General.

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be made to holders of record as of the Distribution Record Date by the Disbursing Agent.  Distributions to holders of Allowed Claims will be made at the address of each such holder as set forth in the Debtor's books and records.  Distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment or like legal process, so that each holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.  None of the Debtor, the Reorganized Debtor and the applicable Disbursing Agent shall incur any liability whatsoever on account of any distributions under the Plan except for gross negligence, willful misconduct or fraud.

7.      Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such distribution shall be made as soon as practicable after such distribution has become deliverable; provided, however, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the applicable Distribution Date.  After such date, all "unclaimed property" or interests in property shall revert to the Reorganized Debtor (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary), and the Claim of any holder to such property shall be discharged and forever barred.

8.      Withholding and Reporting Requirements.

In connection with the Plan and all instruments issued in connection therewith, the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements.

9.      Setoffs.

Except as set forth herein, the Debtor and the Reorganized Debtor may withhold (but not set off except as set forth below) from the distributions called for under the Plan on account of any Allowed Claim an amount equal to any claims, equity interests, rights and Causes of Action of any nature that the Debtor or the Reorganized Debtor may hold against the holder of any such Allowed Claim.  In the event that any such claims, equity interests, rights and Causes of Action of any nature that the Debtor or the Reorganized Debtor may hold against the holder of any such Allowed Claim are adjudicated by Final Order or otherwise resolved, the Debtor may, pursuant to section 553 of the Bankruptcy Code or applicable non bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim) the amount of any adjudicated or resolved claims, equity interests, rights and Causes of Action of any nature that the Debtor or the Reorganized Debtor may hold against the holder of any such Allowed Claim, but only to the extent of such adjudicated or resolved amount.  Neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the

Debtor or the Reorganized Debtor of any such claims, equity interests, rights and Causes of Action that the Debtor or the Reorganized Debtor may possess against any such holder, except as specifically provided herein.

                10.     <u>Insurance Claims.</u>

          No distributions under the Plan shall be made on account of Allowed Claims until the holder of such Allowed Claim has exhausted all remedies with respect to the Debtor's Insurance Policies.  To the extent that one or more of the Debtor's insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

                11.     <u>Applicability of Insurance Policies.</u>

          Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be made in accordance with the provisions of any applicable Insurance Policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtor or any Person may hold against any other Person, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

                12.     <u>Allocation of Distributions Between Principal and Unpaid Interest.</u>

          With the exception of distributions on account of the Bank Secured Claims, which shall be treated as provided in Class 2, to the extent that any Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for U.S. federal income tax purposes, be allocated on the Debtor's books and records to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the accrued but unpaid interest.

    **I.**        **Procedures for Resolving Contingent, Unliquidated and Disputed Claims.**

                1.     <u>Prosecution of Objections to Claims.</u>

          The Debtor (before the Effective Date) or the Reorganized Debtor (on or after the Effective Date), as applicable, shall have the exclusive authority to file, settle, compromise, withdraw or litigate to judgment any objections to Claims as permitted under the Plan.  From and after the Effective Date, the Debtor and the Reorganized Debtor may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.  The Debtor reserves all rights to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.

                2.     <u>Allowance of Claims.</u>

          Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case before the Effective Date (including the Confirmation Order), the Reorganized Debtor after the Effective Date will have and retain any and all rights and defenses held by the Debtor with

respect to any Claim as of the Petition Date. All claims of any Person against the Debtor shall be disallowed unless and until such Person pays, in full, the amount it owes each such Debtor.

3.       Distributions After Allowance.

On the Distribution Date following the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim.

4.       Estimation of Claims.

The Debtor (before the Effective Date) or the Reorganized Debtor (on or after the Effective Date) may, at any time, and from time to time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim against any party or Person, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtor (before the Effective Date) or the Reorganized Debtor (after the Effective Date), may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. All of the objection, estimation, settlement and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, objected to, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

**J.       Conditions Precedent to Confirmation of the Plan and the Effective Date.**

1.       Conditions Precedent to Confirmation.

It shall be a condition to Confirmation of the Plan that each of the following provisions, terms and conditions shall have been satisfied or waived pursuant to the provisions of the Plan:

(a)       The Bankruptcy Court shall have entered an order, which shall not be subject to any stay or subject to an unresolved request for revocation under section 1144 of the Bankruptcy Code, in form and substance reasonably acceptable to the Debtor, approving the Disclosure Statement with respect to the Plan and the solicitation of votes thereon as being in compliance with section 1125 of the Bankruptcy Code and applicable non-bankruptcy law.

(b)       The Confirmation Order (i) shall be, in form and substance, reasonably acceptable to the Debtor; (ii) shall include a finding by the Bankruptcy Court that the Reorganized Debtor's entry into the New Senior Debt will

be authorized; and (iii) shall not be subject to any stay or subject to an unresolved request for revocation under section 1144 of the Bankruptcy Code.

(c)    The Bankruptcy Court shall have held the 506(a) Valuation Hearing.

2.    Conditions Precedent to the Effective Date.

It shall be a condition to the Effective Date that each of the following provisions, terms and conditions shall have been satisfied or waived pursuant to the provisions of the Plan:

(a)    The Bankruptcy Court shall have entered one or more orders (which may include the Confirmation Order) authorizing the assumption and rejection of Executory Contracts and Unexpired Leases by the Debtor as contemplated herein in form and substance reasonably acceptable to the Debtor.

(b)    The Confirmation Order, in form and substance reasonably acceptable to the Debtor, shall have been entered by the Bankruptcy Court and shall not be subject to any stay or subject to an unresolved request for revocation under section 1144 of the Bankruptcy Code.

(c)    All of the schedules, documents, supplements and exhibits to the Plan shall have been filed in form and substance reasonably acceptable to the Debtor.

(d)    All actions, documents, certificates, and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws.

3.    Waiver of Conditions.

The conditions to confirmation and consummation of the Plan set forth herein may be waived at any time by the Debtor; provided, however, that the Debtor may not waive entry of the Orders approving this Disclosure Statement and confirming the Plan.

4.    Effect of Failure of Conditions.

If the consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any claims by or Claims against the Debtor; (2) prejudice in any manner the rights of the Debtor, any holders of Claims or any other Person; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtor, any holders or any other Person in any respect.

**K.    Modification, Revocation or Withdrawal of the Plan.**

1.    Modification and Amendments.

Except as otherwise specifically provided herein, the Debtor reserves the right to modify the Plan as to material terms and seek confirmation consistent with the Bankruptcy Code and, as appropriate, not re solicit votes on such modified Plan.  Subject to certain restrictions and

requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtor expressly reserve its rights to alter, amend or modify materially the Plan, one or more times, after confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with the Plan.

2.    Effect of Confirmation on Modifications.

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

3.    Revocation or Withdrawal of the Plan.

The Debtor reserves the right to, consistent with its fiduciary duties, revoke or withdraw the Plan before the Effective Date.  If the Debtor revokes or withdraws the Plan, or if Confirmation does not occur, then:  (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Class of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan shall:  (i) constitute a waiver or release of any Claims; (ii) prejudice in any manner the rights of the Debtor or any other Person; or (iii) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Person.

**L.    Retention of Jurisdiction.**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Court shall retain such jurisdiction over the Chapter 11 Case and all matters, arising out of or related to, the Chapter 11 Case and the Plan including jurisdiction to:

(a)    allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured or unsecured status or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount or allowance of Claims;

(b)    decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

(c)    resolve any matters related to: (i) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to

which the Debtor is party or with respect to which the Debtor may be liable in any manner and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including rejection Claims, cure Claims pursuant to section 365 of the Bankruptcy Code or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtor amending, modifying or supplementing, after the Effective Date, any Executory Contracts or Unexpired Leases the list of Executory Contracts and Unexpired Leases to be assumed or rejected; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

(d) ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(e) adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

(f) adjudicate, decide or resolve any and all matters related to any Cause of Action;

(g) adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(h) enter and enforce any order for the sale of property pursuant to sections 363, 1123 or 1146(a) of the Bankruptcy Code;

(i) resolve any avoidance or recovery actions under sections 105, 502(d), 542 through 551 and 553 of the Bankruptcy Code;

(j) resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with the consummation, interpretation or enforcement of the Plan or any Person's obligations incurred in connection with the Plan;

(k) issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation or enforcement of the Plan;

(l) resolve any cases, controversies, suits, disputes or Causes of Action with respect to the discharge, releases, injunctions, exculpations, indemnifications and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

(m) enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(n) determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract,

instrument, release, indenture or other agreement or document created in connection with the Plan or the Disclosure Statement;

(o)    adjudicate any and all disputes arising from or relating to distributions under the Plan;

(p)    consider any modifications of the Plan, cure any defect or omission or reconcile any inconsistency in any Court order, including the Confirmation Order;

(q)    determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

(r)    hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

(s)    hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(t)    hear and determine all disputes involving the existence, nature or scope of the Debtor's discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

(u)    enforce all orders previously entered by the Court;

(v)    hear any other matter not inconsistent with the Bankruptcy Code; and

(w)    enter an order concluding or closing the Chapter 11 Case.

## M.    Miscellaneous Provisions.

### 1.    Immediate Binding Effect.

Notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or any other Bankruptcy Rule, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtor, the Reorganized Debtor and any and all holders of Claims (irrespective of whether such Claims are deemed to have accepted the Plan), all Persons that are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in the Plan, each Person acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtor.

### 2.    Additional Documents.

On or before the Effective Date, the Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtor or the Reorganized Debtor, as applicable, and all holders of Claims receiving distributions pursuant to the Plan and all other

parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

3.    <u>Dissolution of The Committee.</u>

On the Effective Date, the Committee shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Case.

4.    <u>Reservation of Rights.</u>

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Court shall enter the Confirmation Order.  None of the Plan, any statement or provision contained in the Plan or any action taken or not taken by the Debtor with respect to the Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtor with respect to the holders of Claims or Interests before the Effective Date.

5.    <u>Successors and Assigns.</u>

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries or guardian, if any, of each Person.

6.    <u>Votes Solicited in Good Faith.</u>

Upon entry of the Confirmation Order, the Debtor will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and any applicable non bankruptcy law, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtor and its respective affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale and purchase of securities offered and sold under the Plan, and, therefore, will have no liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan.

7.    <u>Closing of Chapter 11 Case.</u>

The Debtor or the Reorganized Debtor shall, promptly after the full administration of the Chapter 11 Case, file with the Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Court to close the Chapter 11 Case.

## VI.    RISK FACTORS IN CONNECTION WITH THE PLAN.

**A.    If the Debtor receives the requisite votes to accept the Plan, there can be no assurance that the Court will confirm the Plan.**

Although the requisite votes to accept the Plan may be obtained, there can be no assurance that one or more parties will not seek to oppose confirmation of the Plan or that the Court may otherwise decline to confirm the Plan.

**B.    If the Plan is confirmed, there can be no assurance that the effective date of the Plan will occur.**

Although the Debtor believes that the Effective Date will occur reasonably soon after the Plan is approved by the Court, there can be no assurance as to such timing or as to whether it will occur.

**C.    There can be no assurance that the Court will approve the classification scheme in the Plan.**

The Court, which sits as a court of equity, may exercise substantial discretion in connection with the Plan.  Section 1122 of the Bankruptcy Code requires that the Plan classify claims against, and interests in, the Debtor.  The Bankruptcy Code also provides that the Plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.  The Debtor believes that all claims and interests have been appropriately classified in the Plan.  There can be no assurance, however, that the Court will conclude that such claims and interests are properly classified in the Plan.

**D.    The Debtor's actual financial results may vary significantly from the projections filed with the Court.**

The financial projections attached hereto reflect numerous assumptions, including the consummation of the Plan.   The financial projections should be viewed in conjunction with a review of these assumptions including the qualifications and footnotes (if any) as set forth therein.  The financial projections were prepared by professionals of the Debtor in good faith based upon assumptions believed to be reasonable at the time of preparation.  While presented with numerical specificity, the financial projections are based upon a variety of estimates and assumptions subject to significant business, economic and competitive uncertainties and contingencies, many of which are beyond the control of the Debtor.  Actual results may vary materially from those presented.  The financial projections have not been prepared to comply with the guidelines established with respect to projections by the SEC or the *AICPA*, have not been audited and are not presented in accordance with *GAAP*.

This Disclosure Statement contains projected financial information that demonstrates the feasibility of the Plan and the ability of the Debtor to continue operations upon emergence from proceedings under the Bankruptcy Code.  Such information was prepared for the limited purpose of furnishing holders of all Claims with adequate information to make an informed judgment regarding acceptance of the Plan.  None of the projections should be regarded for the purpose of this Disclosure Statement as representations or warranties by the

Debtor or any other person as to the accuracy of such information or that any such projections will be realized.  The achievement of certain results or other expectations contained in these projections involve known and unknown risks, uncertainties and other factors which may cause actual results, performances or achievements described to be materially different from any future results, performance or achievements expressed or implied by these forward-looking statements. The Debtor does not plan to issue any updates or revisions to those forward-looking statements if or when changes in their expectations, or events, conditions or circumstances on which these statements are based, occur.

**E.    Even if the Plan is confirmed, the extent of the Debtor's remaining indebtedness may impair its financial condition and the Debtor's ability to grow and compete.**

As of the date hereof, the Debtor's total secured debt is approximately $36 million.  Although the Debtor anticipates that the Plan will significantly increase its liquidity, it still will have a significant level of debt upon consummation of the Plan.  The Debtor's debt has important consequences for its financial condition, including:

- making the Debtor vulnerable to general adverse economic, competitive and industry conditions;

- limiting the Debtor's ability to obtain additional financing to support its operations and complete construction and maintenance of its Facility;

- limiting the Debtor's ability to execute key strategies;

- limiting the Debtor's ability to attract and retain key personnel;

- requiring a substantial portion of the Debtor's cash flow from operations for the payment of principal and interest on its debt and reducing its ability to use its cash flow to fund working capital, capital expenditures, execution of its business strategy, acquisitions, operations and general corporate requirements;

- limiting the Debtor's ability to retain and attract residents;

- limiting the Debtor's flexibility in planning for, or reacting to, changes in its business and the industry in which it operates; and

- limiting the Debtor's ability to receive trade credit from its vendors or otherwise placing it at a competitive disadvantage to other less-leveraged competitors.

**F.    Servicing the Debtor's debt will require a significant amount of cash, and its ability to generate sufficient cash depends upon many factors, some of which are beyond its control.**

The Debtor's ability to make payments on and refinance its debt, fund planned capital expenditures and execute its business strategy depends on its ability to generate cash flow in the future.  To some extent, this is subject to general economic, financial, competitive and other factors that are beyond the Debtor's control.  Even if the Plan is consummated, there can be no assurance that the Debtor's business will continue to generate cash flows at or above current levels or that it will be able to meet its cash needs.  If the Debtor is unable to service its debt or experiences a significant reduction in its liquidity, the Debtor could be forced to reduce or delay

planned capital expenditures and other initiatives, sell assets, restructure or refinance its debt or seek additional equity capital, and the Debtor may be unable to take any of these actions on satisfactory terms or in a timely manner, or at all.  Further, any of these actions may not be sufficient to allow the Debtor to service its debt obligations or may have a materially adverse effect on its results of operations and financial condition.  The Debtor's failure to generate sufficient operating cash flows to pay its debts or refinance its indebtedness could have a material adverse effect on its results of operations and financial condition.  If the Debtor cannot make scheduled payments on its debt, it would be in default, and as a result, holders of such debt could declare all outstanding principal and interest to be due and payable and the Debtor's existing and future lenders could, under certain circumstances, terminate their commitments to lend it money and foreclose against the assets securing its borrowings.

G.     **The Debtor may fail to maintain turnover or occupancy.**

The economic feasibility of the Facility depends upon the ability of the Facility to attract sufficient residents and to maintain substantial occupancy of the Facility.

If the levels of occupancy for the Facility do not occur, the revenues anticipated by the Facility from monthly fees and other charges could be adversely affected.  If a substantial number of residents live beyond the life expectancies anticipated by the Debtor, new residents will be admitted at a slower rate and the receipt of additional, potentially higher entrance fees will be curtailed with a consequent impairment of the Facility's cash flow.  Even if the anticipated attrition levels are realized and maintained, no assurance can be given that remarketing of vacated units will take place as quickly as assumed by the Debtor.

H.     **The Debtor may be faced with competition from other similar facilities.**

The Debtor faces competition from similar facilities operating and under construction in or near its market area, from other residential facilities for older adults and from existing facilities offering custodial, intermediate and skilled nursing care, including nearby University of Wisconsin Hospital and related clinics.  The Debtor may face additional competition in the future as a result of the construction of new, or the renovation or expansion of existing, housing and nursing care facilities for elderly persons in the area served by the Facility as well as in the areas surrounding the area served by the Facility.

I.     **The Plan and the related transactions, which contemplate transactions that will modify the Debtor's capital structure, are based in large part upon assumptions and analyses developed by it.  If these assumptions and analyses prove to be incorrect, the Debtor's plan may be unsuccessful in its execution of the restructuring and it may be unable to continue as a going concern.**

The Plan and the transactions related thereto, which contemplate transactions that will affect the Debtor's capital structure, are based upon assumptions and analyses based on the Debtor's experience and perception of historical trends, current conditions and expected future developments, as well as other factors that it considers appropriate under the circumstances.  Whether actual future results and developments will be consistent with the Debtor's expectations and assumptions depend on a number of factors.

In addition, the Plan relies upon financial forecasts, including with respect to revenue growth, improved earnings before interest, taxes, depreciation and amortization, improved interest margins, and growth in cash flow.  Financial forecasts are necessarily speculative, and it is likely that one or more of the assumptions and estimates that are the basis of these financial forecasts will not be accurate.  The Debtor's actual financial condition and results of operations may differ, perhaps materially, from what it anticipated.  Consequently, there can be no assurance that the results or developments contemplated by the Plan will occur or, even if they do occur, that they will have the anticipated effects on the Debtor's business or operations.  The failure of any such results or developments to materialize as anticipated could materially adversely affect the successful execution of the transactions contemplated by the Plan.

**J.      Uncertainties related to the Debtor's business may impact its ability to attract new residents.**

The Debtor's success depends on its ability to consistently, accurately and effectively provide affordable living accommodations and related healthcare and support services to middle-income seniors.  Should seniors perceive that the uncertainties related to the Debtor's business have adversely affected its services, there will a decrease in new residents attracted to its CCRC.

**K.      Uncertainties related to the Debtor's business may create a distraction for or cause a loss of personnel and may otherwise materially adversely affect its ability to attract new personnel.**

The market for qualified personnel is competitive and the Debtor's future success will depend upon, among other factors, its ability to attract and retain key personnel.  In addition, uncertainties about the future prospects and viability of its business is impacting and is likely to continue to impact the Debtor's ability to attract and retain key personnel, and is a distraction for existing personnel.  If the Debtor loses the services of key personnel, if one or more of them decides to join a competitor or otherwise compete with it or if personnel continue to be distracted due to the uncertainties about the future prospects and viability of its business, the Debtor may not be able to effectively implement its business strategy and its business could suffer.  The loss of the services of any of the Debtor's other key management personnel or the failure to attract and retain personnel could have a material adverse effect on its results of operations and financial condition due to disruptions in its leadership and the continuity of its business relationships.

**L.      Costs to provide healthcare and other benefits to the Debtor's employees may increase.**

The Debtor provides healthcare and other benefits to its employees.  In recent years, costs for healthcare have increased more rapidly than general inflation in the U.S. economy.  In addition, there can be no assurance that changes in healthcare regulation will not result in material increases in the Debtor's healthcare-related costs.  If this trend in healthcare costs continues, the Debtor's cost to provide such benefits could increase, which may have a material adverse effect on its profitability.

**M.**     **The Debtor may incur costs or liabilities under environmental laws and regulations.**

The Debtor is subject to a wide range of general environmental, health and safety laws and regulations as well as industry-specific regulations relating to CCRCs. Violation of these laws and regulations can lead to substantial fines and penalties, other civil or criminal sanctions and closure of the Facility. The Debtor incurs costs and capital expenditures to comply with these laws and regulations, and to obtain and maintain all necessary permits.

**N.**     **Third party reimbursement may be reduced or eliminated.**

The health care industry, in general, is subject to regulation by a number of governmental agencies, including those which administer the Medicaid and Medicare reimbursement programs, and other federal, State and local governmental agencies. As a result, the Debtor is sensitive to legislative and regulatory changes in such programs and is affected by reductions in governmental spending for such programs. Congress has in the past enacted a number of provisions which affect health care providers, and additional legislative changes can be expected. Previous legislative actions have included limitation of payments to nursing homes under the Medicare and Medicaid programs.

Future legislation, regulation or actions by the federal government are expected to continue the trend toward more restrictive limitations on reimbursement for long-term care services. At present, no determination can be made concerning whether, or in what form, such legislation would be introduced and enacted into law. Similarly, the impact of future cost control programs and future regulations upon the Debtor's financial performance cannot be determined at this time.

The Debtor may receive reimbursement from non-governmental third-party payors, such as commercial insurers, employers under self-insurance programs, health maintenance organizations, and preferred provider organizations. Most of these programs make payments at rates which are less than actual charges. Accordingly, there can be no assurance that payments made under such programs will be adequate to cover actual costs incurred.

**O.**     **The Debtor may change the level of services provided to its residents.**

The Debtor may, from time to time, be subject to pressure from organized groups of residents seeking, among other things, to raise the level of services or to maintain the level of monthly fees with respect to the Facility or other charges without increase. Moreover, the Debtor may be subject to conflicting pressures from different groups of residents, some of whom may seek an increase in the level of services while others wish to hold down monthly fees and other charges. No assurance can be given that the Debtor will be able satisfactorily to meet the needs of both groups.

**P.**     **The income of the elderly may diminish.**

A large percentage of the monthly income of the residents of the Facility is fixed income derived from pensions and social security or income from investments. If, due to inflation or otherwise, substantial increases in monthly fees are required to cover increases in

operating costs, wages, benefits and other expenses, residents may have difficulty paying such monthly fees. Furthermore, investment income of the residents may be adversely affected by declines in the stock market and market interest rates, also resulting in payment difficulties.

### Q.    Other Possible Risk Factors.

The occurrence of any of the following events, or other unanticipated events, could adversely affect the financial condition or results of operations of the Debtor:

(1)    reinstatement of or establishment of mandatory governmental wage, rent or price controls;

(2)    adoption of federal, state or local legislation or regulations having an adverse effect on the future operating or financial performance of the Debtor;

(3)    events adversely affecting the operation of the Facility, including enactment of legislation imposing ceilings on increases in health care charges, changes in Medicare, Medicaid or comparable regulations or attempts by third-party payors administering health care cost reimbursement plans to control or restrict the operations of certain health care facilities;

(4)    a decline in the population, a change in the age composition of the population or a decline in the economic conditions of the Debtor's market area;

(5)    developments or events affecting the federal or State exemption of the Debtor's income from taxation;

(6)    suspension or revocation of or failure to renew any license, certificate or approval to operate the Facility, or any portion thereof, or any restriction on new admissions to licensed beds;

(7)    changes in key management personnel;

(8)    reductions in utilization of continuing care retirement and assisted living facilities as a result of preventive medicine, improved occupational health and safety, development and utilization of medical and scientific research and technological advances and other developments;

(9)    changes in reimbursement procedures or in contracts under public or private insurance programs;

(10)    increased costs of attracting and retaining, or decreased availability of a sufficient number of, health professionals, including trained nurses vital to the Facility;

(11)    increased costs resulting from employee strikes, or the unionization of the employees of the Debtor or the utilization by a non-union employee of the Debtor of proceedings available under the National Labor Relations Act;

(12)  increases in costs, including costs associated with, among other things, salaries, wages and fringe benefits, supplies, technology and equipment, insurance, energy and other utilities, the attraction and retention of nurses and other personnel, compliance with or violation of environmental laws and regulations, and other costs that could result in a sizable increase in expenditures without a corresponding increase in revenues;

(13)  inability of the Debtor to obtain future governmental approvals to undertake additional projects necessary to remain competitive as to rates, charges and the quality and scope of care or any limitation on the availability of tax-exempt or other financing for future projects; and

(14)  the occurrence of natural disasters, including floods, hurricanes, tornadoes and earthquakes, could damage the Facility, interrupt utility service or otherwise impair the operations of the Debtor and the generation of revenues from the Facility.  The Facility is required to be covered by general property insurance in amounts which management of the Debtor considers to be sufficient to provide for the replacement of such Facility in the event of a natural disaster.

## VII.   FINANCIAL PROJECTIONS

Attached hereto as Exhibit 4 are the Debtor's financial projections (the "Projections") for the ten (10) year period after the Effective Date (the "Projection Period"). Among other things, these Projections reflect the amount and treatment of the New Senior Debt as well as the deferral of Manager's post-Effective Date management fees as described in section V.F.3 herein.  In particular, the Projections show that in years 2 to 5 of the Projection Period, the Reorganized Debtor will be making annual, interest-only payments totaling $1,260,000 (in year 1, the payment totals $315,000 reflecting the pro rata amount that will be due in 2016) related to the New Senior Debt.  In addition, in years 1 to 5 of the Projection Period, the Projections reflect Manager's deferral of management fees totaling approximately $1.0 million annually in order to allow the Reorganized Debtor to build its cash reserves.  In years 6 to 10 of the Projection Period, the Reorganized Debtor will have a maximum annual debt service payment of approximately $1,799,000 comprised of annual interest payments ranging from $1,064,000 to $1,158,000 and annual principal payments ranging from $641,000 to $735,000.  In addition, during years 6 to 10 of the Projection Period, the Reorganized Debtor will begin paying down the deferred management fees that accrued in years 1 to 5.  As reflected in the Projections, in years 6 to 10 of the Projection Period, the Reorganized Debtor anticipates having sufficient cash to pay its new debt service obligations, honor its refund obligations, pay Manager's 5% Base Management Fee and pay down a portion of the deferred management fees while maintaining 120 days cash on hand as described in section V.F.3 herein.

## VIII. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN OF REORGANIZATION

The Plan must be approved by the Court after a confirmation hearing.

### A. Elements of Confirmation.

In order for the Plan to be confirmed, the Bankruptcy Code requires that the Court determine that the Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code and that the disclosures concerning the Plan have been adequate and have included information concerning all payments made or promised in connection with the Plan and this Case. The Bankruptcy Code also requires that: (1) the Plan be accepted by the requisite votes of Creditors except to the extent that confirmation despite dissent is available under Bankruptcy Code section 1129(b); (2) the Plan is feasible (that is, there is a reasonable probability that the Debtor will be able to perform its obligations under the Plan without needing further financial reorganization not contemplated by the Plan); and (3) the Plan is in the "best interests" of all Creditors (that is, Creditors will receive at least as much under the Plan as they would receive in a hypothetical liquidation case under chapter 7 of the Bankruptcy Code). To confirm the Plan, the Court must find that all of the above conditions are met, unless the applicable provisions of Bankruptcy Code section 1129(b) are employed to confirm the Plan, subject to satisfying certain conditions, over the dissent or deemed rejections of Classes of Claims.

### B. Best Interests of Creditors.

With respect to each Impaired Class of Claims, confirmation of the Plan requires that each holder of a Claim either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each Impaired Class of Claims if the Debtor was liquidated under Chapter 7, the Court must first determine the aggregate dollar amount that would be generated from the Debtor's assets if its Chapter 11 Case was converted to a Chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the Debtor's assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral, and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both a Chapter 7 case and Chapter 11 Case. Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the Debtor in its Chapter 11 Case (such as compensation of attorneys, financial advisors and accountants) that are allowed in the Chapter 7 case, litigation costs, and claims arising from the operations of the Debtor during the pendency of the Chapter 11 Case. The liquidation itself would trigger certain Tax and Other Priority Claims (collectively, "Priority Claims") that otherwise would be due in the ordinary course of business. Those Priority Claims would be paid in full from the liquidation proceeds before the balance would be made available to pay General

Unsecured Claims.  The liquidation would also prompt the rejection of most, if not all, of the Debtor's executory contracts and unexpired leases, thereby creating a significant increase in General Unsecured Claims.

Liquidation of the Debtor may create an entirely new class of claims on behalf of the Debtor's residents, including (i) claims for return of Entrance Fees; (ii) claims against the Debtor for failure to honor its life-care commitments; and (iii) claims by residents for hardships caused by a shut-down of the Debtor's facility.  These claims could be entitled to priority under several theories.  Furthermore, liquidation would cause extreme hardship to the Debtor's residents who would be displaced and would likely result in the intervention by the applicable regulatory authorities.

The Debtor believes that the Plan meets the "*best interests of creditors*" test of section 1129(a)(7) of the Bankruptcy Code.  The Debtor believes that the members of Impaired Classes 2, 4, 5 and 7 will receive more under the Plan than they would receive in a liquidation. The Liquidation Analysis for a potential Chapter 7 liquidation scenario is attached hereto as **Exhibit 3**.

Moreover, the Debtor believes that according to applicable Seventh Circuit case law, the "absolute priority rule", which provides that equity cannot retain any interest in a reorganized entity or receive any distributions on account of its equity interest unless either the class of unsecured creditors consents to the plan or is paid in full, is not applicable in this case. With respect to not-for-profit entities, such as the Debtor, no equity interests exist.  In *In re Wabash Valley Power Association*, the Seventh Circuit held that the absolute priority rule did not apply to a not-for-profit, noting that there was no "equity interest" to be retained.  *In re Wabash Valley Power Ass'n, Inc.*, 72 F.3d 1305 (7th Cir. 1995).  The Banks dispute the notion that the absolute priority rule does not apply in this case.

Although the Debtor believes that the Plan meets the "best interests test" of section 1129(a)(7) of the Bankruptcy Code, there can be no assurance that the Court will determine that the Plan meets this test.

### C.    Feasibility of the Plan.

The Bankruptcy Code requires that the Court determine that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor.  For purposes of showing that the Plan meets this feasibility standard, the Debtor has analyzed the ability of the Reorganized Debtor to meet its obligations under the Plan and retain sufficient liquidity and capital resources to conduct their business.

The Debtor believes that it will be able to support the Projections set forth in **Exhibit 4** to this Disclosure Statement.

Holders of Claims against the Debtor are advised, however, that the Projections were not prepared with a view toward compliance with the published guidelines of the American Institute of Certified Public Accountants or any other regulatory or professional agency or body or generally accepted accounting principles.

In addition to any assumptions contained in the Projections themselves, the Projections also assume that (i) the Plan will be confirmed and consummated in accordance with its terms, (ii) there will be no material adverse change in legislation or regulations, or the administration thereof, including environmental legislation or, regulations, that will have an unexpected effect on the operations of the Reorganized Debtor, (iii) there will be no change in United States generally accepted accounting principles that will have a material effect on the reported financial results of the Reorganized Debtor, and (iv) there will be no material contingent or unliquidated litigation or indemnity claims applicable to the Reorganized Debtor.  To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change.  In addition, although they are presented with numerical specificity and considered reasonable by the Debtor when taken as a whole, the assumptions and estimates underlying the Projections are subject to significant business, economic and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtor.

Accordingly, the Projections are only estimates that are necessarily speculative in nature.  It can be expected that some or all of the assumptions in the Projections will not be realized, and that actual results will vary from the Projections, which variations may be material and are likely to increase over time.  The Projections should therefore not be regarded as a representation by the Debtor or any other person that the results set forth in the Projections will be achieved.  In light of the foregoing, readers are cautioned not to place undue reliance on the Projections.

The Debtor does not intend to update or otherwise revise the Projections, including any revisions to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition.  Furthermore, the Debtor does not intend to update or revise the Projections to reflect changes in general economic or industry conditions.  Whether actual results will conform to the Projections is subject to a number of risks and uncertainties, including:

- the high degree of competition in the Debtor's business;
- the susceptibility of the Debtor's business to general economic conditions;
- discovery of unknown contingent liabilities;
- the interest rate environment;
- the ability to attract new residents;
- the effect of tightened liquidity markets on the Debtor and prospective residents; and
- future capital requirements.

**D.    Confirmation of the Plan if One or More Classes Do Not Accept.**

Bankruptcy Code section 1129(b) provides that a plan of reorganization can be confirmed even if the such plan of reorganization is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it.  A bankruptcy court may confirm a plan

of reorganization at the request of the debtor if the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted the plan of reorganization.

A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A plan is fair and equitable as to a class of claims which rejects a plan if the plan provides (a) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (a) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (b) that the holder of any interest that is junior to the interests of such class will not receive or retain any property at all on account of such junior interest under the plan.

### E.      Hearing on Confirmation of the Plan.

At the time and place given in the notice served with the order approving the Disclosure Statement, the Court will hold a hearing to determine if the Plan has been accepted by a requisite number of Claims and whether the other requirements for Confirmation of the Plan have been satisfied.

**CREDITORS ARE NOT REQUIRED TO ATTEND THE HEARING ON CONFIRMATION UNLESS THEY HAVE EVIDENCE OR ARGUMENT TO PRESENT TO THE COURT CONCERNING THE MATTERS TO BE ADDRESSED AT THE HEARING ON CONFIRMATION.**

### IX.      CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

This Disclosure Statement does not discuss any federal income tax consequences of the Plan to Creditors.  Accordingly, Creditors should consult their own tax advisors regarding their ability to recognize a loss for tax purposes and any other tax consequences to them of the Plan.

**DUE TO A LACK OF DEFINITIVE JUDICIAL OR ADMINISTRATIVE AUTHORITY AND INTERPRETATION, SUBSTANTIAL UNCERTAINTIES EXIST WITH RESPECT TO VARIOUS TAX CONSEQUENCES OF THE PLAN.  FOR THE FOREGOING REASONS CREDITORS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS AS TO SPECIFIC TAX CONSEQUENCES (FEDERAL, STATE AND LOCAL) OF THE PLAN.**

## X.    EFFECTS OF PLAN CONFIRMATION

A confirmed plan leaves the holders of Claims with new rights as set forth in the confirmed plan. Therefore, in the event of a default after Confirmation, a holder of a Claim may pursue its remedies under the Plan. Some rights may remain with holders of Claims after the provisions of the confirmed Plan have been carried out. The automatic stay of Bankruptcy Code section 362(a) as to actions against the Debtor and their assets remains in effect until the Chapter 11 Case is closed. Thereafter, all parties in interest will be enjoined from taking any action inconsistent with the Plan.

### A.    Compromise and Settlement of Claims, Interests and Controversies.

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims and controversies relating to the contractual, legal and subordination rights that a holder of a Claim may have with respect to any Allowed Claim, or any distribution to be made on account of such Allowed Claim. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, its Estate and holders of Claims and is fair, equitable and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtor may compromise and settle Claims against them and Causes of Action against other Persons.

### B.    Releases by the Debtor.

Pursuant to section 1123(b) of the Bankruptcy Code and except as otherwise specifically provided in the Plan or the Plan Supplement, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtor and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtor, the Reorganized Debtor and the Estate from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtor, the Reorganized Debtor, the Estate or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's Chapter 11 Case, the purchase, sale or rescission of the purchase or sale of any security of the Debtor, the Reorganized Debtor or the Issuer, the subject matter of, or the transactions or events giving rise to, any Claim that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims before or during the Debtor's Chapter 11 Case, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, any Plan Supplement or related agreements, instruments or other documents (collectively, the "Debtor Released Claims"), other than Debtor Released Claims

against a Released Party arising out of or relating to any act or omission of that party constituting willful misconduct or gross negligence.

### C.    Releases by Holders of Claims.

As of the Effective Date and except as set forth in the Plan or the Plan Supplement, each holder of a Claim who votes to accept the Plan and does not mark such ballot to indicate their refusal to grant the release provided for in this paragraph, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Debtor, the Reorganized Debtor and the Released Parties from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims assertable on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Person would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's restructuring, the Debtor's Chapter 11 Case, the purchase, sale or rescission of the purchase or sale of any security of the Debtor, the Reorganized Debtor or the Issuer, the subject matter of, or the transactions or events giving rise to, any Claim that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims before or during the Chapter 11 Case, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, any Plan Supplement or related agreements, instruments or other documents, including without limitation, the New Senior Debt (collectively, "Released Claims"), other than Released Claims against a Debtor, the Reorganized Debtor, or a Released Party arising out of or relating to any act or omission of that party constituting willful misconduct or gross negligence; provided, however that this Plan shall not release the Debtor, the Reorganized Debtor and the Released Parties from any Cause of Action held by a current resident under his or her Residency Agreement or on account of an alleged tort claim arising from an injury sustained by such resident or invitee at the Facility, or a governmental entity existing as of the Effective Date based on (i) the Internal Revenue Code or other domestic state, city, or municipal tax code, (ii) the environmental laws of the United States or any domestic state, city, or municipality, (iii) any criminal laws of the United States or any domestic state, city, or municipality, (iv) the Securities and Exchange Act of 1934 (as now in effect or hereafter amended), the Securities Act of 1933 (as now in effect or hereafter amended), or other securities laws of the United States or any domestic state, city or municipality, (v) the Employee Retirement Income Security Act of 1974, as amended, or (vi) the laws and regulations of the Bureau of Customs and Border Protection of the United States Department of Homeland Security.

### D.    Exculpation.

Except as otherwise specifically provided in the Plan or Plan Supplement, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim, obligation, cause of action or liability for any Exculpated Claim, except for gross negligence or willful misconduct (to the extent such duty is imposed by applicable non bankruptcy law), but in all respects such Persons shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Debtor and the Reorganized Debtor (and each of their respective affiliates, agents, directors, members, officers, employees, advisors and attorneys) have, and upon Confirmation of the Plan shall be presumed to have, participated in good faith and in

compliance with the applicable provisions of the Bankruptcy Code and applicable non-bankruptcy law with regard to the solicitation and distribution of securities pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

### E.       Discharge of Claims and Termination of Interests.

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release and discharge, effective as of the Effective Date, of all Claims and Causes of Action of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against the Debtor or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, including demands, liabilities and Causes of Action that arose before the Effective Date, any contingent or non contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such Claim, debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim based upon such Claim, debt or right is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim has accepted the Plan. Except as otherwise provided herein, any default by the Debtor or its affiliates with respect to any Claim that existed before or on account of the filing of the Chapter 11 Case shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

### F.       Injunction.

FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THIS PLAN OR THE CONFIRMATION ORDER.

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN THIS PLAN, THE RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THIS PLAN.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THIS PLAN, ALL PERSONS WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS THAT HAVE BEEN RELEASED, DISCHARGED, OR ARE SUBJECT TO

EXCULPATION, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS; (2) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS; (3) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH PERSONS OR THE PROPERTY OR ESTATE OF SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS; AND (4) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS RELEASED, SETTLED OR DISCHARGED PURSUANT TO THIS PLAN.

THE RIGHTS AFFORDED IN THIS PLAN AND THE TREATMENT OF ALL CLAIMS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTOR OR ANY OF ITS ASSETS, PROPERTY OR ESTATE. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTOR SHALL BE FULLY RELEASED AND DISCHARGED (EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS PLAN).

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THIS PLAN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE DEBTOR SHALL BE FULLY RELEASED AND DISCHARGED, AND THE DEBTOR'S LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

ALL PERSONS SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTOR, THE DEBTOR'S ESTATE, THE REORGANIZED DEBTOR, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

G.      **Term of Injunctions or Stays.**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### H.    Protection Against Discriminatory Treatment.

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Persons, including Governmental Units, shall not discriminate against the Reorganized Debtor or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtor or another Person with whom the Reorganized Debtor has or have been associated, solely because the Debtor has been a debtor under chapter 11, has been insolvent before the commencement of the Chapter 11 Case (or during the Chapter 11 Case but before the Debtor is granted or denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Case.

### I.    Release of Liens.

Except as otherwise provided in the Plan, including, but not limited to, Class 2 of the Plan, the New Senior Debt, or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estate shall be fully released and discharged, and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtor and its successors and assigns.  For the avoidance of doubt, except as otherwise provided in the Plan, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estate shall be fully released and discharged on the Effective Date without any further action of any party, including, but not limited to, further order of the Bankruptcy Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code.

### XI.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### A.    Liquidation Under Chapter 7.

At the outset, section 1112(c) of the Bankruptcy Code provides that a not-for-profit chapter 11 case cannot be converted to a chapter 7 liquidation case without the consent of the Debtor.  This rule is in stark variation to the traditional rule of conversion to chapter 7, where a typical debtor corporation may be converted upon request of a debtor or a party-in-interest establishing that such conversion is in the best interests of creditors and the estate.  11 U.S.C. § 1112.  Thus, in this case, the Debtor would have to consent to conversion to chapter 7.

If no Chapter 11 Plan can be confirmed, the Chapter 11 Case may be, solely with the consent of the Debtor, converted to a case under chapter 7 of the Bankruptcy Code, in which a trustee would be elected or appointed to liquidate the assets of the Debtor.  The Debtor believes that liquidation under chapter 7 would result in smaller distributions, if any, being made to Creditors than those provided for in the Plan because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals during such liquidation.

The Debtor, with the assistance of its professionals, has prepared a Liquidation Analysis, attached hereto as **Exhibit 3**.  The Liquidation Analysis is based upon a hypothetical liquidation in a chapter 7 case.  The Debtor has taken into account the nature, status and underlying value of its assets, the ultimate realizable value of its assets, and the extent to which such assets are subject to the liens and security interests.

The likely form of any liquidation would be the sale of the Debtor's individual assets.  Based on this analysis, it is likely that a chapter 7 liquidation of the Debtor's assets would produce less value for distribution to creditors than that recoverable under the Plan.  In the opinion of the Debtor, the recoveries projected to be available in a chapter 7 liquidation are not likely to afford the holders of Claims as great a realization potential as do the Plan.

**B.    Alternative Plan of Reorganization.**

If the Plan is not confirmed, the Debtor or any other party in interest could attempt to formulate a different plan of reorganization.  During the course of negotiation of the Plan, the Debtor explored various other alternatives and concluded that the Plan represented the best alternative to protect the interests of creditors, residents and other parties in interest.  The Debtor has not changed its conclusions.

## XII.   CONCLUSION AND RECOMMENDATIONS

The Debtor urges all creditors entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by immediately returning their properly completed ballots to the appropriate voting agent as set forth on the ballots within the time stated in the notice served with this Disclosure Statement.

Dated: April 17, 2016                           Respectfully submitted,

                                                **Capitol Lakes, Inc.**

                                                By:  _/s/ Tim Conroy_
                                                Name: Tim Conroy
                                                Title: Executive Director