IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

In Re:

CAPITOL LAKES, INC.,                                                              (Chapter 11)

          Debtor.                                                                     Case No. 16-10158

MEMORANDUM DECISION

      Debtor, Capitol Lakes, Inc. (Capitol), filed a voluntary Chapter 11 petition on January 20, 2016. On June 15, 2016, Capitol filed its fifth (5th) amended plan. Secured creditors, Santander Bank N.A. (Santander) and KBC Bank, N.V. (KBC) (the banks), were the only parties to object to confirmation. A confirmation hearing on Capitol's plan was held on June 22, 2016.

      The banks have claims against the debtor totaling $57.6M. This court has previously valued the banks' collateral at $36M (that valuation is currently on appeal). The banks have elected treatment of their claims under 11 U.S.C. § 1111(b). Accordingly, they are entitled to receive total payments under the plan equal to the amount of their claims ($57.6M), which payments must have a current value equaling the value of their collateral ($36M).

      The debtor's plan proposes a restructured note, under which the banks will receive twelve (12) annual payments of $1,674,000, followed by a $33,720,000 balloon payment in year thirteen (13). The $1,674,000 figure was reached by multiplying $36M (the current value of the banks' collateral) by a 4.65% interest rate. In proposing these terms "the Debtor assume[d] that approximately $3.8M [$3,799,000] of cash held in the Debtor's debt service reserve accounts [would] be drawn by the Lenders," thereby reducing "the Allowed Bank 1111(b) Claim on or after the Effective Date, as defined in the Plan." Expert Report of Timothy Dragelin (Capitol's Expert), 4.

1

By its terms, and/or in the absence of objection, the plan complies with 11 U.S.C. §§ 1129(a)(1), (4)-(9), & (12) – (16). Despite the banks' objections, the plan complies with 11 U.S.C. §§ 1129(a)(2), (3), (10), & (11). And, on the facts of this case, the banks do not have standing to argue that the preservation by Pacific Retirement Services (PRS) of its ownership interest in Capitol violates the absolute priority rule. Even if they have standing to assert the benefit of the absolute priority rule, the banks have failed to prove that by contracting for services from its associated for-profit corporation, PRS, as a not-for-profit corporation, has retained incidents of ownership that the "fair and equitable" standard of § 1129 seeks to limit.

The plan as supplemented by the representation of Capitol's counsel, Thomas Califano, preserves all of the banks' properly perfected pre-petition security interests in the banks' collateral, and the plan complies with 11 U.S.C. § 1129(b)(2)(a)(i)(I). The plan provides that the banks' total secured claim ($57.6M), <u>and not</u> the present value of their collateral ($36M), will be reduced by the value of the debt service reserve fund ($3.8M) currently held by the trustee for the benefit of the banks. In the contest of experts Mr. Dragelin's testimony regarding the appropriate interest rate adjustment in this case was much the more persuasive and more firmly based. Mr. Dragelin started with a base rate of Prime (3.5%), and then, applying the factors enumerated by the Supreme Court in *Till v SCS Credit Corp.*, 541 U.S. 465 (2004), adjusted this rate upward by 1.15% for risk. Mr. Biermann lacks credentials and credibility. He used the same factors under more than one category to multiply their effect and failed to defend many of the adjustments suggested both as to character and degree. His testimony and analysis appeared to be facile and predirected to a result. The plan complies with § 1129(b)(2)(A)(i)(II)'s requirements that the banks receive deferred cash payments equaling the total value of their claims ($57.6M) and that these payments have a current value equaling the value of the banks' collateral ($36M).

1. *Compliance with § 1129(a).*

Capitol has established that the plan, on its face, either complies with, or is exempt from compliance (by virtue of inapplicability) with, 11 U.S.C. §§ 1129(a)(1), (4)-(9), & (12) – 16). Despite the banks' objections, the plan complies with 11 U.S.C. §§ 1129(a)(2), (3), (10), & (11).

   a. *§ 1129(a)(2) & § 1125's disclosure requirement*

Under § 1129(a)(2): "(a) The court shall confirm a plan only if all of the following requirements are met: (2) the proponent of the plan complies with the applicable provisions of this title." 11 U.S.C. § 1129. Further, "the legislative history of [§ 1129(a)(2)] indicates that Congress was concerned 'that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure.'" *In re Multiut Corp.*, 449 B.R. 323, 339 (Bankr. N.D. Ill. 2011) (quoting H.R. Rep. No. 95-695, at 412 (1977)).

Under the relevant provisions of § 1125:

(a) In this section -

> (1) "adequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information . . . .

(b) An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and written disclosure information. The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets.

3

11 U.S.C. § 1125 (2012).

The banks argued, relying on *In re Polytherm Industries, Inc.*, 33 B.R. 823 (W.D. Wis. 1983), that Capitol's failure to update its disclosure statement in conjunction with the filing of its fourth (4th) and fifth (5th) amended plans was a sanctionable violation of § 1129(a). Neither the Code nor *Polytherm* provided for that result here. Once a disclosure statement has been approved by the court any additional disclosures are required at the discretion of that court based on the equities and circumstances of the case.

> b. *§ 1129(a)(3)'s good faith requirement, impairment under § 1124, and § 1129(a)(10)'s impaired voting class requirement*

Under § 1129(a)(3) & (10):

(a) The court shall confirm a plan only if all of the following requirements are met:

> (3) The plan has been proposed in good faith and not by any means forbidden by law.
>
> (10) If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

11 U.S.C. § 1129 (2012).

Section 1124 defines impairment:

Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan –

> (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or
>
> (2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default –

4

> (A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title or of a kind that section 365(b)(2) expressly does not require to be cured;
>
> (B) reinstates the maturity of such claim or interest as such maturity existed before such default;
>
> (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law;
>
> (D) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and;
>
> (E) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

11 U.S.C. § 1124 (2012).

This court is familiar with the application of § 1129(a)(3)'s good faith requirement in the 7th Circuit. *See Matter of Madison Hotel Associates,* 749 F.2d 410 (7th Cir. 1984) ("In light of the totality of the circumstances, including the fact that MHA's plan will pay all creditors in full and thereby allow MHA to continue as a viable entity in accord with the purposes of Chapter 11, we agree with the bankruptcy court and hold that MHA's plan of reorganization satisfies the 'good faith' requirement of 11 U.S.C. § 1129(a)(3).") (citing Bankruptcy Judge Robert Martin's framework for analyzing § 1129(a)(3)'s good faith requirement). Here, the banks argued that Capitol artificially impaired the claims of Class 5 (resident) creditors and Class 7 (general unsecured creditors) in order to obtain superficial compliance with § 1129(a)(10), and that this artificial impairment, along with preferential treatment of PRS in the plan, violated § 1129(a)(3).

5

These allegations were not proved. And, in any event, the concept of artificial impairment is a chimera. Further, the banks' contention that the plan's proposed treatment of PRS violated § 1129(a)(3) was not proved.

   c. *§ 1129(a)(11)'s feasibility requirement*

Under § 1129(a)(11):

(a) The court shall confirm a plan only if all of the following requirements are met:

> (11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129 (2012). Courts in the 7th Circuit have repeatedly observed that, in order to satisfy § 1129(a)(11), "[t]he proponent need not demonstrate that a plan carries a guarantee of success." *In re Mayslake Vill.-Plainfield Campus, Inc.*, 441 B.R. 309, 316-17 (Bankr. N.D. Ill. 2010); *see also In re Brice Rd. Developments, L.L.C.*, 392 B.R. 274, 280 (B.A.P. 6th Cir. 2008) ("Importantly, 'the Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility.'") (quoting 7 Collier on Bankruptcy ¶ 1129.03[11] (15th ed. 2006)).

Here, the banks' protestations notwithstanding, Capitol met its burden in establishing that the proposed plan is feasible. Much support for feasibility came from the fact attorney Califano noted in argument, that the plan reduces Capitol's debt service obligations from $4.5M - $5M annually to $1.7M annually. This is an example of the classic adjustment of debt that is central to the concept of reorganization in bankruptcy. Although the payment of any amount 13 years hence is somewhat uncertain, the banks failed to prove that the balloon payment was unlikely to be made.

6

## 2. *Cramdown.*

Because the class of secured creditors has not accepted the plan, the requirements of § 1129(b)(2)(A) on "cramdown" are invoked. While § 1129(b)(2)(A) provides the requirements for cramming down classes of secured claims, the banks seek the protection afforded unsecured claims under § 1129(b)(2)(B) as well. That protection was surrendered and waived by the banks when they elected to be treated under § 1129(b)(2)(A).

Section § 1129(b) codifies the absolute priority rule. To wit:

> (b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.
>
>> (2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
>>
>> (B) With respect to a class of unsecured claims –
>>
>>> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property . . . .

11 U.S.C. § 1129 (2012).

Here, despite the fact that they no longer held unsecured claims, the banks contended that they had standing to argue that the preservation by PRS of its ownership interest in Capitol violated the absolute priority rule. Although the court is familiar with Judge Easterbrook's pronouncements in *In re Castleton Plaza, LP (Castleton I)*, 707 F.3d 821 (7th Cir. 2013), and *In re Castleton Plaza, LP (Castleton II)*, 561 F. App'x 561 (7th Cir. 2014), in this case the banks simply do not have standing to bring this argument. PRS is a not-for-profit corporation that's receiving no more than the opportunity to continue to serve a retirement community by its

7

treatment under the plan. No unsecured creditor has objected. In fact, the vote by the affected resident community was represented as being 97% in favor of the plan.

Under the relevant provisions of § 1129(b)(2)(A):

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes, the following requirements:

(A) With respect to a class of secured claims, the plan provides –

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity to the extent of the allowed amount of such claims . . . .

11 U.S.C. § 1129 (2012).

Here, the banks argued that the plan violated § 1129(b)(2)(A)(i)(I) by eliminating some of their pre-petition security interests in collateral. *See* Santander Objection, 14-16 (citing various sections of the new credit and security agreement). However, Capitol pointed to § 4.9 of the amended plan which provides: "To secure the payment of the Allowed Bank 1111(b) Claim, the Banks shall be entitled to retain all properly perfected liens that were held by the Banks as of the Petition Date, subject to the operation of section 552 of the Bankruptcy Code." Based on representations of attorney Califano that the debtor will cooperate and assist the Banks in perfecting security interests in all prepetition collateral in which the banks had perfected security interests and thereby preserve the banks' pre-petition collateral interests, the plan clearly protects these interests. Failure to so cooperate or assist would be a default under the plan's terms. The subsection in question specifically preserves liens and makes no specific provisions for continuing all covenants of the lending documents upon which the claim is based. The plan is therefore, sufficient

There was a lot of time spent during the hearing discussing how the ultimate disposition of the debt service reserve fund following confirmation of the plan would affect net present value calculations under §§ 1111(b) & 1129(b)(2)(A)(i)(II). This quibbling appears unnecessary when comparing the report of Capitol's expert with Santander's own filings. In the former, Mr. Dragelin observed that: "the Debtor assume[d] that approximately $3.8M of cash held in the Debtor's debt service reserve accounts [would] be drawn by the Lenders," thereby reducing "the Allowed Bank 1111(b) Claim[1] on or after the Effective Date, as defined in the Plan." Expert Report of Timothy Dragelin, 4. In the latter, Santander observed that:

> The Debtor's projections reflect a reduction in the principal amount of the Bank's claim of $3.799 million. (*See* Dkt. 340-7, Ex. G.) This reduction is on account of funds that are being held by the Trustee for the benefit of the Banks in the Debt Service Reserve Fund under the Loan Documents. These funds have been conceded by the Debtor not to be property of the estate. (Dkt. 146, Cash Collateral Order, ¶¶ D(4) and 14.) Because these funds are not property of the estate, *while they reduce the overall amount of the Bank's claims (and the total amount the Banks are to paid over time)*, these funds do not reduce the $36 million secured portion of the Banks' claims, and the Plan must provide to the Banks' [sic] the present value of the $36 million.

Santander Objection, 17 n. 9 (emphasis added). The parties agree that payment to the banks of the $3.8M debt reserve will reduce the amount the banks are to be paid over time ($57.6M) and not the current value of the banks' collateral ($36M). Attorney Califano's recognition of this fact during his closing arguments simply reinforces this conclusion. Contrary to what the banks seemed to contend during the hearing, nobody is disagreeing with them.

A majority of the hearing was spent arguing about what discount rate/interest rate should be used. Mr. Dragelin proposed a 4.65% rate. The banks' expert, Mr. Biermann, proposed an 8.37% rate. Mr. Dragelin's opinion was more persuasive.

---

[1] *See* Debtor's Fifth Amended Plan of Reorganization, §§ 1.7 & 4.9 (The "Allowed Bank 1111(b) Claim" referenced by Capitol in its plan is the banks' $57.6M claim).

In *Till v. SCS Credit Corp.*, the Court established a framework for bankruptcy courts to apply in devising interest rates in Chapter 13 cramdowns. 541 U.S. 465 (2004). The court suggests in a footnote that "picking a cramdown rate in a Chapter 11 case, it might make sense to ask what rate an efficient market would produce." *Id.* at 477 n. 14. In the absence of such a market, the Court prescribed the following approach. First:

> Taking its cue from ordinary lending practices, the approach begins by looking to the national prime rate, reported daily in the press, which reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default.

*Till*, 541 at 478-79. Next:

> Because bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers, the approach then requires a bankruptcy court to adjust the prime rate accordingly. The appropriate size of that risk adjustment depends, of course, on such factors as the [1] circumstances of the estate, the [2] nature of the security, and the [3] duration and [4] feasibility of the reorganization plan.

*Id.* at 479.

Mr. Dragelin's report first noted that due to the fact that Capitol is in bankruptcy there is no efficient market for this type of financing. It then highlighted that the Prime rate itself incorporates a degree of risk. *See id.* at 478-479 ("[T]he approach begins by looking to the national prime rate . . . which reflects . . . the relatively slight risk of default.").

As to *Till's* upward risk adjustment factors, Mr. Dragelin first adjusted upward .25% for circumstances of the estate, taking stock of things such as the character, commitment, and history of the borrower. Here, he found that good management and Capitol's history of debt repayment militated against increased risk in this category. Second, he adjusted upward .53% for nature of the security, taking stock of things such as Capitol's cash flow, the condition of the property, and the characteristics of the loan. Unlike Mr. Dragelin, Mr. Biermann, conducted a site visit as part

10

of his analysis. Third, he adjusted upward .37% for feasibility, taking stock of things such as Capitol's ability to make plan payments and ability to make the proposed balloon payment. Fourth, he declined to include an upward risk adjustment for duration, finding that the variable interest rate proposed in the plan eliminated the need to incorporate risk relating to future adjustments in the base rate in the upward adjustments. Mr. Dragelin's analysis resulted in a final upward risk adjustment of 1.15%.

Under the relevant provisions of § 1111(b):

(1)(A) A claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse unless –

(i) the class of which such claim is a part elects, by at least two-thirds in amount and more than half in number of allowed claims of such class, application of paragraph (2) of this subsection . . . . .

(2) If such an election is made, then notwithstanding section 506(a) of this title, such claim is a secured claim to the extent that such claim is allowed.

11 U.S.C. § 1111 (2012).

Under the relevant provisions of § 1129(b):

(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes, the following requirements:

(i)(I) . . . .

(II) that each holder of a claim of such class receive on account of such claim deferred cash payment totaling at least the allowed amount of such claim, of a value, as of the effective date of the

plan, of at least the value of such holder's interest in the estate's interest in such property . . . .

11 U.S.C. § 1129 (2012).

Taken together, these provisions require the plan to provide that the banks receive deferred cash payments equaling the total value of their claims ($57.6M), and that these deferred cash payments have a current value equaling the value of the banks' collateral ($36M). Given the court's valuation, and the adoption of Mr. Dragelin's proposed interest rate, the calculations actually become rather straightforward.

First, we multiply the present value of the banks' collateral ($36M) by the proposed interest rate (.0465%). This results in the $1,674,000 annual repayment figure. Here, Capitol has proposed twelve (12) years of $1,674,000 payments followed by a $33,720,000 balloon payment in year 13. Thus, we get the following calculation:

| Payment | Fiscal Year | Principal | Interest | Total | Balance |
|---|---|---|---|---|---|
| **Debt Reserve Fund** | | | | | $57,607,000 |
| 0 | 2016 | $3,799,000 | - | $3,799,000 | $53,808,000 |
| **Interest Only** | | | | | |
| 1 | 2017 | - | $1,674,000 | | |
| 2 | 2018 | - | $1,674,000 | | |
| 3 | 2019 | - | $1,674,000 | | |
| 4 | 2020 | - | $1,674,000 | | |
| 5 | 2021 | - | $1,674,000 | | |
| 6 | 2022 | - | $1,674,000 | | |
| 7 | 2023 | - | $1,674,000 | | |
| 8 | 2024 | - | $1,674,000 | | |
| 9 | 2025 | - | $1,674,000 | | |
| 10 | 2026 | - | $1,674,000 | | |
| 11 | 2027 | - | $1,674,000 | | |
| 12 | 2028 | - | $1,674,000 | | |
| **Balloon** | | | | | |
| 13 | 2029 | $33,720,000 | | | - |
| **Total Payments** | | $37,519,000 | $20,088,000 | $57,607,000 | - |

It is also worth noting that the proposed plan contains a back-stop provision which prohibits Capitol from paying less than the total deferred cash payment value of $57.6M. To wit:

> [I]n full and final satisfaction and discharge of and in exchange for the Allowed Bank 1111(b) Claim the Banks shall receive deferred cash payments equal to the total amount of the Allowed Bank 1111(b) Claim, less the total amount of Cash held in the Debtor's debt service reserve accounts that may be drawn by the Banks on or after the Effective Date.

Fifth Amended Plan, § 4.9. Accordingly, even if Capitol were to attempt to pay its obligation early, it would still be required to make payments totaling the $57.6M.

On the basis of the discussion above, which constitutes my findings of fact and conclusions of law, the fifth amended plan of the debtor, as supplemented and modified specifically during the hearing on confirmation and augmented by the representations and promises made by the debtor or its counsel during argument, is fit for confirmation. It may be so ordered.

Dated: June 27, 2016

_____
ROBERT D. MARTIN
UNITED STATES BANKRUPTCY JUDGE